1

2

3

4

5

6

7

8                                UNITED STATES DISTRICT COURT

9                               CENTRAL DISTRICT OF CALIFORNIA

10    FABIOLA ACEVEDO, JANE DOE 1,          Case No. 2:23-cv-01304-AB-AGR
11    JANE DOE 2, JANE DOE 3, and JOHN
      DOE 1,
12
13                        Plaintiffs,

14    v.

15                                          ORDER GRANTING IN PART AND
16    EXP REALTY, LLC; EXP WORLD            DENYING IN PART DEFENDANTS'
      HOLDINGS, INC.; MICHAEL L.            MOTIONS TO DISMISS PLAINTIFFS'
17    BJORKMAN; DAVID S. GOLDEN;            FIRST AMENDED COMPLAINT
      GLENN SANFORD; BRENT GOVE;
18    and DOES 1–10,
19
20                        Defendants.

21    **I.  INTRODUCTION**

22          Before the Court are four Motions to Dismiss Plaintiffs FABIOLA ACEVEDO,

23    JANE DOE 1, JANE DOE 2, JANE DOE 3, and JOHN DOE's ("Plaintiffs") First

24    Amended Complaint. (Dkt. 30). The motions were filed separately by Defendants EXP

25    REALTY, LLC, EXP WORLD HOLDINGS, INC., and GLENN SANFORD (Dkt. 41-

26    1); Defendant BRENT GOVE (Dkt. 63); Defendant MICHAEL L. BJORKMAN (Dkt.

27    77-1); and Defendant DAVID S. GOLDEN (Dkt. 88) ("Defendants"). Plaintiffs oppose

28                                          1.

Defendants' motions, (Dkts. 48, 71, 82, 101), and Defendants filed Replies. (Dkts. 55, 74, 89, 104). The Court held oral arguments on June 30, 2023, regarding Defendants eXp Realty, Sanford and Gove's motions, and on August 18, 2023, regarding Defendants Bjorkman and Golden's motions. For the reasons stated below, the Court **GRANTS in part and DENIES in part** Defendants' motions to dismiss.

## II. BACKGROUND

This case concerns allegations of a large real estate corporation's "longstanding culture" of allowing its most influential male agents to sexually assault female agents and then "silenc[e] those whose accounts of sexual harassment and assault would impact profit," in violation of the Trafficking Victims Protection Reauthorization Act. (Dkt. 30, "FAC" ¶¶ 1–2). In sum, Plaintiffs' First Amended Complaint alleges: (1) Defendants Bjorkman and Golden engaged in an ongoing venture to entice Plaintiffs Fabiola Acevedo ("Acevedo"), Jane Doe 1, Jane Doe 2 and Jane Doe 3 (collectively, "Plaintiffs" or "the female Plaintiffs") to travel to recruitment events with the promise of career advancement, knowing that they would use illicit drugs to cause the women to engage in a sex act; (2) Defendants eXp Realty, LLC, eXp World Holdings, Inc. (collectively, "eXp" or "eXp Realty"), Glenn Sanford, and Brent Gove knew of and ignored this conduct, so they could financially benefit from Bjorkman and Golden's recruiting activities; and (3) because of eXp's business model, Defendants continue to financially benefit and Plaintiffs continue to suffer damages. (*Id.*). Specifically, Plaintiffs allege the following.

### 1. eXp Realty

eXp Realty is a multi-level, "cloud-based," global real estate company that is publicly traded on the NASDAQ. (*Id.* ¶ 19). It is the "fastest growing residential real estate brokerage" and "largest independent brokerage on the planet." (*Id.* ¶¶ 20–21). eXp Realty has two "intricately intertwined" revenue streams: (1) the sale of residential and commercial properties which creates a Revenue Share Program ("RSP" or "the Pyramid"); and (2) the recruitment of agents to eXp. (*Id.* ¶ 22). The Pyramid operates

1    as follows.

2         eXp agents and brokers receive monthly and annual residual overrides on the

3    gross commission generated by agents or brokers they have recruited to eXp. (*Id.* ¶ 23).

4    eXp agents are automatically enrolled in the RSP, and their revenue share is based on

5    the number of "Front Line Qualifying Active" ("FLQA") agents they have recruited to

6    the company. (*Id.* ¶¶ 23, 25). FLQA agents are those who have met a certain sales

7    transaction volume. (*Id.* ¶ 23). eXp's business model—termed "Agent Attraction"—

8    incentivizes its agents to become "Sponsor Agents" whom eXp trains to entice

9    "Recruited Agents" to join the company. (*Id.* ¶¶ 25–26). The higher a Sponsor Agent is

10   placed in the Pyramid (the more tiers of Recruited Agents in their "downline") the more

11   money eXp pays that Sponsor Agent. (*Id.* ¶ 27). For example, agents receive 3.8% from

12   agents that are two tiers below them and only 3.5% from agents that are one tier below

13   them. (*Id.* ¶ 27). eXp receives a direct financial benefit every time a Sponsor Agent

14   recruits an agent including, but not limited to, various fees the Recruited Agent pays to

15   the company. (*Id.* ¶¶ 30–31). To qualify for RSP vesting, an agent must be affiliated

16   with eXp for at least 36 months, but a "Vested Participant" continues to share in the

17   income of their Recruited Agents after they disassociate from eXp. (*Id.* ¶ 24). Sponsor

18   Agents also receive a stock award every time one of their Recruited Agents sells a

19   property. (*Id.* ¶ 28). Top Sponsor Agents are "Influencers" who invite prospective and

20   current eXp agents to social networking events for the purpose of recruiting new agents

21   and retaining current agents. (*Id.* ¶ 29). An Influencer's role is to recruit as many agents

22   as possible to keep the Pyramid from collapsing. (*Id.* ¶ 32).

23        This case concerns the conduct of certain eXp Realty Influencers and members

24   of eXp Realty's executive "Leadership Team" related to the recruitment of the female

25   Plaintiffs. Defendant Michael L. Bjorkman ("Bjorkman") is a former eXp agent and

26   Influencer, and current RSP Vested Participant. (*Id.* ¶ 14). Defendant David S. Golden

27   ("Golden") is a current eXp Realty agent, Influencer and Vested Participant. (*Id.* ¶ 15).

28   Golden recruited Bjorkman to eXp Realty in August of 2018, Golden is Bjorkman's

Sponsor Agent, and Bjorkman is in Golden's downline. (*Id.* ¶¶ 15, 35, 37, 48). Prior to joining eXp, Bjorkman and Golden worked together at Remax. (*Id.* ¶ 36). Both Golden and Bjorkman were top Influencers, known for generating a substantial part of their income from recruitment. (*Id.* ¶¶ 38, 59, 205). According to Bjorkman's "eXp Agent Attraction Boot Camp" video, "your net worth directly relates to your network." (*Id.* ¶ 39). Plaintiffs allege Bjorkman and Golden built their network by making recruits feel like "family" in order to exploit their trust. (*Id.* ¶¶ 39–40, 60). Golden and/or Bjorkman recruited the female Plaintiffs and, with the exception of Jane Doe 2, all were in the Golden-Bjorkman downline with Bjorkman as their Sponsor Agent. (*Id.* ¶¶ 102, 111, 148).

Defendant Brent Gove ("Gove") is a current eXp agent, Influencer and RSP Vested Participant. (*Id.* ¶ 17). He is one of eXp's top recruiters and Golden and Bjorkman are two of 20,000 agents in Gove's downline. (*Id.* ¶¶ 17, 69). All female Plaintiffs were in Gove's downline. (*Id.* ¶¶ 102, 111, 148). Defendant Glenn Sanford ("Sanford") is the Founder and former CEO of eXp Realty. (*Id.* ¶¶ 14–16). As eXp's "Agent #1" he sits at the top of the Pyramid and every eXp agent is in his downline. (*Id.* ¶ 72). All Defendants previously worked together at Keller Williams. (*Id.* ¶ 250; Dkt. 48, "Sanford Opp." at 18).[1] At all relevant times, eXp's Leadership Team included, but was not limited to, Defendant Sanford, Jason Gesing, Jeff Whiteside, Jim Bramble, David Conrad, Michael Valdez, Courtney Keating, and Corey Haggard. (FAC ¶ 34).

Bjorkman and Golden regularly sponsored eXp recruitment events, a key part of which was to create the image of "success" and "being surrounded by beautiful women whom they could sexually exploit." (*Id.* ¶ 65). Plaintiffs allege Bjorkman and Golden enticed them to attend these events as part of a scheme to drug and sexually assault

---

[1] When citing to the parties' briefs, the Court refers to the page numbers at the upper right corner of each document and not the pagination at the bottom of the page.

them. (*Id.* ¶ 2). Plaintiffs allege Sanford, Gove and eXp Realty knew of, ignored and attempted to cover up this conduct so they could continue to financially benefit from Golden and Bjorkman's contribution to the Pyramid. (*Id.* ¶¶ 2, 70, 81–83, 176).

### 2. Fabiola Acevedo

Defendant Golden began recruiting Plaintiff Acevedo at a real estate networking event in early 2018. (*Id.* ¶ 89). Acevedo trusted Golden based on their long-term platonic friendship and Golden's reputation as a leader in the real estate business. (*Id.* ¶¶ 98, 90–91). After many conversations, she decided to join eXp with Golden as her Sponsor Agent, and a contract was sent to her with those terms. (*Id.* ¶¶ 92–93). Shortly thereafter, Golden recalled the contract and convinced Acevedo to name Bjorkman as her Sponsor Agent by telling her it would benefit her career to have more Sponsor Agents in her upline. (*Id.* ¶ 93).

Defendant Golden then explained to Acevedo that Bjorkman had purchased two tickets to a real estate networking event hosted by the Closing Table in Pelican Hill, California, between July 20 and July 22, 2018, and that it would be "good for her career" to attend. (*Id.* ¶ 94). Acevedo traveled from her home in Florida to California to be Bjorkman's guest, but was told there were no vacancies upon her arrival at the hotel. (*Id.* ¶¶ 97, 179, 193). Golden told her to stay in Bjorkman's hotel room and that she could trust him because they were "family." (*Id.* ¶ 97). Because she trusted Golden, Acevedo agreed. (*Id.* ¶ 97). That evening, Acevedo had a single cocktail with Bjorkman and others at the hotel bar. (*Id.* ¶ 99). She remembers nothing until the next morning when she woke up disoriented and naked in Bjorkman's hotel room. (*Id.* ¶¶ 99, 180). Bjorkman and another woman were naked in the other bed and a clothed man was on the floor. (*Id.* ¶ 99). Acevedo ran to the bathroom and Bjorkman followed her, exposing himself and attempting to engage her in sexual contact. (*Id.* ¶¶ 100, 181).

While Acevedo was at the Closing Table event, eXp sent her an offer to join the company with Bjorkman as her Sponsor Agent. (*Id.* ¶ 101). She signed the agreement on July 23, 2018, placing her in the Gove-Golden-Bjorkman downline. (*Id.* ¶¶ 101–02,

182). Acevedo is currently a licensed real estate agent at eXp Realty. (*Id.* ¶ 7). She alleges, as result of her trauma, she was unable to work as a real estate agent but continued to pay all fees required by Defendants. (*Id.* ¶ 103).

### 3. Jane Doe 1

Jane Doe 1 is a real estate agent and former business partner of Bjorkman's, whom he recruited to join eXp Realty. (*Id.* ¶¶ 107–08).[2] Like Acevedo, Jane Doe 1 was in the Gove-Golden-Bjorkman downline. (*Id.* ¶ 111). Initially Jane Doe 1 refused to join eXp based on Golden's reputation as a "dirtbag" and "rapist" and her reluctance to have him in her upline. (*Id.* ¶¶ 108–109). After "incessant recruiting efforts," Jane Doe 1 agreed to name Bjorkman as her Sponsor Agent, in return for a 50/50 share in all revenue share, stock and financial gain from eXp. (*Id.* ¶ 110).

Shortly thereafter, on April 11, 2019, Jane Doe 1 attended an event hosted by the Closing Table in Beverly Hills, California, for the purpose of learning and recruiting more real estate agents to join eXp Realty. (*Id.* ¶ 112). At dinner with Bjorkman and other attendees Jane Doe 1 had one glass of wine, followed by one drink at the hotel bar. (*Id.* ¶¶ 113–14). Later that evening, one of the event hosts invited attendees to his hotel room and Jane Doe 1 felt professionally obligated to attend. (*Id.* ¶ 115). When she arrived, Bjorkman handed her a drink and she quickly "blacked out." (*Id.* ¶ 116–17). She woke up the next day naked in her hotel room, which was in disarray. (*Id.* ¶117). She felt sick, had a "spotty memory" and experienced pain. (*Id.* ¶¶ 117–18). She went to the bathroom and saw blood from her vagina. (*Id.* ¶ 118). When Bjorkman called her soon after, she got "flashes of memories" and accused him of having sex with her, which he denied. (*Id.* ¶¶ 119–120). A few days later, Bjorkman sent Jane Doe 1 a video of her "hallucinating" on the night of the event to "prove" she had been drunk. (*Id.* ¶¶ 121,

---

[2] Based on Plaintiffs' statements made in court on June 30, 2023, Bjorkman recruited Jane Doe 1 to join eXp Realty in April of 2019. (*Id.* ¶¶ 121,

185). Jane Doe 1 has no memory of the events depicted, despite having consumed only three drinks that evening. (*Id.* ¶¶ 121, 185).

On April 27, 2019, Jane Doe 1 and Bjorkman attended another networking and recruiting event in San Antonio, Texas, where she continued to ask if he had assaulted her at the previous event. (*Id.* ¶¶ 123–24). Bjorkman eventually admitted that they did have sex but he hadn't wanted to "embarrass" her because she had been "fucked up" and "all over him." (*Id.*).  Bjorkman did not admit to drugging Jane Doe 1. (*Id.* ¶¶ 124, 184). Jane Doe 1 decided she would sever ties with eXp as soon as financially possible, (*id.* ¶¶ 125, 127), though she continues to be a licensed eXp real estate agent. (*Id.* ¶ 8). She alleges extreme emotional distress, PTSD, and lost business as a result of the assault. (*Id.*  ¶ 128).

### 4. Jane Doe 2

Jane Doe 2 was invited as a prospective recruit to attend an eXp event at the Wynn and Encore Hotel and Casino in Las Vegas, Nevada, from August 27, 2020 to August 30, 2020 ("the Las Vegas event"). (*Id.* ¶¶ 131, 186). The event was hosted by Golden and Bjorkman, and Jane Doe 2 traveled from California to attend. (*Id.* ¶¶ 131, 186, 198).

On Thursday, August 27, Jane Doe 2 attended a get-together at Golden and Bjorkman's pool cabana. (*Id.* ¶ 145). Afterwards, Bjorkman asked Jane Doe 2 to stay behind to have a cigarette and then invited her to his hotel suite where he said "everyone" would be networking. (*Id.*). When she got there, the only people present were Golden and his girlfriend, who pressured her to have another drink. (*Id.*). Jane Doe 2 declined and returned to her hotel room. (*Id.*).

On Friday, August 28, Jane Doe 2 and other attendees took an eXp-provided bus from their hotel to the home of influential real estate coach and event guest speaker, Jon Cheplak, in Henderson, Nevada. (*Id.* ¶ 132). Defendant Gove and many other eXp agents attended to discuss Agent Attraction and the Pyramid. (*Id.*).  The bus returned attendees to the Wynn Hotel, where Jane Doe 2 attended a get-together hosted by

Golden and Bjorkman in their hotel room. (*Id.* ¶¶ 134–35). Jane Doe 2 poured herself a single cup of vodka and soda water which she sipped during the event. (*Id.* ¶¶ 136–37). She then left to have dinner at Caesar's Palace. (*Id.* ¶ 138). Jane Doe 2 has a limited memory of the remainder of the evening, though she recalls excusing herself from the table to vomit, and waking up the next morning feeling groggy with a headache. (*Id.* ¶¶ 139–141).

Coworkers that were at dinner with Jane Doe 2 told her that she left the table multiple times and they found her in the bathroom. (*Id.* ¶ 142). Jane Doe 2 posted about her experience on Facebook and, though she did not name Defendants Bjorkman and Golden, she discovered that other women associated with eXp Realty had been drugged, rendered incapacitated and sexually assaulted at eXp recruitment events, including the Las Vegas event. (*Id.* ¶¶ 143, 187). Jane Doe 2 believes she was also drugged by Defendants Golden and Bjorkman. (*Id.* ¶ 144).

After the Las Vegas event, Bjorkman and his downline agents continued to recruit Jane Doe 2 so that she would select someone from Bjorkman's downline as her Sponsor Agent. (*Id.* ¶ 188). Jane Doe 2 eventually joined eXp but named another Sponsor Agent, placing her out of Bjorkman's downline but in Gove's downline. (*Id.* ¶ 200). Jane Doe 2 continues to be a licensed real estate agent at eXp Realty. (*Id.* ¶ 9). As a result of the incident, Plaintiff alleges extreme emotional distress and lost business opportunities. (*Id.* ¶ 146).

**5. Jane Doe 3**

Jane Doe 3 was an eXp agent whom Bjorkman recruited. (*Id.* ¶¶ 147–48).[3] Bjorkman, as her Sponsor Agent, and Golden both invited Jane Doe 3 to the Las Vegas event, telling her it "would be good for her real estate career to attend." (*Id.* ¶¶ 148,

---

[3] Based on Plaintiffs' statements made in court on June 30, 2023, this occurred in February of 2019.

189). On Thursday, August 27, Jane Doe 3 traveled from Florida to stay at the Encore Hotel and Casino, where parts of the event were hosted. (*Id.* ¶¶ 149, 189, 201).

On Saturday, August 29, Jane Doe 3 went to Bjorkman and Golden's hotel suite at the Wynn Hotel for an eXp get-together. (*Id.* ¶ 150). At some point, Golden became upset and Jane Doe 3 and Bjorkman left to walk on the Las Vegas Strip and gamble in the casino. (*Id.*). After they returned to the hotel suite, Jane Doe 3's memory became "spotty and limited" for the rest of the evening, though she recalls being sexually assaulted by Bjorkman. (*Id.* ¶¶ 151–52). She also  recalls Bjorkman and Golden consuming GHB from a plastic "5 Hour energy" bottle and telling her they do so recreationally. (*Id.* ¶¶ 153, 190).[4]  After the event, Defendant Bjorkman "gave Jane Doe 3 a highly valuable" FLQA agent. (*Id.* ¶¶ 191, 203).

A few weeks later, Defendant Golden encouraged Jane Doe 3 to lie to police, and people associated with Bjorkman and Golden sent her threatening messages. (*Id.* ¶¶ 154–55). Jane Doe 3 is no longer an eXp agent. (*Id.* ¶ 10). Plaintiff alleges she suffered and continues to suffer from PTSD and extreme emotional distress. (*Id.* ¶ 159). Her husband, Plaintiff John Doe, also alleges loss of consortium. (*Id.* ¶ 162).

**6.  eXp Realty's response**

Jane Doe 2 and Jane Doe 3 reported their experiences to eXp's Leadership Team shortly after the Las Vegas event, in August of 2020. (*Id.* ¶ 164). Plaintiffs allege Defendants eXp, Sanford and Gove had actual knowledge of Defendants Golden and

---

[4] GHB (Gamma-Hydroxybutric Acid) is commonly known as the "date rape" drug. It comes in a liquid or as a white powder that is dissolved in water, juice, or alcohol. In liquid form, GHB is clear and colorless. When taken, it can cause hallucinations, euphoria, drowsiness, decreased anxiety, excited and aggressive behavior. Overdose symptoms include unconsciousness, seizures, slowed heart rate, greatly slowed breathing, lower body temperature, vomiting, nausea, coma, and death. (FAC ¶ 61, n. 4) (citing https:www/dea.gov/factsheets/ghb-gamma-hydroxybutyric-acid).

Bjorkman's conduct before this. (*Id.* ¶ 163).[5] Plaintiffs allege eXp took no action against Golden because his upline agents—namely, Defendants Gove and Sanford—stood to lose substantial income. (*Id.* ¶ 68). eXp Board Member Gene Frederick ("Frederick") was heard saying, "[Jane Doe 3] wants [Golden] fired, and we all know that's not going to happen." (*Id.* ¶ 171). Gove threatened to pull his entire team, which was roughly one-fifth of the company. (*Id.* ¶ 74). Sanford, Gove, and eXp eventually "came to an agreement" to keep Golden, but remove Bjorkman. (*Id.* ¶ 75).

On September 18, 2020, Bjorkman's contract with eXp Realty was terminated. (*Id.* ¶¶ 48, 50). However, eXp decided it made "economic sense" to pay Bjorkman his downline revenue, allowing him to become a Vested Participant despite the fact that he had been at eXp less than 36 months. (*Id.* ¶¶ 51–52, 78). eXp did not grant the same vesting exception to Jane Doe 3, nor did they allow her to switch Sponsor Agents, forcing her to pay Bjorkman and Golden. (*Id.* ¶¶ 53, 55). Plaintiffs allege eXp denied a similar request by an anonymous agent who reported Golden had raped her. (*Id.* ¶ 175). Jane Doe 1 also reported her assault to Corey Haggard in or around October of 2020 and repeatedly requested to move downlines. (*Id.* ¶¶ 129, 130, 165). Fearing more women would come forward, eXp initially denied this request. (*Id.* ¶ 166). While eXp eventually agreed to move Jane Doe 1, they refused to pay her the part of the revenue share that they were sending to Bjorkman. (*Id.* ¶ 130). eXp continued to promote Golden as one of their "respected agents" and former CEO Jason Gesing still works closely with Golden. (*Id.* ¶¶ 67, 170). eXp allowed Bjorkman to attend eXp events where Frederick publicly socialized with Bjorkman and Golden. (*Id.* ¶¶ 54, 169). Bjorkman is currently an RSP Vested Participant. (*Id.* ¶ 50).

Around this time, the Las Vegas Police Department ("LVPD") was investigating

---

[5] Plaintiffs allege, for example, Defendant Gove personally hosted recruiting events where Defendant Bjorkman and Golden assaulted other women. (FAC ¶ 71).

the sexual assault of Jane Doe 3, and Gove allegedly asked multiple eXp agents to make false statements as part of that investigation. (*Id.* ¶¶ 43, 156, 233). On March 3, 2021, Jane Doe 3 discussed her assault with Gove, who told her that he saw her at the Las Vegas event, she had been "out of her mind" and he "had no idea what she was talking about" regarding the assault, but "hoped it wasn't true." (*Id.* ¶¶ 157–58). On March 8, 2021, Bjorkman was arrested in Miami-Dade, Florida, on two counts of sexual assault of Jane Doe 3. (*Id.* ¶ 42).[6] The Arrest Warrant Declaration includes multiple accounts of women being drugged and assaulted by Bjorkman at eXp Realty recruitment events, as well as a "long history" of similar accusations dating back to 2000. (*Id.* ¶¶ 43–44, 47). This includes an eXp agent that reported her 2007 rape to Frank Crandall in October of 2018. (*Id.* ¶¶ 45–46). The  same woman tried to report the incident to eXp Realty's Designated California Broker, Debbie Penny, but never received a response. (*Id.* ¶ 46). Many women informed the LVPD that they personally saw Golden with GHB which they believed was used to drug them. (*Id.* ¶ 61). Several women reported that Golden was a participant in their sexual assault, and that Golden and Bjorkman both had videos of their assault. (*Id.* ¶¶ 61–63). Police obtained a search warrant for Golden's cell phone, the digital extraction of which remains in police custody. (*Id.* ¶ 64).

Certain members of eXp's Leadership Team and the Board of Directors suggested ways in which eXp could assist the women, such as changing their sponsors, which Sanford explicitly rejected. (*Id.* ¶ 168). On March 7, 2022, Acevedo discussed her assault with Sanford, who did not offer any support. (*Id.* ¶¶ 104, 172). On June 9, 2022, Acevedo discussed her assault with then CEO, Jason Gesing, who did not offer any support. (*Id.* ¶¶ 105, 173). Acevedo reached out to several people at eXp who did not offer help. (*Id.* ¶ 174).   Rather, Plaintiffs allege eXp attempted to cover up

---

[6] These charges have since been dismissed. (Dkt. 71, "Gove Opp." at 19).

11

Acevedo's assault through the use of nondisclosure agreements. (*Id.* ¶ 83).[7] Similarly, Plaintiffs allege eXp silenced or terminated those that knew its past president had sexually assaulted women. (*Id.* ¶ 177).

### 7. Procedural background

Based on the above allegations, Plaintiffs bring three causes of action under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §§ 1591, 1595, as well as several state tort claims. (*Id.* ¶¶ 178–210). Plaintiffs filed a Complaint on February 22, 2023, (Dkt. 1), and a First Amended Complaint on March 2, 2023. (FAC). Female Plaintiffs allege Defendant Bjorkman perpetrated sex trafficking under the TVPRA (Count 1), and Acevedo, Jane Doe 2 and Jane Doe 3 allege Defendant Golden also perpetrated sex trafficking (Count 2). (FAC ¶¶ 178–203). Female Plaintiffs allege Defendants Golden, Gove, Sanford and eXp Realty benefitted from sex trafficking within the meaning of the TVPRA (Count 3). (*Id.* ¶¶ 204–210). Acevedo, Jane Doe 1 and Jane Doe 3 bring a sexual battery claim against Defendant Bjorkman (Count 4) and all female Plaintiffs allege civil battery against Bjorkman (Count 5). (*Id.* ¶¶ 211–223). Jane Doe 2 and Jane Doe 3 also allege civil battery against Golden (Count 5). (*Id.* ¶¶ 216–223). Female Plaintiffs bring a claim for intentional infliction of emotional distress against Defendants Bjorkman, Golden, Gove and Sanford (Counts 6–8). (*Id.* ¶¶ 224–241). Female Plaintiffs allege negligence against all Defendants (Count 9) and negligent hiring, retention and supervision against Defendants Sanford and eXp Realty (Count 10). (*Id.* ¶¶ 242–252). John Doe brings one claim for loss of consortium against all Defendants (Count 11). (*Id.* ¶¶ 253–54). Plaintiffs also sue Does 1–10, whose names and corporate or individual capacities are unknown. (*Id.* ¶ 18).

On April 13, 2023, Defendants eXp Realty and Sanford filed a Motion to Dismiss

---

[7] On June 30, 2023, Plaintiffs stated to the Court that this allegation refers to Acevedo, but that Plaintiffs have subsequently learned many other women were given non-disclosure agreements, prior to the alleged assaults here.

Plaintiffs' Fist Amended Complaint. (Dkt. 41-1, "Sanford MTD"). Plaintiffs filed an Opposition on April 21, 2023, (Dkt. 48, "Sanford Opp."), and Defendants filed a Reply on April 28, 2023. (Dkt. 55, "Sanford Reply"). Defendant Gove then filed a Motion to Dismiss on May 26, 2023. (Dkt. 63-1, "Gove MTD"). Plaintiffs filed their Opposition on June 9, 2023, (Dkt. 71, "Gove Opp."), and Gove filed a Reply on June 16, 2023. (Dkt. 74, "Gove Reply"). The Court held a hearing on June 30, 2023, and took the motions under submission. (Dkt. 79). On July 12, 2023, the Court granted Gove's Ex Parte Application to File Supplemental Briefing, (Dkt. 81), on the effect of recent amendments made to the TVPRA. (Dkt. 90). The Court has considered the parties' briefing on that issue. (Dkts. 83, 98).

On  June 27, 2023, Defendant Bjorkman filed a Motion to Dismiss Plaintiffs' First Amended Complaint. (Dkt. 77-1, "Bjorkman MTD"). On July 7, 2023, Plaintiffs filed an Opposition, (Dkt. 82, "Bjorkman Opp."), and Bjorkman filed a Reply on July 12, 2023. (Dkt. 89, "Bjorkman Reply"). On July 11, 2023, Defendant Golden filed a Motion to Dismiss. (Dkt. 88, "Golden MTD"). On July 28, 2023, Plaintiffs filed an Opposition, (Dkt. 101, "Golden Opp."), and Golden filed a Reply on August 4, 2023. (Dkt. 104, "Golden Reply"). The Court held a hearing on August 18, 2023, and took the motions under submission. (Dkt. 111). On August 28, 2023, the Court ordered supplemental briefing on the effect of recent state law legislation, in response to Golden's argument that some of Plaintiffs' state law claims are barred by Nevada's two-year statute of limitations. (Dkt. 118). The Court has considered that briefing. (Dkts. 121–23).

All four motions discuss the extent to which the TVPRA applies in this case—whether it applies at all and, if so, whether any or all Defendants are liable under direct or beneficiary theories—and whether Plaintiffs' state claims are timely. Defendants eXp Realty, Sanford and Gove set forth additional arguments as to why the Court should dismiss Plaintiffs' state causes of action. Considering the overlapping nature of Defendants' motions, the Court addresses Plaintiffs' claims in the following order: (1)

Defendants Bjorkman and Golden's direct liability under § 1591; (2) Defendants Golden, eXp Realty, Sanford, and Gove's beneficiary liability under § 1595; (3) whether Plaintiffs' state law claims are procedurally barred; and (4) whether Plaintiffs have otherwise sufficiently pled their state law claims against Defendants eXp Realty, Sanford and Gove.

## III.    LEGAL STANDARDS

### 1. Motion to dismiss standard

Federal Rule of Civil Procedure 8 requires a plaintiff to present a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a pleading for failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

To defeat a Rule 12(b)(6) motion to dismiss, the complaint must provide enough factual detail to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must also be "plausible on its face," meaning that it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570). A plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. Labels, conclusions, and "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

A complaint may be dismissed under Rule 12(b)(6) for the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). When ruling on a Rule 12(b)(6) motion, "a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But a court is

14

"not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (2009) (internal quotation marks omitted).

The court generally may not consider materials other than facts alleged in the complaint and documents that are made a part of the complaint. *Anderson v. Angelone*, 86 F.3d 932, 934 (9th Cir. 1996). However, a court may consider materials if (1) the authenticity of the materials is not disputed and (2) the plaintiff has alleged the existence of the materials in the complaint or the complaint "necessarily relies" on the materials. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (citation omitted). The court may also take judicial notice of matters of public record outside the pleadings and consider them for purposes of the motion to dismiss. *Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646, 649 (9th Cir. 1988); *Lee*, 250 F.3d at 689–690.

## 2. TVPRA

Congress enacted the Trafficking Victims Protection Act of 2000 ("TVPA") to "combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominately women and children, to ensure just and effective punishment of traffickers, and to protect their victims." *Ditullio v. Boehm,* 662 F.3d 1091, 1094 (9th Cir. 2011) (quoting Pub. L. No. 106–386, 114 Stat. 1464 (Oct. 28, 2000) (codified as amended at 18 U.S.C. § 1589 et. seq.)). The legislation created several new federal criminal offenses for forced labor and sex trafficking "intended to more comprehensively and effectively combat human trafficking." *Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159, 1164 (9th Cir. 2022) (quoting *Roe v. Howard*, 917 F.3d 229, 236 (4th Cir. 2019)).[8] Congress has repeatedly reauthorized and amended the Trafficking Victims Protection and Reauthorization Act ("TVPRA") to expand

_____

[8] Section 1589 imposes criminal liability for forced labor; Section 1590 for trafficking with respect to peonage, slavery, involuntary servitude, or forced labor; and Section 1591 for sex trafficking of children or by force, fraud, or coercion. 18 U.S.C. §§ 1589, 1590, 1591.

coverage—most significantly, by creating a civil remedy against traffickers and then extending liability to those that benefit from what they should have known was a trafficking venture. [9] The Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108–193, 117 Stat. 2875 (Dec. 19, 2003) (enacted as amended at 18 U.S.C. § 1595) (creating civil liability); William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110–457, 122 Stat. 5044 (Dec. 23, 2008) (enacted as amended at 18 U.S.C. § 1595) (including civil liability for beneficiaries).

Two provisions of the TVPRA are relevant to this case. First, 18 U.S.C. § 1591 provides for criminal penalties for sex trafficking:

(a) Whoever knowingly—

(1) in or affecting interstate or foreign commerce, ... recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or

(2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),

knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

18 U.S.C. § 1591(a). Section 1591 defines "participation in a venture" as "knowingly assisting, supporting, or facilitating a violation of subsection (a)(1)," 18 U.S.C. § 1591(e)(4), "venture" as "any group of two or more individuals associated in fact, whether or not a legal entity," 18 U.S.C. § 1591(e)(6), and "commercial sex act" as "any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3).

---

[9] The Court hereinafter refers to the TVPA, as reauthorized and amended, as the TVPRA.

16

Second, 18 U.S.C. § 1595 sets forth the standard for civil liability under the

TVPRA. That section currently provides:

> An individual who is a victim of a violation of this chapter may bring a
> civil action against the perpetrator (or whoever knowingly benefits, or
> attempts or conspires to benefit, financially or by receiving anything of
> value from participation in a venture which that person knew or should
> have known has engaged in an act in violation of this chapter) in an
> appropriate district court of the United States and may recover damages
> and reasonable attorneys fees.

18 U.S.C. § 1595(a).[10] Thus, § 1595 provides trafficking victims with a private right of

action to pursue claims against perpetrators of trafficking ("direct liability") or those

who knowingly financially benefit from trafficking ("beneficiary liability"). *Doe v.

Mindgeek,* 558 F. Supp. 3d 828, 835 (C.D. Cal. 2021) (*Mindgeek*). The requirements

for beneficiary liability can be stated as follows: (1) the person or entity must

"knowingly benefit[ ], financially or by receiving anything of value," (2) from

participating in a venture, (3) that the "person knew or should have known has engaged

in an act in violation of [the TVPRA]." 18 U.S.C. § 1595(a); *M.A. v. Wyndham Hotels

& Resorts, Inc.*, 425 F. Supp. 3d 959, 964 (S.D. Ohio 2019).

## IV.  DISCUSSION

### 1.  Counts 1 and 2: TVPRA direct liability

Plaintiffs' first two causes of action are for violation of § 1591 of the TVPRA,

18 U.S.C. § 1591. A "perpetrator" of sex trafficking can be either a direct violator under

§ 1591(a)(1) or a participant under § 1591(a)(2), but both require actual knowledge of

the trafficking under § 1591(e)(4). *Geiss v. Weinstein*, 383 F. Supp. 3d 156, 167, n. 3

---

[10] In 2023, Congress amended § 1595 to permit recovery against anyone who "attempts
or conspires to benefit" from sex trafficking. Abolish Trafficking Reauthorization Act
of 2022, Pub. L. No. 117–347, 136 Stat. 6199 (Jan. 5, 2003) (enacted as amended at 18
U.S.C. § 1595). Defendant Gove argues this amendment cannot be applied
retroactively, (Dkt. 83), but Plaintiffs only allege attempt as to the benefit he continues
to seek. (Dkt. 98 at 2). *See* discussion *infra* Part IV, 2, a, iii.

(S.D.N.Y. 2019). Here, Plaintiffs allege direct violator liability against both Bjorkman and Golden under § 1591(a)(1). Accordingly, Plaintiffs must adequately plead that Bjorkman and Golden knowingly and in interstate or foreign commerce: (1) recruited, enticed, harbored, transported, provided, obtained, or maintained by any means a person; (2) "knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud … or any combination of such means will be used"; (3) "to cause the person to engage in a commercial sex act." 18 U.S.C. § 1591. In sum, Plaintiffs allege that Bjorkman and Golden enticed them with career advancement—including recruitment opportunities, training materials, and coaching by top Influencers—to attend networking events so that Defendants could lure them into hotel rooms, knowing that drugs would be used to cause their assault. (FAC ¶ 2; Bjorkman Opp. at 7). The Court finds these allegations plausibly establish that both Defendants directly violated § 1591(a)(1).

As a threshold matter, the Court agrees with Plaintiffs that the "enticement" used to induce the sex act and the "commercial" nature of the sex act itself are intertwined—if not, in some instances, the same thing. (*See* Bjorkman Opp. at 6, n. 2). Moreover, the parties agree that a series of cases analyzing claims brought against movie producer Harvey Weinstein make clear that enticement of victims by means of fraudulent promises of career advancement for the purpose of engaging them in sexual activity is violative of the TVPRA. (Bjorkman MTD at 11–12; Golden MTD at 10; Bjorkman Opp. at 6–7; Golden Opp. at 5) (all citing *Geiss*). In other words, the career opportunity can be the thing used to entice the victim *and* the thing of value that makes the sex act commercial.

All female Plaintiffs bring a claim against Bjorkman (Count 1), and Acevedo, Jane Doe 2 and Jane Doe 3 bring a claim against Golden (Count 2). (FAC ¶¶ 178–203). Defendants move to dismiss on two grounds: (1) Plaintiffs fail to allege "enticement" and (2) Plaintiffs fail to allege a "commercial sex act." (Bjorkman MTD at 11–20; Golden MTD at 6–8). Particularly, both Defendants argue the Weinstein cases

demonstrate that a "commercial sex act" requires a "quid pro quo" exchange. (Bjorkman MTD at 12–15; Golden MTD at 7–8). As discussed below, the Court disagrees and denies Defendants' motions to dismiss Counts 1 and 2.

### a. Sections 1591 and 1595 require broad interpretation

Though not raised by Bjorkman and Golden, the Court rejects Defendants eXp Realty, Sanford and Gove's argument that the TVPRA is wholly inapplicable to the circumstances alleged here. (Sanford MTD at 18; Gove MTD at 25) (both arguing Plaintiffs seek to "transform" workplace sexual assault into federal sex trafficking offenses). This belies the TVPRA's statutory construction and caselaw.

Section 1595, which permits civil actions for damages under § 1591, amended the TVPRA for the remedial purpose of "enhancing provisions on prevention of trafficking, protections of victims of trafficking, and prosecution of traffickers[.]" H.R. Rep. No. 108–264(I), 8, 2004 U.S.C.C.A.N. 2408, 2408. Remedial statutes require broad interpretation. *See Peyton v. Rowe,* 391 U.S. 54, 65 (1968) (recognizing the "canon of construction that remedial statutes should be liberally construed."); *see also Marshall v. Coastal Growers Ass'n*, 598 F.2d 521, 525 (9th Cir. 1979) (applying *Peyton* and finding the Farm Labor Registration Act should be broadly construed because it is remedial). Sections 1591 and 1595 also employ broad, expansive language. *See*, *e.g.*, *Noble v. Weinstein,* 335 F. Supp. 3d 504, 515–16 (S.D.N.Y. 2018) ("Congress's use of the word 'whoever' and its repeated use of the word 'any' does not lend itself to restrictive interpretation.") (citing *United States v. Jungers*, 702 F.3d 1066, 1070 (8th Cir. 2013)). "Where, as here, a broad statute has a plain and unambiguous meaning, it ought to be interpreted broadly." *Noble*, 335 F. Supp. 3d at 516 (citing *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004)).

Thus, numerous courts have found "the TVPRA covers allegations of coercive sexual assault where the defendant uses force and/or fraud to entice the plaintiff to engage in a 'commercial sex act,' even if the defendant has not 'trafficked' the plaintiff within the ordinary or traditional meaning of that word." *David v. Weinstein Company,*

*LLC*, 431 F. Supp. 3d 290, 299 (S.D.N.Y. 2019). *See Ardolf v. Weber,* 332 F.R.D. 467, 473 (S.D.N.Y. 2019) ("Even though this law has been traditionally used to prosecute the types of sex trafficking that Defendant describes, [i.e., 'the illicit sex trade and human trafficking for commercial gain,'] that does not mean that it only applies in those circumstances."); *Geiss*, 383 F. Supp. 3d at 168 ("[T]he TVPA extends to enticement of victims by means of fraudulent promises of career advancement, for the purpose of engaging them in consensual or, as alleged here, non-consensual sexual activity."); *Canosa v. Ziff*, No. 18 Civ. 4115 (PAE), 2019 WL 498865, at *23 (S.D.N.Y. Jan. 28, 2019) ("[Defendants'] attempt to cabin the TVPA to reach only caricatures of child slavery, and to exclude corporate-supported conduct, is wholly unpersuasive. The text of the TVPA does not provide any charter for this self-serving distinction."); *Noble*, 335 F. Supp. 3d at 516 (rejecting the argument that "the application of Section 1591 should be limited to 'the type of criminality for which the Government has historically prosecuted under Section 1591, such as child prostitution, torture, and child pornography,' " and noting that "other courts have applied Section 1591 to defendants who have lured women, under false pretenses and with lucrative promises, for sexual purposes") (citations omitted); *see also Huett v. Weinstein Co. LLC,* No. 18-cv-06012-SVW-MRW, 2018 WL 6314159, at *1 (C.D. Cal. Nov. 5, 2018) ("[N]otwithstanding Defendant's argument regarding legislative intent, there are reasons to believe that Sections 1591 and 1595 should be interpreted broadly.").

Thus, while this might not be the "archetypal" sex trafficking action, *see Noble* 335 F. Supp. 3d at 515, the TVPRA extends to allegations such as those described in Plaintiffs' First Amended Complaint.

### b. Enticement

Defendants argue that Plaintiffs have failed to sufficiently plead "enticement" as required by § 1591. (Bjorkman MTD at 18–20; Golden MTD at 7). When a word is undefined in a statute courts "normally construe it in accord with its ordinary and natural meaning." *Smith v. United States,* 508 U.S. 223, 228 (1993); *F.D.I.C. v. Meyer,* 510

U.S. 471, 476 (1994) ("In the absence of such a definition, we construe a statutory term
in accordance with its ordinary or natural meaning."). The ordinary and natural meaning
of "entice" is "to attract artfully or adroitly or by arousing hope or desire." MERRIAM-
WEBSTER          ONLINE          DICTIONARY,          https://www.merriam-
webster.com/dictionary/entice (last visited Jan. 24, 2024); *see also Noble*, 335 F. Supp.
3d at 517 (defining "entice" under § 1591 as "to attract artfully or adroitly or by arousing
hope or desire" or "to attract or tempt by offering pleasure or advantage"); *Ardolf,* 332
F.R.D. at 474 (same). Here, Plaintiffs allege Defendants enticed them with the chance
to have a lucrative career as an eXp Realty agent, if they joined the Gove-Golden-
Bjorkman downline and recruited other agents. Defendants argue this does not satisfy
the definition of enticement. The Court disagrees.

Acevedo alleges Golden recruited her to join eXp, stressed the importance of
attending the Closing Table event as Bjorkman's guest and choosing him as her Sponsor
Agent, and then convinced her to stay in Bjorkman's hotel room where Bjorkman
drugged and assaulted her. (FAC ¶¶ 90–94, 97, 101, 182).[11] Jane Doe 1 alleges
Bjorkman recruited her to join eXp and choose him as her Sponsor Agent, that she
attended the Closing Table event with him for the purpose of attracting more agents to
their downline, and she was motivated by this purpose to attend the smaller gathering
where Bjorkman drugged and assaulted her. (*Id.* ¶¶ 112, 185). Jane Doe 2 alleges the
following: she was invited as a prospective eXp recruit to attend the Las Vegas event;
she was promised coaching by the famous John Cheplak and Defendant Gove;
Defendants Golden and Bjorkman hosted the larger event, as well as the smaller
gatherings; Bjorkman and Golden attempted to get Jane Doe 2 to drink with them in

---

[11] Implicit in these allegations is that Bjorkman also enticed Acevedo. For example, he
clearly invited, or at the very least allowed, Acevedo to attend the event as his guest and
stay in his hotel room. (FAC ¶¶ 94, 97–99). Regardless, Bjorkman admits to telling
Acevedo she should attend the event. (*See* Bjorkman MTD at 19).

their hotel suite under the false pretense that other event attendees would be there; and the next night she attended a networking event in Defendants' hotel suite where she was drugged. (*Id.* ¶¶ 131–32, 135, 145). Jane Doe 3 alleges both Bjorkman (her Sponsor Agent) and Golden (an Influencer in her upline) promised it would be good for her career to attend their recruiting event and hotel suite, where she was drugged and sexually assaulted. (*Id.* ¶¶ 148–49).

Defendants put forth two arguments, neither of which the Court finds persuasive. First, Bjorkman argues that he did not personally invite Jane Doe 1 or Jane Doe 2 to the recruiting events, and Golden argues the same as to Jane Doe 2. (Bjorkman MTD at 12–13; Golden Reply at 6).[12] This argument ignores that enticement is done "artfully" or "adroitly" which implies, or at the very least includes, a number of events several steps removed from one another. The fact that Bjorkman and Golden did not *need* to personally invite Jane Doe 1 or Jane Doe 2 does not defeat their claims—it more likely demonstrates Defendants' ability to surreptitiously attract women to these events. This argument also imposes an element of precision that the statute does not. Section 1591 requires that the defendant entice the victim, knowing that a commercial sex act will occur. It does not require that the defendant direct that enticement at any particular

---

[12] Golden does not raise the issue of enticement as to a specific Plaintiff until his Reply. (Golden Reply at 5–6). Nonetheless, the Court has considered those arguments and dismisses them for the following reasons. First, Golden's argument that he did not entice Jane Doe 1 and Jane Doe 3 to join eXp Realty is irrelevant. Jane Doe 1 does not allege direct liability (and, thus, enticement) against Golden and Jane Doe 3 explicitly alleges Golden invited her to attend the Las Vegas event. (FAC ¶ 148). Second, as explained, the Court disagrees with Golden's assertion that he did not sufficiently entice Jane Doe 2 to attend the Las Vegas event. Finally, Golden's argument that Acevedo agreed to join eXp Realty before the alleged enticement is both inaccurate and immaterial. Golden's repeated efforts to get Acevedo to join eXp Realty and choose Bjorkman as her Sponsor Agent *was* the enticement—as was his encouragement that Acevedo attend the event as Bjorkman's guest and stay in his hotel room. Whether these events took place while Acevedo was an eXp agent or prospective recruit does little to affect the Court's analysis.

person. In other words, the statute does not necessarily require that the defendant know *who* will be enticed—only that the defendant know *whoever* is enticed will be subjected to a commercial sex act.

Perhaps more importantly, Defendants overlook crucial allegations. eXp's entire business model is Agent Attraction, and Bjorkman and Golden's specific role as top Influencers was to attract existing and prospective agents to attend recruiting events, in furtherance of Agent Attraction. (FAC ¶¶ 25, 29, 32). Given this pervasive priority, the allegations plausibly establish that Defendants' conduct "aroused" Plaintiffs' "hope or desire" that the recruiting events would benefit their careers. Jane Doe 1 and Bjorkman attended the same event to recruit more agents into their shared downline, just days after Bjorkman recruited Jane Doe 1 to join eXp—which he did, at least in part, by "offering the advantage" of this very opportunity. (FAC ¶¶ 110, 112). Jane Doe 2 attended a recruitment event hosted by Bjorkman and Golden which, by its very purpose, was intended to attract women like her by "offering the advantage" of eXp affiliation, Agent Attraction, and top Influencers' coaching services. (FAC ¶¶ 131–35). At the event, Bjorkman's downline personally recruited Jane Doe 2 and she was invited to Defendants' hotel suite on two occasions, once by Bjorkman himself. (FAC ¶¶ 134–35, 145). By inviting Jane Doe 2 to his hotel suite, Bjorkman "aroused the hope or desire" to network with agents and both Defendants did the same by hosting the smaller gathering the following evening—consistent with the original opportunity that enticed Jane Doe 2 to attend the Las Vegas event altogether. Considering this context, the Court finds Plaintiffs' allegations plausibly establish Bjorkman enticed Jane Doe 1 and Bjorkman and Golden enticed Jane Doe 2.

Second, Defendants argue Plaintiffs' potential career advancement is too speculative to satisfy "enticement." (Bjorkman MTD at 18–20; Golden MTD at 7–8). Bjorkman argues he told Acevedo and Jane Doe 3 "nothing more than [it] would be good for their careers to attend." (Bjorkman MTD at 19). Golden argues his "[v]ague assertions of 'career advancement' are too ambiguous and conclusory" to withstand a

motion to dismiss. (Golden MTD at 8). The Court disagrees. First, some of Defendants' "assertions" were not "vague." For example, Golden explicitly (and fraudulently) told Acevedo that it would benefit her career if she chose Bjorkman as her Sponsor Agent, legitimizing his suggestion that she attend the event as Bjorkman's guest. (FAC ¶ 93). Second, considering the significance of Agent Attraction and the purpose of the recruitment events, Bjorkman's statements to Acevedo and Jane Doe 3 were self-explanatory and compelling. (*Id.* ¶¶ 94, 148). Finally, to the extent that other representations were more subtly made, they effectively "aroused" Plaintiffs' "hope or desire" to obtain a specific advantage. At the time of the alleged enticement, Bjorkman and Golden were top Influencers and in each Plaintiffs' actual or prospective uplines, with Bjorkman already named as Jane Doe 1 and Jane Doe 3's Sponsor Agent. (*Id.* ¶¶ 102, 111, 131, 148). Any representation that the events in question were likely to benefit Plaintiffs' career—whether explicitly or implicitly made—were wholly consistent with eXp's business model. In fact, to a certain extent, the speculative nature of the opportunity strengthens Plaintiffs' claims. Plaintiffs' entire career at eXp depended on selecting a successful Sponsor Agent and recruiting agents, making *any* opportunity to do so that more valuable. Providing Plaintiffs with the opportunity to attend recruitment events under these circumstances was more than enough to arouse Plaintiffs' "hope or desire" that their career would benefit.

Construing these factual allegations in the light most favorable to Plaintiffs, as required by Rule 12(b)(6), there is a plausible inference that Defendants "attracted" the female Plaintiffs to the various recruiting events by arousing their "hope or desire" that it would advance their careers. The Court concludes that Plaintiffs have met their burden of pleading facts showing that Bjorkman enticed all female Plaintiffs and Golden enticed Acevedo, Jane Doe 2 and Jane Doe 3 to attend the recruiting events, in violation of § 1591.

### c. *Knowing that means of force, fraud, or coercion will be used*

The plain language of § 1591(a) requires Plaintiffs to plausibly allege that

Defendants enticed them with knowledge that means of force or fraud would be used to cause a commercial sex act to take place. *United States v. Todd*, 627 F.3d 329, 333–34 (9th Cir. 2010). This does not impose another "layer" of knowledge on the pleader, but merely requires an allegation of awareness that, at the initial recruitment or enticement stage, certain prohibited means will be employed to cause a commercial sex act. *Id.* ("The knowledge required is such that if things go as he planned, force, fraud or coercion will be used to cause his victim to engage in a commercial sex transaction."). This element is sufficiently pled by demonstrating "a state of mind in which the [defendant] is familiar with a pattern of conduct." *Id.* at 334.

Defendants do not contest this issue. Moreover, the Court agrees with Plaintiffs that Defendants ignore allegations that Plaintiffs were drugged and, thus, "force, fraud and coercion" were employed. (Bjorkman Opp. at 8, n. 4). Consequently, the only issue—to the extent that Defendants have not waived it—is whether Plaintiffs have plausibly established a state of mind in which Bjorkman and Golden were familiar with the alleged pattern of conduct when they enticed the women to attend the events in question. The Court finds that Plaintiffs have met this burden with allegations including, but not limited to, the following.

Multiple women reported—to the LVPD and Jane Doe 2's Facebook post—that they saw Defendants Golden and Bjorkman with GHB and that they were drugged and/or raped by them. (FAC ¶¶ 43, 61, 63, 129, 143). Jane Doe 3 alleges Defendants admitted to using the drug recreationally, and that she saw them use it on the night of her assault. (*Id.* ¶ 153). Plaintiffs allege Golden had previously been accused of rape and Bjorkman had a long history of similar allegations, dating back to 2000. (*Id.* ¶¶ 45, 175). Plaintiffs allege Bjorkman and Golden had a relationship throughout this history and, in fact, Jane Doe 1 alleges Bjorkman told her Golden was a "dirtbag" and "rapist." (*Id.* ¶ 36). Taken as true, these allegations demonstrate Defendants' access to and familiarity with a drug known to cause sexual assault, as well as a mutual knowledge of each other's reputations for, in fact, using that drug for that purpose.

Plaintiffs also allege Golden and Bjorkman made several fraudulent representations designed to induce trust, that was then exploited to cause a commercial sex act. For example, Golden explicitly stated that Acevedo's career would benefit from choosing Bjorkman as her Sponsor Agent when, in fact, only Defendants stood to benefit by creating an additional tier in Golden's downline. (*Id.* ¶ 93). This underpins Acevedo's entire decision to attend the Closing Table event, where Golden then insisted that Bjorkman was a trustworthy individual, despite his reputation to the contrary. Similarly, Jane Doe 2 alleges that Bjorkman explicitly stated that "everyone" would be in his hotel suite, fraudulently promising the opportunity to network. (*Id.* ¶ 145). Read as a whole, these allegations plausibly establish that Defendants had a pattern of luring women into vulnerable situations by misrepresenting professional opportunities, in order to forcibly cause a sex act.

Construing these factual allegations in the light most favorable to Plaintiffs, as required by Rule 12(b)(6), there is a plausible inference that Defendants enticed Plaintiffs' with knowledge of this pattern of conduct—drugging and sexual assault—in violation of § 1591.

### d. Commercial Sex Act

Defendants argue Plaintiffs have failed to allege a "commercial sex act" within the meaning of § 1591. (Bjorkman MTD at 11–18; Golden MTD at 7–8). "Commercial sex act" is defined in § 1591(e)(3) as "*any sex act* on account of which *anything of value* is given to or received by *any person*." 18 U.S.C. § 1591(e)(3) (emphasis added). Defendants raise several arguments related to this element of a § 1591 claim, though they do not proffer many of them until their Replies and, regardless, offer little authoritative support. Nevertheless, the Court has considered Defendants' arguments which can be summarized as follows: (1) Plaintiffs have insufficiently alleged a "sex act" and (2) even if a "sex act" is sufficiently alleged, it was not "commercial" in nature because it was not part of a "quid pro quo" or "bargained for" exchange. The Court addresses these two arguments in turn.

1                       **i.**      **Sex Act**

2       The term "sex act" is not defined in § 1591. The Court therefore relies on the

3 plain and ordinary meaning. "Sex act" means "an act performed with another for sexual

4 gratification."       MERRIAM-WEBSTER       ONLINE       DICTIONARY,

5 https://www.merriam-webster.com/dictionary/sexact (last visited Jan. 24, 2024); *Noble*,

6 335 F. Supp. 3d at 521–23 (defining "sex act" under § 1591 as "an act performed with

7 another for sexual gratification"); *Ardolf v. Weber,* 332 F.R.D. at 477 (same). This

8 "purposefully broad definition allows perpetrators to be liable … for fraudulently

9 enticing Plaintiffs or forcefully engaging them in commercial sex acts with the

10 perpetrators themselves." *Ardolf,* 332 F.R.D. at 478.

11       Bjorkman argues that Jane Doe 2 and Jane Doe 3 have not alleged "sexual

12 gratification." (Bjorkman MTD at 16–18). Jane Doe 2 alleges that her memory is limited

13 from the time she consumed a single cocktail in Bjorkman and Golden's hotel room.

14 (FAC ¶¶ 136–39). She became ill at dinner, woke up the next morning feeling sick, and

15 has no memory of the events her friends describe from the evening. (*Id.* ¶¶ 140–42).

16 She alleges to have subsequently discovered other women were drugged and assaulted

17 after attending the same event. (*Id.* ¶ 143). Jane Doe 3 alleges that her memory is limited

18 from the time she and Bjorkman returned to the hotel suite. (*Id.* ¶ 151). Jane Doe 3

19 explicitly recalls witnessing Golden and Bjorkman consume GHB and she explicitly

20 recalls being sexually assaulted by Bjorkman. (*Id.* ¶¶ 152–53). In other words, Plaintiffs

21 allege experiences that are consistent with the known effects of GHB and its known

22 purpose of causing rape—which is, by definition, "sexual activity and usually sexual

23 intercourse[.]"  S*ee*   MERRIAM-WEBSTER   ONLINE   DICTIONARY,

24 https://www.merriam-webster.com/dictionary/rape (last visited Jan. 24, 2024). This

25 creates the plausible inference that Plaintiffs were also drugged for the purpose of

26 causing a sex act.

27       To the extent that further analysis is required, the Court rejects Bjorkman's

28 argument for two reasons. First, there is no requirement that a sex act, in fact, occur.

*United States v. Hornbuckle,* 784 F.3d 549, 553–54 (9th Cir. 2015) (finding commission of a sex act or sexual contact is not an element of a conviction under 18 U.S.C. § 1591). Rather, the relevant statutory language requires the defendant take certain action (i.e., "entice" the victim) knowing that she "will be caused to engage in a commercial sex act." 18 U.S.C. § 1591(a). This future verb tense "indicates that a sex act does not have to occur" and the "offense was complete when [the defendant] acted with the requisite knowledge[.]" *Hornbuckle,* 784 F.3d at 554 (citing *United States v. Willoughby*, 747 F.3d 229, 241 (6th Cir. 2014)). Thus—insofar as Bjorkman implies this element is not satisfied because Jane Doe 2 was not sexually assaulted—this argument is irrelevant. Golden's argument that Plaintiffs fail to allege any sex act *by him* is even less relevant. (Golden MTD at 8). The statute does not require that the perpetrator commit the sex act himself. 18 U.S.C. § 1591(a). Again, the relevant action is the enticement and—having established that Golden enticed Acevedo, Jane Doe 2 and Jane Doe 3—his "offense was complete when [he] acted with the requisite knowledge" that a sex act would occur. *Hornbuckle*, 784 F.3d at 554.

Second, Jane Doe 3's statement that she recalls being sexually assaulted is not conclusory. (Bjorkman MTD at 12; FAC ¶ 152). The legal element in question, that Jane Doe 3 must plausibly establish, is "a commercial sex act." 18 U.S.C. 1591(a). She alleges Bjorkman performed the act of "sexual assault"—that is, he subjected Jane Doe 3 to nonconsensual "sexual contact." *See* MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/sexualassault (last visited Jan. 24, 2024). In support of this, Jane Doe 3 alleges that she was drugged—and in support of that, she alleges to have experienced symptoms consistent with GHB and, in fact, to have seen Defendants use GHB. (FAC ¶ 151–53). She further alleges coercive efforts to interfere with the LVPD investigation of these allegations. (*Id.* ¶¶ 154–55). This creates the plausible inference that Jane Doe 3's alleged sex act occurred.

Plaintiffs have alleged a series of events that, taken as true, suggest all four women involuntarily ingested the same drug, that caused the same response, and created

the same opportunity for a sex act to forcibly occur. Plaintiffs have also alleged a pattern of conduct that creates the plausible inference that Defendants Bjorkman and Golden both had the requisite knowledge that such events would occur when they enticed Plaintiffs' presence at the various events. The fact that Jane Doe 2 was never forced to commit a sex act, or Jane Doe 3's sexual assault is not alleged in more graphic detail, does not alter this inference. Plaintiffs have sufficiently alleged a "sex act" and, thus, the only remaining question is whether it was "commercial in nature."

### ii.  Commercial in nature

Defendants argue, even if Plaintiffs have alleged enticement and a sex act, they have insufficiently alleged that it was "commercial" because a "quid pro quo" or "bargained for" exchange is required. (Bjorkman MTD at 11–15; Golden MTD at 7–8). The Court disagrees. Plaintiffs must allege "*any sex act* on account of which *anything of value* is given to or received by *any person*." 18 U.S.C. § 1591(e)(3) (emphasis added). While this implies a causal connection between the sex act and the commercial exchange, it does not require a bargained for exchange. The coexistence of the sex act and the thing of value is the exchange necessary to satisfy a commercial sex act.

The TVPRA extends to enticement by means of fraudulent promises of career advancement that are made for the purpose of engaging in consensual or nonconsensual sexual activity. *See*, *e.g., Noble*, 335 F. Supp. 3d 504 (reasonable expectation of a film role, modeling career, and a continued relationship with film producer's company were "things of value"); *Geiss*, 383 F. Supp. 3d at 168 (declining to dismiss TVPRA claims against Harvey Weinstein where the complaint alleged that Weinstein promised plaintiffs career advancement and, during private meetings, sexually assaulted them); *David*, 431 F. Supp. 3d at 303 (finding a commercial sex act based on Weinstein's " 'promise of a role' in one of his productions," coupled with his "pattern of doing the same with other women over decades"); *Canosa v. Ziff,* 2019 WL 498865, at  *2 (declining to dismiss TVPRA claims against Harvey Weinstein and The Weinstein Company where the complaint alleged that Weinstein met with plaintiff "under the

29

guise of working together on productions," and "t[ook] advantage of the seclusion of those meetings and his power as a well-known producer to sexually assault and intimidate her"); *see also Ardolf,* 332 F.R.D. at 471–73 (declining to dismiss TVPRA claims against renowned photographer Bruce Weber where the complaint alleged that Weber enticed plaintiffs with the prospect of modeling career advancement, fraudulently convinced them to be alone with him for a "breathing exercise" and sexually molested them during photoshoots).

Put another way, when a victim is enticed with a fraudulent career opportunity for the purpose of causing a sex act, that sex act is commercial in nature. This "reflect[s] the modern reality" that even the opportunity for career advancement is a "thing of value." *Noble,* 334 F. Supp. 3d at 515, 521. Defendants concede this but argue it requires a "quid pro quo" or "bargained for" exchange. Bjorkman argues the Weinstein cases demonstrate a commercial sex act "where it is credibly alleged that the defendant made a fraudulent promise of career advancement in exchange for (i.e., quid pro quo for) the aspiring plaintiff's provision of some sort of 'sexual activity.'" (Bjorkman MTD at 12). Golden argues, "[t]here must be some allegations of a quid pro quo that connects the alleged sex act to a thing of value exchanged." (Golden MTD at 7). The Court disagrees. First, the Weinstein cases do not require that a promise be made on the condition of sex—only that a promise be made with the intent that it cause a sex act. Second, while Defendants separate the two, "enticement" and "commercial sex act" are intertwined such that sometimes, as in the Weinstein cases, the enticement necessarily makes the sex act commercial. Finally, the Weinstein cases exemplify allegations sufficient—not necessary—to violate the TVPRA.

Defendants offer scant authority in support of their position. Bjorkman relies entirely on *Corradino v. Liquidnet Holdings Inc.,* No. 19 Civ. 10434 (LGS), 2021 WL 2853362 (S.D.N.Y. July 8, 2021). (Bjorkman MTD at 14–15). In that case, plaintiff alleged sexual harassment where she repeatedly refused defendants' propositions for sex and was later promoted. *Corradino,* 2021 WL 2853362, at *1–2. Unlike here, the

court was asked to determine whether sexual harassment is a "sex act" and, if so, whether defendants promised career advancement in exchange for that act. *Id.*, at \*3. The court deferred its answer to the first question because the complaint failed to allege that any promise had been made. *Id.* at \*3 ("While the Complaint alleges that [Defendants] propositioned Plaintiff for sex on several occasions, it does not allege that they ever proposed any sort of quid pro quo, like sex for career advancement."). Under *Corradino*'s facts—where the alleged sex act is a request for sex, and the alleged value is a promise—a violative exchange might necessarily be quid pro quo. However, the court did not answer that question and, regardless, Plaintiffs do not allege sexual harassment.

Golden argues that a subsequent decision in the *Noble* case precludes Plaintiffs' assertion that none of the Weinstein cases considered allegations that defendant offered movie roles on the condition of sex. (Golden Reply at 5; Golden Opp. at 5). While Golden provides no explanation for his conclusion, the Court notes the following.

The Weinstein cases demonstrate that "commercial sex acts" are plausibly established in a variety of circumstances, ranging from coercive assault to forcible rape. This is demonstrated by *Geiss*, alone, in which the court found that the diverse allegations of nine plaintiffs all demonstrated that Weinstein "enticed women to attend meetings with him by promising them a chance to work for him, and then assaulted them[.]" 383 F. Supp. 3d at 168. While Weinstein went so far as to proposition some women for sex before he assaulted them, and offer others career prospects after he assaulted them, several *Geiss* plaintiffs alleged exchanges that were far less explicit—the court saw no distinction. *See Geiss*, 383 F. Supp. 3d at 164–65. This does not demonstrate, nor does *Geiss* discuss, a quid pro quo or bargained for exchange.

This is true even in *Noble*, where Weinstein repeatedly told plaintiff "everything would be taken care of" throughout her assault, and plaintiff "understood this to mean" that Weinstein would help her career "if the sex act was completed." F. Supp. 3d at 512–13. Surely, the court did not mean to imply Weinstein's coercion—after he had

forcibly initiated the sex act—and the plaintiff's ultimate submission demonstrated a negotiation. This contradicts the very definition of sexual assault, which is nonconsensual. Golden argues that the court's subsequent order in *Noble*, denying Weinstein's interlocutory appeal, changes this. *Noble v. Weinstein,* No. 17-cv-09260 (AJN), 2019 WL 3940125 (S.D.N.Y. Aug. 5, 2019) (*Noble II*). However, in that opinion the court merely rejected Weinstein's argument verbatim and confirmed its earlier ruling: the expectation of career advancement, even if based on fraudulent promises, is a "thing of value." *Noble II*, 2019 WL 3940125, at *4. Weinstein argued that, because he never intended to help plaintiff, there was no "quid pro quo, no conferring of a real benefit, and no actual value provided." *Id.* The court clearly considered this argument as it relates to the value of the thing promised, not the way in which it is exchanged. *Id.* (describing Weinstein's argument as "the proposition that a promise—particularly a promise of a career-making and life-changing opportunity—is of *no* actual value to the recipient simply because the promisor was lying at the time.") (emphasis in original).

The only Weinstein case in which the court includes the language "quid pro quo" in its reasoning is *David*, and it is not helpful to Defendants. 431 F. Supp. 3d at 304, n.5. ("the [complaint] plausibly alleges that Plaintiff received a "thing of value"—both the meetings and the promises of certain movie and television roles—as a quid pro quo for meeting with [Weinstein] and being caused to engage in the sex acts."). Even if the court's decision hinged on the exchange being quid pro quo, the objects of that exchange were the meeting and plaintiff's attendance at the meeting (i.e., the circumstances that enabled her sexual assault)—not the assault itself. The same reasoning applies here. Plaintiffs have plausibly established that they attended each networking event in exchange for the "value" of either recruiting agents or being recruited themselves which, in turn, provided Defendants with the opportunity to cause their assault.

Golden cites to *Marcus* which is similarly unpersuasive. *United States v. Marcus*, 487 F. Supp. 2d 289 (E.D.N.Y. 2007), *rev'd on other grounds*, 538 F.3d 97 (2d. Cir. 2008). First, Marcus was decided in 2007—long before courts considered TVPRA

allegations like those here. Second, *Marcus* resolved the specific issue of whether the TVPA was limited to prostitution or if it includes pornography. *Id.* at 306–07. The court rejected defendants' narrow interpretation of the statute and found that, because there was a "causal relationship" between the sex and the photography, pornography was a "sex act." *Id.* at 306. In other words, the court considered the sufficiency of the act, not the sufficiency of the value—or the exchange. ("The statutory language provides no basis for limiting the sex acts at issue to those in which payment was made for the acts themselves.").

Finally, a promise of career advancement is not the only way Plaintiffs can establish a thing of "value." In fact, Plaintiffs have put forth allegations suggesting their careers did, in fact, advance after Defendants caused their sex act. Acevedo officially joined eXp Realty after Bjorkman assaulted her, (FAC ¶¶ 101–02), and Bjorkman "gave" Jane Doe 3 a highly valuable FLQA after her assaulted her. (*Id.* ¶¶ 191, 203). Jane Doe 1 also alleges Bjorkman received a thing of value in photographs and videos he took of her assault. *See*, *e.g.*, *Doe v. Fitzgerald*, No. cv-20-10713-MFW (RAOx), 2022 U.S. Dist. LEXIS 8194, at *18 (C.D. Cal. Jan. 6, 2022) (declining to find that sexual acts themselves represent things of "value" but finding that photographs and videos of the alleged sex acts do).

Construing these factual allegations in the light most favorable to Plaintiffs, there is a plausible inference that Defendants caused Plaintiffs to engage in a commercial sex act within the meaning of § 1591. Accordingly, the Court **DENIES** Defendants Bjorkman and Golden's motions to dismiss Counts 1 and 2, respectively.

### 2. Count 3: TVPRA beneficiary liability

Plaintiffs' third cause of action is for violation of § 1595 of the TVPRA, 18 U.S.C. § 1595. All female Plaintiffs allege Defendants Golden, Gove, Sanford and eXp Realty benefitted from their sex trafficking (Count 3). (FAC ¶¶ 204–210). The requirements for beneficiary liability under the TVPRA can be stated as follows: (1) the person or entity must "knowingly benefit[ ], financially or by receiving anything of

value," (2) from participating in a venture, (3) that the "person knew or should have known has engaged in an act in violation of [the TVPRA]." *M.A.*, 425 F. Supp. 3d at 964 (citing 18 U.S.C. § 1595(a)). Unlike § 1591, § 1595 does not define "participation in a venture." *Compare* 18 U.S.C. § 1595 *with* 18 U.S.C. § 1591(e)(4) (defining "participation in a venture" as "knowingly assisting, supporting, or facilitating a [TVPRA] violation[.]").

As a threshold matter, the Court agrees with numerous courts that have held this and the "should have known" language means that a beneficiary's "participation" need not include an overt act in furtherance of or actual knowledge of a sex trafficking venture. *See A.B. v. Marriot Int'l, Inc.*, 455 F. Supp. 3d 171, 183–88 (E.D. Pa. 2020) (collecting cases and declining to apply § 1591's "participation in a venture" definition to a § 1595 claim).[13] In other words, § 1595's "venture" is not limited to a "sex trafficking venture." This conclusion follows from the *M.A.* court's statutory construction analysis, which reasoned that applying the "participation in a venture" definition from § 1591, "would void the 'should have known' language in the civil remedy" and, thus, "violate[ ] the 'cardinal principle of statutory construction that a

_____

[13] The *A.B.* court provided extensive analysis of two schools of thought in § 1595 cases involving hotel liability. *A.B.*, 455 F. Supp. 3d at 183-88. The Southern District of Ohio and the Western District of Washington have adopted the *M.A.* court's reasoning and concluded the following: (1) financial benefit is satisfied from a relationship with the trafficker and need not be received on account of the trafficking; (2) knowledge is satisfied along a spectrum; and (3) participation requires direct association or a business relationship, the latter of which can be demonstrated by a pattern of conduct or a tacit agreement. *M.A.*, 425 F. Supp. 3d at 964–971; *see also Doe S.W. v. Lorain-Elyria Motel, Inc.,* No. 2:19-cv-1194, 2020 WL 1244192 (S.D. Ohio Mar. 16, 2020); *H.H. v. G6 Hospitality, LLC,* No. 2-19-cv-755, 2019 WL 6682152 (S.D. Ohio Dec. 6, 2019). In contrast, the *Red Roof* cases in the Northern District of Georgia held that § 1595 has three separate knowledge requirements: (1) knowledge that the benefit is from trafficking; (2) knowledge as to "assisting, supporting, or facilitating" trafficking; (3) knowledge Plaintiff was subjected to force. *See, e.g., Doe 1 v. Red Roof Inns Inc.*, No. 1:19-cv-03840-WMR, 2020 WL 1872335 (N.D. Ga. Apr. 13, 2020) (relying on the criminal liability analysis in *U.S. v. Afyare*, 632 Fed. Appx. 272 (6th Cir. 2016)).

statute ought, upon the whole, to be construed so that, if it can be prevented, no clause, sentence, or word should be superfluous, void or insignificant." *J.C. v. Choice Hotels Int'l, Inc.,* No. 20-cv-00155-WHO, 2020 WL 3035794, *1, n.1 (N.D. Cal. June 5, 2020) (quoting *M.A.,* 425 F. Supp. 3d at 969). At least one court in this district has applied this reasoning outside the hotel context. *Mindgeek,* 558 F. Supp. 3d at 836 (plaintiffs' claim that websites published child pornography in violation § 1595 need only "meet the more lenient requirements of a Section 1595 claim[ ]" and is not barred by FOSTA immunity, 47 U.S.C. § 230); *see also Doe v. Twitter,* 555 F. Supp. 3d 889, 926 (N.D. Cal. 2021) (same). The Court is persuaded by this precedent and, thus, addresses Defendants' arguments only insofar as it is necessary to analyze Plaintiffs' claims under the standard announced in *M.A.*.

Plaintiffs allege, even if Golden did not directly violate § 1591, he benefitted from sex trafficking because he, at the very least, financially benefitted from his relationship with Bjorkman when he should have known Bjorkman had assaulted the women. (Golden Opp. at 7–9). Golden moves to dismiss for failure to allege the requisite "knowledge" and "benefit" under § 1595. (Golden MTD at 9). However, having found that Plaintiffs have plausibly demonstrated Golden's conduct towards Acevedo, Jane Doe 2 and Jane Doe 3 did violate § 1591(a)(1) and he is, thus, liable for those damages under § 1595, the Court denies Golden's motion to dismiss the corresponding Count 3 claims and only addresses his arguments with respect to Jane Doe 1's claim for beneficiary liability.

Plaintiffs allege Defendants eXp Realty, Sanford and Gove also benefitted from their relationship with Bjorkman and—with respect to Acevedo, Jane Doe 2 and Jane Doe 3's claims—their relationship with Golden, and that they should have known about the violative conduct. (Sanford Opp. at 9–19; Gove Opp. at 9–17). Both Sanford and Gove move to dismiss Count 3 for failure to allege "knowledge," "benefit" and

"participation in a venture." (Sanford MTD at 17–25; Gove MTD at 12–24).[14]

Plaintiffs have sufficiently pled a sex trafficking venture in Counts 1 and 2. For the purposes of Count 3, the alleged "venture" is the Revenue Share Plan or Pyramid and the question is whether *that* venture violated § 1595. For the reasons discussed below, the Court finds Plaintiffs' allegations plausibly establish that it did and the Court denies Defendants' motions to dismiss Count 3.

### a. Benefit

Defendants argue Plaintiffs have insufficiently pled the "benefit" element of a § 1595 claim. (Golden MTD at 9; Sanford MTD at 22–24; Gove MTD at 16–20). Plaintiffs must plausibly establish Defendants "knowingly benefit[ted] . . . financially or by receiving anything of value from participation" in the alleged venture. 18 U.S.C. § 1595. This only requires that Defendants knowingly received "a financial benefit from a relationship" with Bjorkman—not that Bjorkman provided any benefit because Defendants facilitated in the sexual misconduct. *M.A.*, 425 F. Supp. 3d at 964–65 (rejecting the § 1591(a)(2) liability standard articulated in *Geiss*); *see also B.M. v. Wyndham Hotels & Resorts, Inc.*, No. 20-cv-00656-BLF, 2020 WL 4368214 (N.D. Cal. Jul. 30, 2020) (finding the rental of a hotel room or franchisors' receipt of royalties constitutes a financial benefit "from a relationship with the trafficker" in violation of § 1595).

### i.    Golden

Golden argues Plaintiffs' allegations are conclusory and vague. (Golden MTD at 8–10). ("Plaintiffs have not identified a concrete specific benefit to Mr. Golden other than vague references to the revenue share program."). However, he argues these allegations do not satisfy the "benefit" required by § 1591(a)(2). (Golden MTD at 9)

---

[14] For the reasons discussed above, the Court rejects Defendants' argument that the TVPRA is not applicable to the circumstances alleged. (Sanford MTD at 17–18; Gove MTD at 25).

(citing *Geiss* and § 1591(a)(2)). The codefendants in *Geiss*—and all the Weinstein cases—were alleged to have been perpetrators of sex trafficking under § 1591(a)(2), not § 1595. Moreover, the Court has already concluded that Golden's conduct violated §1591(a)(1), resolving three of the four claims here. The only issue is whether the First Amended Complaint is also sufficient to sustain Jane Doe 1's claim against Golden. The Court considers the following allegations.

Golden was a top Influencer who generated a substantial part of his income from recruiting agents to join eXp Realty. (FAC ¶ 59). Golden recruited Bjorkman to eXp Realty, Golden was Bjorkman's Sponsor Agent, and Bjorkman was in Golden's downline. (*Id.* ¶¶ 15, 35, 37, 48). Golden receives a financial benefit from Bjorkman's downline. (*Id.* ¶¶ 27, 206). Bjorkman recruited Jane Doe 1, she was in his downline and, therefore, Golden receives a financial benefit from Jane Doe 1's downline. (*Id.* ¶¶ 27, 107–08, 111, 206). Jane Doe 1 is still a licensed real estate agent with eXp Realty and Golden is currently an eXp real estate agent, Influencer and RSP Vested Participant. (*Id.* ¶¶ 8, 15). Irrespective of Jane Doe 1's exact contribution to eXp Realty, Golden received a financial benefit from her recruitment and, considering eXp's business model, this receipt was knowingly made. Jane Doe 1's allegations are sufficient to meet this element of a claim at the motion to dismiss stage.

### ii.    Sanford[15]

Sanford argues the § 1595 benefit must "derive directly from, and be knowingly received in exchange for, participating in a venture that committed sex trafficking crimes." (Sanford MTD at 23). However, Sanford's proffered authority is neither

_____

[15] eXp Realty and Sanford file their Motion to Dismiss collectively and the parties make no distinction between Sanford in his individual capacity and eXp Realty in its corporate capacity. (Dkts. 41-1, 48, 55). Thus, the Court only distinguishes between Sanford and eXp Realty where necessary and otherwise refers to these Defendants collectively as "Sanford."

binding nor persuasive. (*Id.* at 22–23). First, he cites to *Bridges v. Poe*, which explicitly declined to decide which "participation in a venture" standard was required for beneficiary liability. 487 F. Supp. 3d 1250, 1261–62 (N.D. Ala. 2020) ("This Court does not need to decide whether 'participation' requires scienter, because Bridges 'participated' in the venture even under a stricter 'knowingly' standard."). Because the defendant "expressly agreed" to participate in the sex trafficking venture, his benefit— which was not at issue—necessarily violated §1595, regardless of what standard the court applied. *Id.* Sanford's reliance on *Kolbeck v. Twenty First Century Holiness Tabernacle Church, Inc.* is similarly misplaced. No. 10-cv-4124, 2013 WL 6816174 (W.D. Ark. Dec. 24, 2013). There, the court found § 1595's civil remedy was not available to plaintiffs because a "commercial sex act" was not sufficiently alleged under § 1591. *Id.* at, *16 ("The fact that sexual abuse was committed by the ministry's leader and that members of the ministry had their expenses paid for through ministry funds is simply not sufficient to establish a violation under 18 U.S.C. § 1591."). Even if the Court found *Kolbeck*'s reasoning persuasive, the facts are very different here, where the Court has already concluded that Bjorkman and Golden plausibly violated § 1591. Finally, Sanford's arguments that eXp did not "benefit from Bjorkman engaging in non-consensual sexual acts" or that "Bjorkman's alleged drugging and assaults [did not] cause[ ]" Plaintiffs to join or remain at eXp are irrelevant. (Sanford MTD at 23). Even if, as Sanford implies, such causation would be necessary to satisfy a § 1591(a)(2) claim under *Geiss*, that is not the inquiry here.

Here, Plaintiffs allege Sanford knowingly benefitted from the recruitment of the female agents due to his relationship with Bjorkman. (Sanford Opp. at 17). Specifically, Plaintiffs allege the following: eXp's revenue derives from the sale of real estate and its recruited agents' contribution to the RSP or Pyramid (FAC ¶ 23); Bjorkman, Golden, Sanford and Gove are all current RSP Participants (*id.* ¶¶ 14–18, 50); Sanford is Agent #1 and every eXp agent is in his downline (*id.* ¶ 72); Sanford benefits from the real estate transactions of his downline agents in the form of a commission and a stock award

(*id.* ¶¶ 27–28); eXp Realty additionally benefits from agent fees, including a fee for failure to generate a minimum gross income (*id.* ¶¶ 30–31, 48); Bjorkman recruited Acevedo, Jane Doe 1 and Jane Doe 3 to eXp Realty and all three women named him as their Sponsor Agent (*id.* ¶¶ 101, 110, 148); Jane Doe 2 joined eXp Realty after recruiting efforts by Bjorkman's downline at an eXp recruitment event, hosted by Bjorkman (*id.* ¶¶ 131, 188); and three of the four female Plaintiffs are currently eXp real estate agents and all four female Plaintiffs allege to have paid all necessary eXp fees. (*Id.* ¶¶ 7, 8, 9). Again, irrespective of the female agents' exact contribution to eXp Realty, the First Amended Complaint plausibly demonstrates that Sanford, at the very least, benefitted from their agent fees. These allegations are sufficient to meet the "benefit" element at the motion to dismiss stage.

### iii.    Gove

Gove argues that Plaintiffs have only alleged that he "attempted" to benefit from Bjorkman's sex trafficking which is insufficient to state a claim under the Ninth Circuit's ruling in *Ratha*, 35 F.4th at 1164. (Gove MTD at 20, n. 7). In sum, he argues that because Plaintiffs allege that "Gove only received money from the sale of real estate, and that Plaintiffs could not sell real estate as a result of their assaults[,]" the First Amended Complaint fails to allege that "benefit flowed to Gove." (Gove at 20). The Court granted Gove's Ex Parte Application to File Supplemental Briefing and has considered the parties' arguments related to the effect of the TVPRA's 2023 Amendment which extends civil liability to attempted benefit. (Dkts. 81, 83, 98). The Court concludes the new language is applicable and that, regardless, Plaintiffs sufficiently allege an actual benefit. Finally, for reasons already discussed, the Court disagrees with Gove's attempt to impose more stringent causation between the sex acts, under § 1591, and the benefit received, under § 1595. (*See*, *e.g.*, Gove MTD at 18) (arguing commissions and fees are paid "regardless of whether a sexual assault has taken place" and are, thus, insufficient to allege benefit.).

On January 5, 2023, Congress amended § 1595 of the TVPRA to extend civil

1  liability to anyone who "attempts or conspires to benefit" from a violation of the

2  TVPRA. Abolish Trafficking Reauthorization Act of 2022, Pub. L. No. 117–347, 136

3  Stat. 6199 (Jan. 5, 2003) (enacted as amended at 18 U.S.C. § 1595). Congress expressly

4  noted that this amendment was "a technical and clarifying update." *Id.* § 102 (section

5  adding new language titled as "SEC 102. TECHNICAL AND CLARIYING UPDATE

6  TO CIVIL REMEDY."); *see ABKCO Music, Inc. v. LaVere,* 217 F.3d 684, 689 (9th

7  Cir. 2000) ("We have long recognized that clarifying legislation is not subject to any

8  presumption against retroactivity and it applies to all cases pending as of the date of its

9  enactment[.]").

10     Gove acknowledges this precedent, but argues *Ratha* compels dismissal here.

11  Prior to the enactment of the 2023 Amendment, the Ninth Circuit held "the phrase

12  'knowingly benefits' as used in § 1595(a) does not encompass attempts to benefit[.]"

13  *Ratha*, 35 F.4th at 1176. "Had Congress intended to create liability under § 1595 for

14  attempts to benefit, we can reasonably conclude that it would have done so in express

15  terms." *Id.* Because plaintiffs had failed to raise a triable issue of fact as to whether

16  defendants had, in fact, benefitted from their relationship with the alleged trafficker—

17  as well as whether they had knowledge or participated—the court affirmed the district

18  court's grant of summary judgment in defendants' favor. *Id.* Following the enactment

19  of the 2023 Amendment, plaintiffs filed a motion for relief from judgment, arguing §

20  1595's new language should be retroactively applied, pursuant to Rule 60(b)(6)'s

21  "extraordinary circumstances" analysis. *Ratha v. Phatthana Seafood Co., Ltd.*, No. 16-

22  4271-JFW (ASx), 2023 WL 2762044 (C.D. Cal. Mar. 3, 2023) (*Ratha II*). Unlike the

23  inquiry before this Court, post-judgment changes in law are analyzed under a six non-

24  exhaustive factor test. *Ratha II*, 2023 WL 2762044, at *3 (citing *Byone v. Bacca,* 966

25  F.3d 972, 980 (9th Cir. 2020)). Under that test, the court reasoned that plaintiffs had

26  failed to demonstrate participation, knowledge *and* benefit and, thus, the 2023

27  Amendment would not alter the court's decision—regardless of whether the new

28  language applied. *Id.*, at *4.

40

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The present motion is clearly distinguishable. Here, Plaintiffs filed their
Complaint on February 22, 2023. (Dkt. 1). Their case was pending at the time of the
2023 Amendment's enactment and it is still pending. Regardless, Plaintiffs do not
seek to apply this new language retroactively and only argue "attempt" as to Gove's
continuing benefit. (*See* Dkt. 98 at 3) ("Plaintiffs have sufficiently alleged that
Defendant Gove was in actual receipt of something of value prior to the 2023
Amendment but the question of attempt or conspire remains at issue for the ongoing
benefit post 2023 Amendment. Any attempts made by Defendant Gove in 2023 to
continue to receive something of value from the 'venture' falls squarely under the new
amendment."). Therefore, the Court need not decide whether the 2023 Amendment
represents a "change in substantive law and attaches new legal burdens to violations
of the TVPRA[,]" requiring a clear statement from Congress before applying it
retroactively. *Ratha II*, at *4 (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 267
(1994)); *see also Ditullio,* 662 F.3d at 1100 (denying plaintiff's motion for partial
summary judgment, seeking to retroactively apply newly enacted civil remedy to prior
criminal conviction, pursuant to *Landgraf*).

Again, Plaintiffs allege that the RSP and Gove's placement within the Pyramid
sufficiently establish his actual benefit. (Gove Opp. at 14) (citing to FAC ¶¶14–17;
22–28, 30-32, 48, 50, 55). The Court agrees. Each female Plaintiff was recruited by
Bjorkman or his downline. (FAC ¶¶ 102, 111, 148). Each female Plaintiff was in
Gove's downline and contributed to the RSP, of which Gove is a Vested Participant.
(*Id.* ¶¶ 17, 22–28).  Again, regardless of the precise monetary amount that they
individually contributed to the company, Plaintiffs' allegations, taken as true,
demonstrate that Gove actually benefitted from Plaintiffs' recruitment and continues
to benefit from the RSP. Gove argues Plaintiffs' allegations fail for two reasons. First,
Gove did not receive new agent fees and, second, the benefit that he did receive from
sale proceeds is unconnected to the sex acts. (Gove MTD at 18–20). The Court agrees

41

with Plaintiffs that the former argument disputes the facts and is, thus, not appropriate at this stage of proceedings. (Gove Opp. at 14–15). The latter argument which is partially irrelevant for reasons already discussed, concedes that Gove did, in fact, benefit from Plaintiffs' sale of real estate.

Construing these factual allegations in the light most favorable to Plaintiffs, as required by Rule 12(b)(6), there is a plausible inference that Gove financially benefitted from his relationship with Bjorkman and Golden. Plaintiffs have met their burden of pleading facts showing that Golden, Sanford and Gove "knowingly, financially benefitted" within the meaning of § 1595.

### b. Knowledge

All three Defendants argue Plaintiffs fail to allege the requisite "knowledge" for beneficiary liability. (Golden MTD at 9; Sanford MTD at 24–25; Gove MTD at 20–24). Beneficiary liability extends to those with constructive knowledge of, here, the drugging and sexual assaults. 18 U.S.C. § 1595 ("whoever knowingly benefits … from participation in a venture which that person knew or should have known has engaged in an act in violation of [the TVPRA]."). This "should have known" language invokes a negligence standard which is satisfied along a spectrum. *M.A.*, 425 F. Supp. 3d at 965–66. In *M.A.,* the court provided an instructive discussion of this spectrum. *Id.* At one end is *Ricchio v. McLean*, where plaintiff alleged their trafficker worked with a hotel owner who intended to profit on the venture, satisfying the "reckless disregard" standard of § 1589 and, thus, the lower negligence standard of § 1595. 853 F.3d 553, 555 (1st Cir. 2017). Plaintiff alleged the two had a past business relationship, "high-fived" when they discussed the desire to "get[ ] this thing going again," and the hotel owner personally witnessed plaintiff's abuse. *Id.*. At the other end of the spectrum is *Lawson v. Rubin*, where plaintiff sued the owner of a condominium who leased to her trafficker. No. 17-cv-6404 (BMC), 2018 WL 2012869 (E.D.N.Y. Apr. 29, 2018). There, the court found that one police visit and one ambulance visit at the condominium in six years was

insufficient to demonstrate defendant "knew or acted in reckless disregard" of the alleged trafficking. *Id.*, at * 13–14.

The *M.A.* court found plaintiff's claims fell somewhere between these two cases. 425 F. Supp. 3d at 966–67. There, the plaintiff alleged the following: their trafficker frequently paid in cash, requested rooms near exit doors, refused housekeeping services, and left "an extraordinary number" of used condoms in the trash cans; the same staff worked at hotels where plaintiff was trafficked for multiple days or weeks in succession; plaintiff's trafficker routinely escorted her in view of the front desk; staff ignored plaintiff's pleas and screams for help; and defendant's hotel locations were in areas "known for sex trafficking." *Id.* at 967. While the court found these allegations insufficient to demonstrate actual knowledge, it found they were sufficient to demonstrate negligence where "Defendants were on notice about the prevalence of sex trafficking generally at their hotels and failed to take adequate steps to train staff in order to prevent its occurrence." *Id.*

### i.    Golden

Golden states, "there are no specific allegations that Defendant Golden had knowledge that each specific Plaintiff was allegedly being trafficked." (Golden MTD at 9). To the extent that this effectively raises the issue, the Court rejects Golden's argument. As discussed above, the Court finds Acevedo, Jane Doe 2 and Jane Doe 3 have plausibly demonstrated Golden's direct liability and, thus, his actual knowledge of their trafficking because even a "participant" under §1591(a)(2) must know that subsection (a)(1) was violated. *See Geiss*, 383 F. Supp. 3d at 167, n. 3 (discussing the two types of direct liability); *see also* 18 U.S.C. 1591(e)(4) (defining "participation in a venture" for subsection (a)(2) claims). The Court, therefore, only analyzes Golden's constructive knowledge insofar as it is necessary to analyze Jane Doe 1's claim— beginning with the observation that Golden's actual knowledge of the other Plaintiffs' trafficking informs what he should have known with respect to Jane Doe 1's assault. This conclusion is based on allegations including, but not limited to, the following.

All four women allege they were surreptitiously drugged by Bjorkman, Jane Does 2 and 3 specifically allege Golden supplied that drug, and Jane Doe 3 explicitly alleges to have seen Golden consume GHB. (FAC ¶¶ 153, 180, 184, 187, 190, 199, 202). Multiple women reported to police that Golden supplied Bjorkman with GHB and other illicit drugs. (*Id.* ¶ 61). Golden made it known to several women that he had videos and photos of their assault, which police allegedly have in their possession. (*Id.* ¶¶ 62–64). As discussed above, Golden and Bjorkman had a previous relationship that coincided with numerous allegations of drugging and sexual assault. (*Id.* ¶¶ 36, 43–47, 250). Despite knowing about these allegations, Golden encouraged Acevedo to stay in Bjorkman's hotel room. (*Id.* ¶¶ 90–98). Jane Doe 3 alleges that she discussed her assault with Golden, who told her to lie to the police. (*Id.* ¶ 154). Plaintiffs also allege that Golden has been accused of rape and that Bjorkman specifically told Jane Doe 1 that Golden was a "rapist" and a "dirtbag." (*Id.* ¶¶ 108–09, 175).

Taking these allegations as true, the First Amended Complaint demonstrates Golden was familiar with and had access to GHB, a known purpose of which is to render women incapacitated for the purpose of causing their sexual assault. These allegations also create the plausible inference that—at multiple points along the timeline of Bjorkman and Golden's relationship—Defendants were both engaged in drug use and sexual assault or, at the very least, that Golden knew of Bjorkman's reputation for such conduct. Plaintiffs have sufficiently pled that, at the very least, Golden should have known Bjorkman was routinely drugging women in order to sexually assault them, in violation of § 1591(a)(1).

### ii.     Sanford

Sanford argues Plaintiffs must allege "constructive knowledge of the trafficking venture specifically involving Plaintiffs[.]" (Sanford MTD at 24). However the authority he relies on is unpersuasive. First, Sanford draws an inapposite conclusion from *B.M.,* 2020 WL 4368214. There, the court did not find that the complaint insufficiently involved the plaintiff—it insufficiently involved the defendant. *B.M.,*

2020 WL 4368214, at *6 (finding allegations supported a theory that staff had knowledge, but "fail[ed] to allege facts as to how Wyndham (the ultimate parent company of the franchisor) and Choice (the franchisor)" were on notice). Second, *Doe 1 v. Red Roof Inns, Inc.*, applied the criminal statute's "participation" standard which this Court does not. 2021 WL 1872335, at *3. Sanford next points to cases in the hotel context that have found "an abstract awareness of sex trafficking" is not sufficient to sustain a TVPRA claim. (Sanford MTD at 24) (citing *S.J. v. Choice Hotels Int'l, Inc.*, 473 F. Supp. 3d 147, 154 (E.D.N.Y. 2020); *A.B. v. Hilton Worldwide Holdings, Inc.*, 484 F. Supp. 3d 921, 938 (D. Or. 2020)). Even if the Court were persuaded by the reasoning in these decisions, they dealt with the specific context of hotel franchisor versus franchisee liability not applicable to the facts here and, regardless, Plaintiffs do not allege "an abstract awareness of sex trafficking."

Plaintiffs allege Defendant Sanford had both actual and constructive knowledge of Bjorkman's conduct. (Sanford Opp. at 17–19). In support of actual knowledge, Plaintiffs allege the following facts, which the Court considers true: Jane Doe 2 posted her experience on Facebook in September of 2020 (FAC ¶ 76); Jane Doe 1 reported her assault to eXp Leadership Team member, Corey Haggard, in October of 2020 (*id.* ¶ 129); and Acevedo reported her assault to Sanford directly on March 7, 2022. (*Id.* ¶ 104). Plaintiffs argue "§ 1595 has no timing requirement on 'actual knowledge[,]'" and, in the alternative, Defendants continue to receive a financial benefit from the venture even after, inevitably, acquiring actual knowledge of these allegations. (Sanford Opp. at 18; *see also* FAC ¶¶ 50–55, 75). Setting aside whether § 1595's knowledge element has *any* timing requirement, that timing is clearly with respect to the benefit obtained. *See* 18 U.S.C. § 1595(a) ("receiving anything of value from participation in a venture which that person knew or should have known has *engaged* in an act in violation of this chapter[.]") (emphasis added). Thus, the fact that Plaintiffs fail to allege Sanford actual knowledge of Bjorkman's sex trafficking before they were individually assaulted is irrelevant for purposes of this claim. The issue is when he received the benefit and

45

Plaintiffs allege Sanford continues to benefit from the alleged venture. Taken as true, these allegations, alone, are sufficient to withstand a motion to dismiss.

To the extent that further analysis is necessary, the Court also considers Defendants' previous employment at Keller Williams, (FAC ¶ 250; Sanford Opp. at 18), and the extensive history of allegations that Bjorkman and Golden drugged and assaulted women and used GHB recreationally during that time. (FAC ¶¶ 44–46, 153). Plaintiffs argue Sanford is liable for failing to implement policies sufficient to address this known behavior. (Sanford Opp. at 18). Several courts have found failure to implement policies sufficient to combat a known problem in one's operations can rise to the level of willful blindness or negligence. *See Brown v. Corr. Corp. of Am.*, 603 F. Supp. 2d 73, 81 (D.D.C. Mar. 26, 2009) (finding that complaint stated sufficient allegations under § 1983, based on willful blindness, where defendants knew that a supervisor at a correctional facility raped his employee, sexual harassment at the facility "was not an isolated incident," and defendants failed "to implement and effectuate the appropriate policies ... to remedy and/or prevent the discriminatory conduct, sexual abuse and sexual harassment and rape."); *Trollinger v. Tyson Foods, Inc.*, No. 4:02-cv-23, 2007 WL 1574275, at *12 (E.D. Tenn. May 29, 2007) (finding that a "willful blindness policy" could be sufficient to show a RICO violation); *see also M.A.*, 425 F. Supp. 3d at 968 (applying this reasoning and finding TVPRA liability for franchisor hotels' failure to implement such policies). Here, the allegations are sufficient to meet § 1595's negligence standard. Plaintiffs have alleged that Sanford was on notice about the prevalence of illicit drug use and sexual assault at recruitment events, generally, and at the hands of Bjorkman and Golden, specifically, and he failed to take adequate steps when training Sponsor Agents to prevent its occurrence—despite eXp's control over training and emphasis on recruiting. These allegations are sufficient to survive a Rule 12(b)(6) motion to dismiss.

### iii.    Gove

Gove argues Plaintiffs fail to allege he had knowledge of the sexual misconduct

before his alleged benefit, as required by *Ratha*, 35 F.4th at 1180. (Gove MTD at 20).[16] Plaintiffs argue "the TVPRA is silent as to when the receipt of the benefit must occur in relation to the actual or constructive knowledge." (Gove Opp. at 17). However, the Court need not resolve that issue because Plaintiffs allege Gove continues to benefit from Bjorkman's conduct.[17]

Gove argues "[a]t most, the FAC alleges that Gove learned of this misconduct on March 8, 2021, well after the end of the venture, and after Bjorkman's termination." (Gove MTD at 20–21). Gove argues Plaintiffs' other allegations—namely, that he attended some of the events where the conduct occurred—are insufficient to demonstrate otherwise. (Gove MTD at 21–22). However, Bjorkman's termination is largely irrelevant. The "venture" is the Revenue Share Program. Not only has the RSP not ended, but Bjorkman's recruited agents continue to contribute to it and Bjorkman continues to benefit from it. (*See* FAC ¶ 17).

Plaintiffs argue Gove's reliance on March 8, 2021, is misplaced because Gove obtained actual knowledge on March 3, 2021, when Jane Doe 3 told him that Bjorkman had assaulted her. (*Id.* ¶¶ 158, 232). Ignoring this allegation creates the plausible inference that Gove ignored or, at least, overlooked other notice about Bjorkman's conduct. Plaintiffs argue the following allegations support this: in August of 2020, Gove attended the Las Vegas event, where he saw Jane Doe 3 was "out of her mind which

---

[16] Gove also relies on the same cases as Golden which the Court has already discussed above. (*See* Gove MTD at 23–24).

[17] *Ratha* found plaintiffs failed to create a triable issue that defendant benefitted from the alleged venture after the undisputed date upon which knowledge was obtained and, thus, affirmed summary judgment in defendant's favor. 34 F. 4th at 1180. While this ostensibly defeats Plaintiffs' argument that the TVPRA has no timing requirement, the Court declines to answer that question. Here, on a motion to dismiss, the Court does not have the benefit of undisputed facts and, more importantly, Plaintiffs allege Defendants continue to benefit, unlike *Ratha*.

was completely out of character" (FAC ¶ 157); in September, Jane Doe 2's Facebook Post detailing her experience at the Las Vegas event was spread widely among eXp agents, as were the replies to that post detailing similar experiences at eXp recruiting events (*id.* ¶ 76); days later, Bjorkman was removed from eXp and Gove threatened to pull his entire team if Defendant Golden was terminated (*id.* ¶¶ 48, 74); and Gove attempted to interfere with the LVPD police investigation before Bjorkman was arrested. (*Id.* ¶ 233) (*See also* Gove Opp. at 16). Plaintiffs also allege Gove personally hosted recruiting events where Defendants Bjorkman and Golden assaulted other women. (FAC ¶ 71).

Taken as true and read together in the light most favorable to Plaintiffs, these allegations plausibly demonstrate that Gove actually knew about Bjorkman's alleged conduct, at the very least, in August or September of 2020. Moreover, for the reasons discussed above, Plaintiffs plausibly demonstrate that Gove and Sanford knew or should have known about Bjorkman's reputation and, therefore, should have known about his violative conduct much earlier. Plaintiffs have met their burden of satisfying "knowledge" as required by § 1595 beneficiary liability sufficient to survive a motion to dismiss.

### c. *Participation*

Defendants Sanford and Gove argue Plaintiffs fail to allege that they "participated in a venture" within the meaning of § 1595. (Sanford MTD at 18–22; Gove MTD at 14–16).[18] Specifically, Sanford argues this requires "an overt act" and

---

[18] Golden does not raise and, thus, waives argument on this issue. Regardless, having found that Plaintiffs have plausibly demonstrated Golden violated § 1591(a)(1) and, thus, participated in a sex trafficking venture, the Court finds Plaintiffs have also sufficiently alleged Golden participated in the broader definition of a "venture" under § 1595. To the extent that further analysis is necessary, as to Jane Doe 1's claim, the Court finds the First Amended Complaint plausibly establishes a direct association and business relationship between Golden and Bjorkman, sufficient to state a claim.

Gove argues this requires "physical participation" that is "more than a passive benefit." (Sanford MTD at 18; Gove MTD at 16). As explained above, the *M.A.* school of thought does not require a plaintiff asserting beneficiary liability to allege an overt act. *M.A.,* 425 F. Supp. 3d at 970. Rather, a plaintiff must allege the defendant had a direct association or a business relationship with their trafficker, the latter of which can be demonstrated by a pattern of conduct or a tacit agreement. *Mindgeek*, 558 F. Supp. 3d at 837 (citing *M.A.*, 425 F. Supp. 3d at 970; *J.B. v. G6 Hospitality, LLC,* No. 19-cv-07848-HSG, 2020 WL 4901196, *9 (N.D. Cal. Aug. 20, 2020); *A.B. v. Marriot Int'l, Inc.*, 455 F. Supp. 3d at 186).

Sanford's proffered authority does not dissuade the Court from adopting this standard. *See*, *e.g.*, *Afyare*, 632 F. App'x at 280–86; *Ricchio,* 853 F.3d 553; *Noble*, 335 F. Supp. at 524 (all involving § 1591(a)(2) claims); *see also Red Roof Inns, Inc.*, 21 F.4th at 726–27 (Eleventh Circuit applying the criminal standard to § 1595 where plaintiff did not, until appeal, allege anything other than a "sex trafficking venture"). In fact, while Sanford is correct that the court in *S.G. v. Vagabond Inn Corp.* recognized the Eleventh Circuit's rationale was not "inconsistent with those laid out by Courts in this circuit[,]" the court ultimately adopted the more lenient standard set out in *M.A.* No. SACV 21-955 PSG (KESx), 2022 U.S. LEXIS 104102, *9 (C.D. Cal. Mar. 2, 2022). This Court also adopts that standard.

In support of his argument that "more than a passive benefit" is required, Gove cites to a prior opinion in the *Ratha* case that is inapplicable—although, arguably detrimental to his argument. No. 16-4271-JFW (ASx), 2017 WL 8293174, *4 (C.D. Cal. Dec. 21, 2017), *aff'd*, 26 F.4th 1029 (9th Cir. 2022), and *aff'd sub. nom.*, *Ratha*, 35 F.4th 1159 (9th Cir. 2022).  There, the court granted summary judgment in favor of defendants alleged to have violated the TVPRA's sections prohibiting peonage, forced labor, involuntary servitude, unlawful conduct with respect to documents, and human trafficking—not sex trafficking. *Id.*, at *2. In fact, the court rejected plaintiffs' argument that "the TVPRA criminalizes merely 'passive'  beneficiaries" because it "relie[d] on

49

the definition of 'venture' in the TVPRA that expressly relates solely to sex trafficking[
]"—signaling, though not deciding, that "passive" beneficiaries of *sex* trafficking *may*
violate the TVPRA. *Id.*, at \*4. Thus, to the extent that evidence of "action to operate or
manage the venture" is required for some TVPRA claims on a motion for summary
judgment, that is not the inquiry here. *Id*.

Here, Plaintiffs argue Bjorkman's relationship with Sanford and Gove
demonstrates direct association and a business relationship—not requiring a tacit
agreement, though "one exists and could be demonstrated." (*See* Sanford Opp. at 14).
In sum, Plaintiffs allege, "all Defendants are involved in a venture, described in detail
as a multi-level marketing ("MLM") enterprise from which its members are partners in
a Revenue Share Pyramid that requires continual recruitment of new agents for the
direct financial benefit of everyone upline, including, and most specifically, Defendant
Sanford, sitting alone at the top of the  pyramid." (Sanford Opp. at 16) (citing FAC ¶
16). Gove participated in the same venture, in order to benefit from each Plaintiffs'
placement in his upline, by "promot[ing] Defendants Bjorkman and Golden's
recruitment efforts, which included luring agents to attend recruitment events with
promises of career advancement." (Gove Opp. at 13) (citing FAC ¶¶ 1–2, 26–27, 32,
72, 102, 133, 163, 205–210).

Construing these factual allegations in the light most favorable to Plaintiffs, as
required by Rule 12(b)(6), there is a plausible inference that Sanford and Gove had
direct association and a business relationship with Bjorkman and, thus, "participated
in a venture"—the Revenue Share Plan—that they knew or should have known
violated the TVPRA. Plaintiffs have met their burden of pleading facts showing that
Golden, Sanford and Gove are beneficiaries of Bjorkman's sex trafficking and, thus,
liable under § 1595. Accordingly, the Court **DENIES** Defendants Sanford, eXp
Realty, Golden, and Gove's motions to dismiss Count 3.

**3. Counts 4–11: State Tort Claims**

Plaintiffs' remaining causes of action (Counts 4–11) are all state law claims.

50

1  (FAC ¶¶ 211–252). All Defendants argue these claims are barred by a two-year statute
2  of limitations. (Bjorkman MTD at 22–24; Golden MTD at 12; Sanford MTD at 25–26;
3  Gove MTD at 26, 29). Defendants Sanford and Gove argue the claims against them also
4  fail to sufficiently plead various elements. (Sanford MTD at 27–31; Gove MTD at 27–
5  30). The Court first addresses the statute of limitations and then Defendants' arguments
6  as to each claim in turn.[19]

7         *a. Statute of Limitations*

8        Plaintiffs bring the following state law claims: Acevedo, Jane Doe 1 and Jane
9  Doe 3 allege sexual battery against Bjorkman (Count 4); all female Plaintiffs allege civil
10  battery against Bjorkman and Jane Doe 2 and Jane Doe 3 also allege civil battery against
11  Golden (Count 5); all female Plaintiffs allege intentional infliction of emotional distress
12  ("IIED") against all Defendants (Counts 6–8); all female Plaintiffs allege negligence
13  against all Defendants (Count 9) and negligent hiring, retention and supervision against
14  Sanford (Count 10); John Doe alleges loss of consortium against all Defendants (Count
15  11). (FAC ¶¶ 211–254).

16        The statute of limitations is an affirmative defense that "may be raised by a
17  motion for dismissal . . . . [i]f the running of the statute is apparent on the face of the
18  complaint . . . ." *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980)
19  (external citations omitted). "[T]he defendant has the burden of proving the action is
20  time-barred." *Grisham v. Phillip Morris, Inc.*, 670 F. Supp. 2d 1014, 1020 (C.D. Cal.
21  2009) (external citations omitted); *see also ASARCO, LLC v. Unicon Pac. R.R. Co.*, 765
22  F.3d 999, 1004 (9th Cir. 2014) ("Dismissal under Rule 12(b)(6) on the basis of an
23  affirmative defense is proper only if the defendant shows some obvious bar to securing

24

25

---

26  [19] Having found Plaintiffs' TVPRA claims have been sufficiently pled, the Court rejects
27  Bjorkman and Golden's argument that the state law claims lack subject matter jurisdiction. (Bjorkman MTD at 20–22; Golden MTD at 11).

28

relief on the face of the complaint."). A defendant's motion to dismiss, therefore, can be granted "only if the assertions of the complaint, read with the required liberality, would not permit the plaintiff to prove plausibly that the statute was tolled." *See Jablon*, 614 F.2d at 682.

It is undisputed that until recently Plaintiffs' state tort claims were subject to a two-year statute of limitations, whether brought in California or Nevada. *See* Cal. Civ. Proc. Code § 335.1 (actions for "assault, battery, or injury to, or for the death of, an individual caused by the wrongful act or neglect of another[,]" must be brought within two years); *see also* Nev. Rev. Stat. § 11.90 ("Except as otherwise provided … an action to recover damages for injuries to a person or for the death of a person caused by the wrongful act or neglect of another[,]" must be brought within two years). It is also undisputed that the California and Nevada legislatures have extended that period for certain claims of sexual assault. *See* Cal. Civ. Proc. Code § 340.16(a); 2018 Cal. Stat. Ch. 939 (A.B. 1619), § 1, eff. Jan 1, 2019; *see also* 2023 Nev. Stat. Ch. 112 (S.B. 129), eff. May 31, 2023.[20] The Court must apply California's choice-of-law rules in order to address the parties' arguments about these new laws, which can be summarized as follows.

In their motions to dismiss each Defendant argues Plaintiffs' claims are barred by California's two-year statute of limitations. (Sanford MTD at 25–26; Gove MTD at

---

[20] Section 340.16 has been amended four times since it was enacted. 2019 Cal. Stat. Ch. 462 (A.B. 1510), § 1, eff. Oct. 2, 2019; 2020 Cal. Stat. Ch. 246 (A.B. 3092), § 1, eff. Jan. 1, 2021; 2022 Cal. Stat. Ch. 442 (A.B. 2777), § 3, eff. Jan. 1, 2023. The Court hereinafter refers to California's statute as "section 340.16."

While S.B. 129 made changes to Chapter 11 of the Nevada Revised Statutes ("NRS") that were immediately effective on May 31, 2023, the most recent publication of the NRS is the 2021/2022 edition. *See* Nevada Legislative Counsel Bureau, *Nevada Law Library,* https://www.leg.state.nv.us/law1.html (last visited Jan. 24, 2024). The Court hereinafter refers to Nevada's statute as "S.B. 129."

26, 29; Bjorkman MTD at 22–24; Golden MTD at 12). In their oppositions Plaintiffs argue their claims are revived under section 340.16. (Sanford Opp. at 19–22; Gove Opp. at 18–19; Bjorkman Opp. at 14–16; Golden Opp. at 10–11). Sanford, Gove and Bjorkman respond by arguing that Plaintiffs fail to allege a "cover up" under subsection (e) of section 340.16. (Sanford Reply at 12–13; Gove Reply at 18–19; Bjorkman Reply at 13–14). Golden additionally argues, for the first time in his Reply, that Jane Doe 2, Jane Doe 3 and John Doe's claims are controlled by Nevada law and, thus, time-barred irrespective of section 340.16's applicability. (Golden Reply at 7). In their supplemental briefs on that issue, Plaintiffs argue their claims are open under either section 340.16 or S.B. 129 and, thus, there is no conflict of law. (Dkt. 121 at 5, 7). Defendants Bjorkman and Golden argue this Court must apply Nevada law to Jane Doe 2, Jane Doe 3 and John Doe's claims which are not subject to S.B. 129. (Dkt. 122 at 5–8; Dkt. 123 at 4–5).

For the reasons stated below, the Court finds that there is a difference between California's section 340.16 and Nevada's S.B. 129 but, by operation of California's borrowing statute, only Jane Doe 2's claims require choice-of-law analysis. Ultimately, the Court concludes that all of Jane Doe 2's claims are revived under section 340.16, some of Jane Doe 3's claims are revived under S.B. 129, and John Doe's claim is time-barred.

### i.    California's Governmental Interest Test

"In a federal question action where the federal court is exercising supplemental jurisdiction over state claims, the federal court applies the choice-of-law rules of the forum state—in this case, California." *Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*, 96 F.3d 1151, 1164 (9th Cir. 1996) (citations omitted). In California, "general choice-of-law rules have been formulated by courts through judicial decisions rendered under the common law, rather than by the legislature through statutory enactments." *McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68, 83 (2010) (collecting cases). California courts apply the "governmental interest" test to resolve choice-of-law questions. *Id.* That test

sets out the following three-part inquiry:

> First, the court determines whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different. Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists. Third, if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law "to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state" [citation], and then ultimately applies "the law of the state whose interest would be the more impaired if its law were not applied."

*Chen v. Los Angeles Truck Centers, LLC*, 7 Cal. 5th 862, 867–68 (citing *Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95, 107–08 (2006)).

Here, the potentially affected jurisdictions are California and Nevada. Thus, the Court must determine whether any of Jane Doe 2, Jane Doe 3 or John Doe's claims are time-barred in either of those states. First, the Court applies California law to those claims and, at the same time, considers whether Plaintiffs Acevedo and Jane Doe 1's claims are revived by section 340.16. Next, the Court applies Nevada law to Jane Doe 2, Jane Doe 3 and John Doe's claims to determine if there is a different result.

### ii.    California's Borrowing Statute

A majority of states have enacted "borrowing statutes" that direct the courts of a state, in lawsuits filed within that state, to apply or "borrow" the statute of another state when the cause of action in question "arose," "originated," or "accrued" in the other state and would be barred as untimely in that state. *McCann,* 48 Cal. 4th at 83–85. Borrowing statutes specifically seek to prevent forum shopping. *Id.* at 84. Under common law, the local statute of limitations of the forum state applied to an action filed in the forum state, regardless of the location of the most significant events. *Id.* When a forum state's statute was shorter than the other jurisdiction's statute, the plaintiff could still bring suit in the other state. *Id.* However, when the forum state's statute was longer, a plaintiff who had failed to timely file an action in the state in which the action arose, had the opportunity to search out another jurisdiction with a longer statute—"a classic

example of questionable forum shopping." *Id.* Many borrowing statutes include an exception for lawsuits filed by residents or citizens of the forum state. *Id.* at 85. California's borrowing statute adopts this general rule and exception:

> When a cause of action has arisen in another State, or in a foreign country, and by the laws thereof an action thereon cannot there be maintained against a person by reason of the lapse of time, an action thereon shall not be maintained against him in this State, except in favor of one who has been a citizen of this State, and who has held the cause of action from the time it accrued.

Cal. Civ. Proc. Code § 361.[21]

In their supplemental briefs on the choice-of-law issue, Bjorkman and Golden argue Jane Doe 2, Jane Doe 3 and John Doe's claims are time-barred by Nevada's two-year statute of limitations because they allege torts that occurred exclusively in Nevada. (Dkts. 122–23). Specifically, Bjorkman argues that section 361's exception does not apply because Jane Doe 2 has not alleged that she is a citizen of California and Jane Doe 3 and John Doe are citizens of Florida. (Dkt. 122 at 5, n. 1, 6). Because Jane Doe 2 has alleged that she is a citizen of California, (FAC ¶ 9), the Court proceeds with California's governmental interest test with respect to her claims. *See McCann*, 48 Cal. 4th at 86–87 (section 361 cannot compel application of the California statute of limitations and the question of which jurisdiction's statute should be applied in a particular case must be determined through application of the governmental interest analysis). However, because Jane Doe 3 and John Doe are citizens of Florida, (FAC ¶¶ 10–11), and their cause of action stems from alleged incidents that occurred in Nevada,

---

[21] Nevada's borrowing statute operates similarly, by applying the general rule and creating an exception for lawsuits filed by Nevada residents or citizens. *See* Nev. Rev. Stat. § 11.020. With respect to Nevada's borrowing statute, Jane Doe 2's claims did not "arise" in another state—the premise of Defendants' choice-of-law argument is that they arose in Nevada. Thus, it is irrelevant that Jane Doe 2 is not a citizen or resident of Nevada for purposes of applying S.B. 129.

those claims may only be brought in California if permitted under the laws of Nevada. *See Shubin v. Universal Vacation Club*, 622 F. Supp. 3d 849, 852 (C.D. Cal. 2022) (under California choice-of-law rules, section 361 barred Idaho residents' claims that arose from alleged incidents that occurred in Cabo San Lucas, Mexico). Accordingly, the Court need not address the applicability of section 340.16 with respect to Jane Doe 3 and John Doe's claims.

### iii.    California's Section 340.16

Section 340.16 was enacted in 2018 and took effect on January 1, 2019. Cal. Civ. Proc. Code § 340.16; 2018 Cal. Stat. Ch. 939 (A.B. 1619), § 1. Since October 2, 2019, section 340.16 has provided:

> [i]n any civil action for recovery of damages suffered as a result of sexual assault, where the assault occurred on or after the plaintiff's 18th birthday, the time for commencement of the action shall be the later of the following:
>
> (1) Within 10 years from the date of the last act, attempted act, or assault with the intent to commit an act, of sexual assault against the plaintiff.
>
> (2) Within three years from the date the plaintiff discovers or reasonably should have discovered that an injury or illness resulted from an act, attempted act, or assault with the intent to commit an act, of sexual assault against the plaintiff.

Cal. Civ. Proc. Code § 340.16(a) (as amended by 2019 Cal. Stat. Ch. 462 (A.B. 1510), § 1).

Among other changes, the 2019 amendment specifically enlarged the statute of limitations for civil claims against defendants who were not alleged to have committed sexual assault.[22] "Sexual assault" under section 340.16 is defined to mean any of a

_____

[22] From January 1, 2019 through October 1, 2019, the ten-year and three-year periods were defined with reference to an "act, attempted act, or assault with intent to commit an act, of sexual assault *by the defendant* against the plaintiff." 2018 Cal. Stat. Ch. 939 (A.B. 1619), § 1 (italics added). Since October 1, 2019 subsection (a), by its terms, is not limited to defendants who sexually assaulted the plaintiff. Cal. Civ. Proc. Code § 340.16(a); *see also Doe #21 (S.H.) v. CFR Enterprises, Inc.,* 93 Cal. App. 5th 1199, 1208, n. 9 (Cal. Ct. App. First 2023).

The 2019 amendment also added subsection (b)(2) which provides: "For the

number of crimes described in the California Penal Code, assault with the intent to commit any of those crimes, or an attempt to commit any of those crimes. Cal. Civ. Proc. Code § 340.16(b)(1).[23] This definition includes sexual battery and rape, which are described in distinct sections of the California Penal Code. *Id.*[24]

Effective January 1, 2023, section 340.16 was amended to add two revival provisions. 2022 Stats. Ch. 442 (A.B. 2777), § 3. First, subdivision (b)(3) was added to provide that section 340.16 apply retroactively to "any action described in subdivision (a) that is based upon conduct that occurred on or after January 1, 2009, and is commenced on or after January 1, 2019, that would have been barred solely because the applicable statute of limitations has or had expired. Such claims are hereby revived and may be commenced until December 31, 2026." Cal. Civ. Proc. Code § 340.16(b)(3).

Second, subdivision (e) was added to establish a one-year window reviving claims where the plaintiff additionally alleges that the defendant or defendants "engaged in a cover up or attempted a cover up of a previous instance or allegations of

---

purposes of this section, it is not necessary that a criminal prosecution or other proceeding have been brought as a result of the sexual assault or, if a criminal prosecution or other proceeding was brought, that the prosecution or proceeding resulted in a conviction or adjudication. This subdivision does not limit the availability of causes of action permitted under subdivision (a), including causes of action against persons or entities other than the alleged person who committed the crime." Cal. Civ. Proc. § 340.16(b)(2).

[23] Between 2019 and 2023, there were minimal changes made to the language of subsection (b)(1), however the same Penal Code sections are identified. *See* 2019 Cal. Stat. Ch. 462 (A.B. 1510), § 1; 2020 Cal. Stat. Ch. 246 (A.B. 3092), § 1; 2022 Cal. Stat. Ch. 442 (A.B. 2777), § 3.

[24] Section 340.16(b)(1) provides: "As used in this section, 'sexual assault' means any of the crimes described in Sections 243.4, 261, 264.1, 286, 287, or 289, or former Sections 262 and 288a, of the Penal Code, assault with the intent to commit any of those crimes, or an attempt to commit any of those crimes." *See* Cal. Penal Code §§ 243.4 (sexual battery), 261 (rape).

sexual assault by an alleged perpetrator of such abuse." Cal. Civ. Proc. Code § 340.16(e).[25] Such claims may be brought until December 31, 2023, regardless of when the underlying conduct occurred. Cal. Civ. Proc. Code § 340.16(e)(1).[26] A claim is revived under subdivision (e) where the plaintiff alleges that they were sexually assaulted; that one or more entities are legally responsible for damages arising out of the sexual assault; and that "[t]he entity or entities, including but not limited to, their officers, directors, representatives, employees, or agents, engaged in a cover up or attempted a cover up of a previous instance or allegations of sexual assault by an alleged perpetrator of such abuse." Cal. Civ. Proc. Code § 340.16(e)(2)(A)–(C). "Legally responsible" is defined as meaning that "the entity or entities are liable under any theory of liability established by statute or common law, including, but not limited to, negligence, intentional torts, and vicarious liability." Cal. Civ. Proc. Code § 340.16(e)(4)(C). "Cover up" is defined as "a concerted effort to hide evidence relating to a sexual assault that incentivizes individuals to remain silent or prevents information relating to a sexual assault from becoming public or being disclosed to the plaintiff,

---

[25] Subdivision (e)(1) provides: "Notwithstanding any other law, any claim seeking to recover damages suffered as a result of a sexual assault that occurred on or after the plaintiff's 18th birthday that would otherwise be barred before January 1, 2023, solely because the applicable statute of limitations has or had expired, is hereby revived, and a cause of action may proceed if already pending in court on January 1, 2023, or, if not filed by that date, may be commenced between January 1, 2023, and December 31, 2023." Cal. Civ. Proc. Code § 340.16(e)(1).

[26] Opposition to A.B. 2777 makes clear that—in addition to the "cover up" pleading requirement—the qualifying distinction between the two revival provisions is whether the alleged sexual assault must have occurred before 2009. "AB 2777 provides a one-year 'reviver' window in 2023 to sue for alleged sexual assault or other inappropriate conduct of a sexual nature that can go back in time for half a century or more." 21 California Assembly Bill No. 2777, California 2021-2022 Regular Session, Senate Floor Analysis at 8; *see also Doe #21 (S.H.) v. CFR Enterprises, Inc.,* 93 Cal. App. 5th 1199, 1211 (Cal. Ct. App. First 2023) ("Unlike the revival provision in section 340.16(b)(3), section 340.16(e) applies to claims regardless of when the alleged sexual assault occurred[.]").

58

including, but not limited to, the use of nondisclosure agreements or confidentiality agreements." Cal. Civ. Proc. Code § 340.16(e)(4)(A). "[N]othing in the language of the statute requires that the alleged cover up involve a previous instance of sexual assault by the same individual who later assaulted plaintiff[,]" but requires only that the plaintiff allege a cover up that predated her alleged assault. *Doe #21 (S.H.) v. CFR Enterprises, Inc.,* 93 Cal. App. 5th 1199, 1211, 1222 (Cal. Ct. App. First 2023).

The parties' briefing on this issue is circuitous and suffers, in part, due to the repetitive nature of Defendants' motions to dismiss which were individually filed nearly three months apart. (Dkts. 41-1, 63, 77-1, 88). The Court summarizes the critical points as follows. In Plaintiffs' oppositions and Defendants' replies the parties only dispute the applicability of subsection (e) and, specifically, whether Plaintiffs have sufficiently alleged a cover up. (Sanford Opp. at 19–22; Gove Opp. at 18–19; Bjorkman Opp. at 14–16; Golden Opp. at 10–11; Sanford Reply 12–13; Gove Reply 18–19; Bjorkman Reply at 13–14; Golden Reply at 7). In their supplemental brief, Plaintiffs argue that Defendants Bjorkman and Golden are directly liable under subsection (a) and, therefore, need not demonstrate a cover up to revive those claims. (Dkt. 121 at 6, n. 3). Golden and Bjorkman do not respond to this argument. (Dkts. 122–23). Plaintiffs do not argue that Defendants Sanford or Gove are also directly liable under subsection (a) and, instead, imply that they are *only* liable *if* Plaintiffs sufficiently allege a cover up under subsection (e). However, upon a complete review of the briefing—and because Defendants Bjorkman and Golden raise the issue of choice-of-law, which requires the Court to analyze which statute of limitations does, in fact, apply in California state court—the Court concludes subsection (a) directly applies to Defendants Sanford and Gove, as well. It is Defendants' burden on a motion for dismissal to demonstrate why Plaintiffs cannot possibly revive their claims under section 340.16. Consequently, the Court only addresses the parties' arguments about specific subsections of the California statute, insofar as it must decide whether Defendants have met their burden.

While there is little caselaw on this newly enacted statute, the Court is persuaded

by the statutory analysis provided by the First Division of the Second District of the California Court of Appeal. *S.H.*, 93 Cal. App. 5th 1199. There, plaintiffs alleged that massage chain franchise defendants "concealed or suppressed" information about a "rampant problem of sexual assaults" occurring at their stores between August of 2003 and November of 2014. *Id.* at 1204. In 2019, eighteen plaintiffs brought multiple causes of action including sexual battery, negligence, and intentional infliction of emotional distress, against the franchises based on their employees' conduct, arguing their claims were revived under both subdivisions (b)(3) and (e) of section 340.16. *Id.* at 1205. After extensive statutory analysis, the Court made two conclusions that are relevant here.

First, section 340.16, by its terms, is not limited to *claims* of sexual assault, but applies to *any action* seeking damages *as a result of* sexual assault, regardless of the legal theory alleged. *Id.* at 1209–1210. Second, subdivisions (b)(3) and (e) are distinct, but not mutually exclusive, revival provisions. The Court explained the distinction between the two provisions—apart from the cover up—is the date of the underlying assault. *Id.* at 1211 ("[T]his means that the claims of Jane Doe No. 18 and Jane Doe No. 19, who allege they were assaulted before January 1, 2009, are potentially subject to revival under section 340.16(e) even though those claims are not revived by section 340.16(b)(3). And the claims of the other remaining plaintiffs who allege they were assaulted on or after January 1, 2009 are also potentially subject to revival by section 340.16(e), as well as section 340.16(b)(3)."). In other words, a "cover up" is not necessary to hold an entity liable under section 340.16. Rather, subdivision (e) creates an additional way to hold entities liable, even when an individual may evade liability under subdivision (b)(3) because the alleged sexual assault occurred before 2009.

Here, Plaintiffs seek damages resulting from sexual assault that allegedly occurred after January 1, 2009, potentially reviving their claims under subdivision (b)(3), *and* they allege some or all Defendants engaged in a cover up, potentially

reviving their claims under subdivision (e) as well.[27] Regardless of which subdivision applies, the same underlying claim is revived—namely, an "action for recovery of damages suffered as a result of sexual assault" as defined by subdivision (b)(1). *See* Cal. Civ. Proc. § 340.12(a)–(b). Plaintiffs argue their claims against Bjorkman and Golden are revived under subdivision (b)(3) and correctly state that they need not allege a cover up with respect to those claims. (Dkt. 121 at 6, n. 3). However, no Defendant persuades the Court that Plaintiffs need allege a cover up at all.

Acevedo and Jane Doe 1 bring an action for sexual battery against Bjorkman (Count 4). (FAC ¶¶ 211–215).[28] As one of the enumerated actions constituting "sexual assault" under subdivision (b)(1), Count 4 is clearly revived. All female Plaintiffs bring an action for civil battery against Bjorkman and Jane Doe 2 brings a claim for civil battery against Golden (Count 5). (*Id.* ¶¶ 216–223). Plaintiffs allege that Defendants intentionally placed a drug in their drinks, without their consent, to render them unconscious for the purpose of causing their sexual assault. In other words, Plaintiffs allege battery "with the intent to commit" sexual battery, provided for in subdivision (b)(1). Thus, subdivision (b)(3) revives, not only Counts 4 and 5, but any claim "for recovery of damages suffered as a result of" those sexual assaults. So long as Plaintiffs seek damages that they experienced as a result of being sexually battered or drugged, those claims are revived under subdivision (b)(3), regardless of the legal theory alleged. This includes Plaintiffs' IIED claims against Bjorkman and Golden (Count 6), alleging Defendants caused their injuries by "subjecting them to forceful sexual touching and assault" (i.e., sexual battery and/or drugging), as well as the negligence claims against Bjorkman and Golden (Count 9) realleging the same conduct. (*Id.* ¶¶ 224–28, 242–46).

---

[27] Unlike the plaintiffs in *S.H.*, Plaintiffs do not allege sexual assault that occurred before 2009 and, thus, subsection (e) is not necessary to save their claims.

[28] Because Jane Doe 3 and John Doe are not subject to section 361's exception, the Court excludes those claims (Counts 4–11) from its analysis of section 340.16.

It also includes the IIED and negligence claims against Sanford and Gove (Counts 7–9) because Plaintiffs allege Defendants' various actions—such as denying sponsorship requests and interfering with the criminal investigation—exacerbated the injuries they experienced "as a result of [their] sexual assault." (*Id.* ¶¶ 229–246). Plaintiffs also allege Sanford negligently hired, retained and supervised Golden and Bjorkman (Count 10). (*Id.* ¶¶ 247–252). While the hiring and training predated the alleged sexual battery and drugging, Plaintiffs allege Sanford's negligent practices caused their sexual battery and drugging, and they seek damages suffered "as a result of [that] sexual assault." Cal. Civ. Proc. Code § 3401.16(a). Plaintiffs also argue that Sanford retained Bjorkman and Golden after learning about their reputation and after learning about Plaintiffs' own assaults. (*See* FAC ¶¶ 250, 45–47, 83). The nexus of these events underscores that the injuries all stem from the alleged sexual assaults. Like the plaintiffs in *S.H.*, Plaintiffs allege various legal theories, but each claim seeks to recover damages that Plaintiffs would not have suffered, but for their sexual assault. Such claims are actions for "recovery of damages suffered as a result of sexual assault[.]"

While not necessary, the Court also finds that Plaintiffs have sufficiently alleged a cover up within the meaning of subdivision (e). Plaintiffs allege: (1) they were sexually assaulted; (2) Defendant eXp, a limited liability company and corporation, is legally responsible under the TVPRA, as well as theories of negligence; and (3) Defendants Sanford and Gove made a concerted effort to hide specific incidents of sexual assault, as well as Defendants Bjorkman and Golden's known "pattern and practice of predatory sexual conduct." (FAC ¶¶ 12–13, 83–84, 104–05, 173). Defendant Sanford is the Founder, Chairman of the Board, and CEO of eXp, as well as the top agent of its Revenue Share Pyramid. (*Id.* ¶¶ 16, 239). Defendant Gove is a real estate agent and top Influencer at eXp, whose downline translates to more than one-fifth of eXp's agents. (*Id.* ¶ 69). These roles satisfy the expansive language which "include[es] but [is] not limited to … officers, directors, representatives, employees or agents[,]" of a "limited liability company [or] corporation[.]" Cal. Civ. Proc. Code §§

340.16(e)(2)(C), (4)(B). Plaintiffs allege Sanford and Gove engaged in a cover up by means of "repeated gaslighting, the use of Non-Disclosure Agreements, and interference with the criminal investigation." (Sanford Opp. at 20; FAC ¶¶ 80–84, 154–56, 168, 175, 176). This describes a "concerted effort to hide evidence … that incentivizes individuals to remain silent or prevents information relating to a sexual assault from becoming public … including, but not limited to, the use of *nondisclosure agreements*[.]" Cal. Civ. Proc. Code § 340.16(e)(4)(A) (emphasis added).

Several of these allegations demonstrate that Defendants attempted to cover up Plaintiffs' own alleged sexual assaults because "they thought more women would come forward." (FAC ¶ 166). However, read as a whole, the First Amended Complaint creates the plausible inference that Defendants also attempted to cover up a "previous instance or allegations of sexual assault" as required by subsection (e)(2)(C). The Arrest Warrant Declaration includes multiple accounts of women being drugged and assaulted by Bjorkman at eXp Realty recruitment events, as well as a "long history" of similar accusations dating back to 2000. (*Id.* ¶¶ 43–44, 47). This includes an eXp agent that reported her 2007 rape to her Sponsor Agent in October of 2018 and tried to report it to eXp's Designated California Broker. (*Id.* ¶¶ 45–46). Another eXp agent informed eXp that Golden raped her and eXp denied her request to change sponsorship. (*Id.* ¶ 175). All Defendants knew each other from Keller Williams which overlaps with the alleged prior assaults. (*Id.* ¶¶45–46, 175, 250). At the hearing, Plaintiffs also stated that their allegations regarding the use of nondisclosure agreements refer to incidents that predate Plaintiffs' alleged assaults. Plaintiffs further allege that eXp's former president was accused of sexual assault and women were "silenced" and terminated when they knew or complained about those allegations.  (*Id.* ¶ 177). Read as a whole and with the required liberality, Plaintiffs' allegations create the plausible inference that the eXp Leadership Team had a "longstanding culture—their pattern and practice—of creating an environment that allowed these assaults, then silencing those whose accounts of sexual harassment and assault would impact profit." (*Id.*¶ 1).  The Court finds that

Plaintiffs have sufficiently alleged a cover up to, alternatively, revive Plaintiffs Acevedo, Jane Doe 1 and Jane Doe 2's claims.[29]

In sum, Defendants provide no argument that disproves the following conclusion: section 340.16, by its terms, is not limited to *claims* for sexual assault and it is not limited to claims *against the perpetrator* of sexual assault. Having sufficiently alleged that Acevedo, Jane Doe 1 and Jane Doe 2 (1) were sexually assaulted within the meaning of subdivision (b)(1) after January 1, 2009, and (2) suffered injuries as a result of that sexual assault as required by subdivision (a), section 340.16 applies retroactively under subdivision (b)(3) to any of Plaintiffs' claims that seek damages for those injuries, regardless of the legal theory alleged—and regardless of whether subdivision (e) provides an alternative means of revival. For the reasons discussed above, Acevedo, Jane Doe 1 and Jane Doe 2 have sufficiently alleged such injuries for all of their state law claims and, thus, those claims are open under section 340.16(b)(3). Plaintiffs have also plausibly demonstrated a cover up and, thus, their claims are also open under section 340.16(e).

Accordingly, Plaintiffs Acevedo, Jane Doe 1 and Jane Doe 2 have sufficiently pled that their claims in Counts 4–10 against all Defendants are timely in California.[30] The Court **DENIES** Defendants' motions to dismiss those claims on the grounds that they are time-barred by California's two-year statute of limitations. Next, the Court applies Nevada law to Jane Doe 2, Jane Doe 3, and John Doe's claims to determine whether there is a conflict of law, with respect to Jane Doe 2, and whether Jane Doe 3

---

[29] Plaintiffs, in the alternative, seek leave to amend the FAC with several allegations against Gove and Sanford that plausibly demonstrate a cover up. (*See* Sanford Opp. at 29; Gove Opp. at 21–23).

[30] While Plaintiffs Acevedo and Jane Doe 1 are citizens of Florida and Tennessee, respectively, they allege substantial conduct that took place in California. Defendants fail to meaningfully argue that these claims are subject to Florida or Tennessee law.

or John Doe's claims are time-barred.

<div align="center">

**iv.**      **Nevada's S.B. 129**

</div>

Under California's governmental interest test, the Court must decide if there is a difference between application of California's section 340.16 and Nevada's S.B. 129, with respect to Jane Doe 2's claims. At the same time, the Court considers whether Jane Doe 3 and John Doe's claims are barred by Nevada's two-year statute of limitations or whether S.B. 129 revives those claims.

As of May 31, 2023, Nevada no longer has a statute of limitations for civil actions to recover damages for sexual assault that occurred when the plaintiff was 18 years of age or older. Section 1 of this bill provides:

> 1. An action to recover damages for an injury to a person arising from the sexual assault of the plaintiff which occurred when the plaintiff was 18 years of age or older may be commenced against the alleged perpetrator or person convicted of the sexual assault at any time after the sexual assault occurred. In such an action, if the alleged injury to the plaintiff is the result of a series of two or more acts constituting sexual assault, the plaintiff is not required to identify which specific act in the series of acts caused the alleged injury.
>
> 2. As used in this section, "sexual assault" has the meaning ascribed to it in NRS 200.366.

2023 Nev. Stat. Ch. 112 (S.B. 129), § 1, eff. May 31, 2023.

Section 3 of this bill provides that the changes shall be applied retroactively:

> The amendatory provisions of this act apply retroactively to any act constituting sexual assault as defined in section 1 of this act that occurred before the effective date of this act, regardless of any statute of limitations that was in effect at the time the act constituting sexual assault occurred, including, without limitation, any civil action that would have been barred by the statute of limitations that was in effect before the effective date of this act.

*Id.*, § 3.

By its terms, S.B. 129 differs from section 340.16 in two ways. First, S.B. 129 is limited to allegations of rape because, in Nevada, "sexual assault" specifically describes rape. "A person who subjects another person to sexual penetration, or who forces another person to make a sexual penetration on himself or herself or another, or on a

<div align="center">65</div>

beast, against the will of the victim or under conditions in which the perpetrator knows or should know that the victim is mentally or physically incapable of resisting or understanding the nature of his or her conduct, is guilty of sexual assault." Nev. Rev. Stat. § 200.366. Significantly, S.B. 129 does not apply to "battery with the intent to commit sexual assault," Nev. Rev. Stat. § 200.400, nor does it apply to any other definition of assault or battery. *See* Nev. Rev. Stat. §§ 200.471 (assault), 200.481 (battery). Thus, even if the language "a person who *subjects* another person to sexual penetration" includes attempt, aiding and abetting, or conspiracy, those theories only advance allegations of rape. Second, S.B. 129 is limited to actions commenced "against the perpetrator" of the sexual assault. Thus, S.B. 129 applies to a more limited type of conduct and defendant than section 340.16.

Here, Jane Doe 2 and Jane Doe 3 bring claims for "civil battery" against Bjorkman and Golden (Count 5). (FAC ¶¶ 216–220). They allege Defendants put GHB in their drinks, causing them to "unknowingly ingest the drug and be touched for which they did not consent." (*Id.* ¶¶ 144, 151–53, 217–19). Such allegations do not satisfy the conduct described in NRS § 200.36 and, rather, describe "battery" as defined by NRS § 200.481. Thus, Count 5 is not revived under S.B. 129.

Jane Doe 3 also brings a claim for "sexual battery" against Bjorkman (Count 4). (*Id.* ¶¶ 211–15). Jane Doe 3 describes "unwanted and unlawful, sexual physical touching… " and "recall[s] being sexually assaulted by Defendant Bjorkman" on the night of August 20, 2020. (*Id.* ¶¶ 152, 213). While Jane Doe 3 does not explicitly allege an act of penetration, her allegations do not negate the occurrence of such an act.[31]

---

[31] At the hearing on August 18, 2023, the Court agreed with Plaintiffs that Jane Doe 3's statement that she recalls being sexually assaulted by Bjorkman is not conclusory. (*See* FAC ¶ 153). Plaintiffs requested, in the alternative, that the Court grant leave to amend this allegation with a description of Bjorkman's physical acts. Because it is Defendant's burden to prove that Plaintiff cannot possibly demonstrate this allegation amounts to sexual battery as defined by NRS § 200.36 and he fails to meet that burden, it is not

1    Moreover, Bjorkman does not argue that Jane Doe 3 fails to allege a qualifying sexual

2    assault. In fact, Bjorkman argues that—*except for* her allegation of "sexual battery"—

3    Jane Doe 3 fails to allege an act defined by NRS § 200.366. (*See* Dkt. 122 at 7–8).

4    Bjorkman effectively concedes that at least Count 4 is revived by S.B. 129. (*Id.* at 8).

5    At this stage of litigation, Jane Doe 3's allegations are sufficient to demonstrate that she

6    was subjected to rape.

7         However, this only revives Jane Doe 3's sexual battery, IIED and negligence

8    claims against Bjorkman (Counts 4, 6 and 9). (FAC ¶¶ 211–215, 224–228, 242–246).

9    S.B. 129 only applies to claims against the perpetrator of sexual assault and, thus, Jane

10   Doe 3's claims against Sanford, Gove and Golden are time-barred (Counts 5–10). (FAC

11   ¶¶ 216–252). Jane Doe 3's civil battery claim against Bjorkman is also time-barred. As

12   discussed above, it is not a qualifying sexual assault under S.B. 129, nor do its injuries

13   arise from the revived sexual battery claim. The Court's analysis of Plaintiffs' negligent

14   hiring, supervision and retention claims against Sanford under section 340.16, above, is

15   inapposite to Jane Doe 3's civil battery claims against Bjorkman under S.B. 129. It is

16   possible that—like the act of negligently hiring Defendants—the act of drugging Jane

17   Doe 3 caused her to be raped. However, with respect to negligent hiring, Jane Doe 3's

18   injuries did not arise *until* she was raped (or drugged). In contrast, Jane Doe 3 was

19   immediately injured when she was drugged and those injuries did not "arise from" her

20   subsequent rape. Finally, John Doe 3's claim (Count 11) is not revived by S.B. 129

21   which requires injuries "arising from the sexual assault *of the plaintiff*." Because John

22   Doe does not allege that he was sexually assaulted, his claim is time-barred. (FAC ¶¶

23   253–54).

24         In sum, Jane Doe 2 and John Doe's state law claims are all barred by Nevada's

25   two-year statute of limitations and, with the exception of Counts 4, 6, and 9 against

26

27

28   necessary for Plaintiffs to amend this allegation.

Bjorkman, Jane Doe 3's claims are barred by Nevada's two-year statute of limitations. Because Jane Doe 3 and John Doe's claims are also time-barred under California law, the Court need not proceed any further with choice-of-law analysis with respect to those claims. The Court **DENIES** Bjorkman's motion to dismiss Jane Doe 3's Counts 4, 6 and 9, only, on the grounds that they time-barred in Nevada. The Court **GRANTS** Defendants' motions to dismiss Jane Doe 3 and John Doe's remaining claims, on the grounds that they are time-barred.

However, because there is a difference between California's section 340.16 and Nevada's S.B. 129, with respect to Jane Doe 2's claims, the Court proceeds to the second prong of California's governmental interest test to see if there is a true conflict of law.

<center>v.    Conflict</center>

The second step of the governmental interest analysis requires the Court to examine "each jurisdiction's interest in the application of its own law in the circumstances of the particular case to determine whether a true conflict exists." *McCann*, 48 Cal. 4th at 90 (quoting *Kearney*, 39 Cal. 4th at 107–08). Although two involved states may have different laws governing the issue presented in a tort action, a "true conflict" only arises if both states have an interest in having their respective law applied. *Bernhard v. Harrah's Club,* 16 Cal. 3d 313, 318–19 (1976). Here, the Court must establish the relationship of the parties and the pertinent state policies underlying civil liability for Jane Doe 2's claims to determine if there is a true conflict between California and Nevada's law.

California's statute of limitations serves two purposes: (1) "it protects state residents from the burden of defending cases in which memories have faded and evidence has been lost" and (2) "it protects the courts of the state from the need to process stale claims[.]" *Rustico v. Intuitive Surgical, Inc.*, 993 F.3d 1085, 1092 (9th Cir. 2021) (citing *Ledesma v. Jack Stewart Produce, Inc.*, 816, F.2d 482, 485 (9th Cir. 1987)). "California courts and a California resident would be protected by applying

<center>68</center>

California's statute of limitations when California is the forum and the defendant is a California resident." *Nelson v. International Paint Co.*, 716 F.2d 640, 644 (9th Cir. 1983). Generally, a forum state's interest in applying its own law is strongest when its statute of limitations is shorter than that of the foreign state, because a "state has a substantial interest in preventing the prosecution in its courts of claims which it deems to be 'stale.'" *Deutsch v. Turner Corp.*, 324 F.3d 692, 716–17 (9th Cir. 2003) (quoting Restatement (Second) of Conflict of Laws, § 142, cmt. f (1988)). However, the key inquiry is the relationship of the parties and events to the forum state. For example, "California has little interest in applying its statute of limitations when no California defendant is involved and when California plaintiffs seek to recover for injuries that occurred in a state in which the claim was not time-barred." *Ledesma* , 816 F.2d at 486 (applying the non-forum's longer statute of limitations where Arizona's legitimate government policy would be impaired by failure to bring those personal injury claims).

Similarly, borrowing statutes seek to protect state courts against forum shopping, by "borrowing" the statute of limitations from the state in which the action accrued. *McCann*, 48 Cal. 4th at 84 (citing Leflar et al., American Conflicts Law (4th ed. 1986), § 127, pp. 348–349). Both California and Nevada's borrowing statutes protect their residents and citizens from this general rule, when their action is time-barred in the state of accrual but their own state has provided a longer period of recovery for the same action. *See McCann*, 48 Cal. 4th at 85 (explaining purpose of California's borrowing statute, Cal. Civ. Proc. Code § 361)*; Flowers v. Carville,* 310 F.3d 1118, 1123 (9th Cir. 2022) (explaining purpose of Nevada's borrowing statute, Nev. Rev. Stats. § 11.020). In choosing to extend the statute of limitations beyond two years, California and Nevada have both expressed a similar interest—namely, protecting individuals' ability to recover for injuries arising due to sexual assault. Specifically, California has an interest in protecting plaintiffs' ability to recover for a broad range of conduct and an interest in protecting defendants against liability after the ten-year or three-year periods. Meanwhile, Nevada has an interest in protecting plaintiffs' ability to recover against

perpetrators of rape regardless of when they bring a claim and an interest in protecting local defendants from liability for lesser conduct. By its terms, neither of these statutes are limited only to persons assaulted in California or Nevada.

The parties do not present any arguments related to governmental interests. (Dkts. 121–23). However, the Court considers the following. In California, all of Jane Doe 2's claims survive against all Defendants, by operation of the applicable statute of limitations and borrowing statute. In contrast, all of Jane Doe 2's claims are time-barred against all Defendants under Nevada's statute of limitations. Jane Doe 2 is a citizen of California who alleges injuries that occurred primarily in Nevada by the following Defendants: Bjorkman, a California resident; Golden, a Nevada resident; Sanford, a Washington resident; Gove, a California resident; and eXp Realty, a corporation organized in Delaware, with its principal place of business in Washington. (FAC ¶¶ 9, 12–17). Thus, a California resident has alleged the type of sexual assault that section 340.16 expressly seeks to address, and California has an interest in protecting her right to recover for those injuries. To the extent that California has an interest in protecting its in-state Defendants, Bjorkman and Gove, Jane Doe 2 has satisfied California's requirement that a claim be brought within 10 years. Meanwhile, as the non-forum state, Nevada has no interest in judicial economy. It also has no interest in protecting non-local Defendants. However, Nevada does have an interest in protecting Golden, a Nevada citizen, from liability for conduct that occurred in Nevada and does not rise to the level recognized as sexual assault in Nevada.

Thus, the only question is, under step three of California's governmental interest test, "which state's interest would be more impaired if its policy were subordinated to the policy of the other state." *Chen*, 7 Cal. 5th at 868. Specifically, the Court must decide whether California's interest in allowing Jane Doe 2 to recover would be greater impaired than Nevada's interest in protecting Golden from the "burden of defending cases in which memories have faded and evidence has been lost." *Rustico*, 993 F.3d at 1092. In light of the overlapping nature of Plaintiffs' allegations, including Golden's

70

purposeful availment of California's citizens and economy, the Court concludes that California law should apply to Jane Doe 2's claims. Golden recruited Bjorkman, a California citizen, to join eXp; he recruited Acevedo, a California citizen, to join eXp and caused her relationship with Bjorkman and her attendance at events in California; Golden hosted the Las Vegas event and invited several California residents; he directly invited Jane Doe 3 and his invitation was allegedly extended to Jane Doe 2; he personally hosted the event where Jane Doe 2 was drugged; Jane Doe 2 specifically alleges Golden caused her to travel from California to Nevada. (*See*, *e.g.*, FAC ¶¶ 15, 35, 37, 48, 89, 93–94, 131, 135, 186, 189, 198, 201). Nevada law enforcement has documented critical evidence which, apparently, led to the dismissal of the criminal charges underlying the alleged sexual misconduct. Moreover, Golden must already litigate similar claims against three other defendants in California. This weighs against the inference that Golden will be unduly burdened with faded or lost evidence.

For the reasons discussed above, the Court concludes that California, as the forum state where several of the parties are residents and substantial events took place, has a greater interest in protecting its citizen's right to recover for injuries it has expressly sought to protect than Nevada does in protecting Golden in a case which he already must litigate. Accordingly, the Court applies California's section 340.16 to Jane Doe 2's claims (Counts 4–10) and **DENIES** Defendant's motions to dismiss those claims on the grounds that they are barred by California or Nevada's two-year statute of limitations.

### vi.    Discovery rule

In the alternative, Plaintiffs argue their claims satisfy the "discovery rule." (Sanford Opp. at 20–22; Gove Opp. at 19; Bjorkman Opp. at 15–16; Golden Opp. at 11). Plaintiffs argue that the "added layer of drugging, gaslighting, and concealment adds a separate—critical—consideration that must be more fully vetted and developed through discovery." (Golden Opp. at 11). They argue that as Plaintiffs learn more about Defendants' conduct, they understand the nature of their injuries and new injuries arise.

(*See*, *e.g.*, Sanford Opp. at 21). Plaintiffs argue the Court must consider the following allegations to be true: Plaintiffs have been "putting the pieces of the puzzle together" and the most cognized realization of their injuries occurred after learning of the facts contained in the March 8, 2021, police report, which occurred less than two years before filing their complaint on February 22, 2023. (FAC ¶¶ 43, 80, 143).

Defendants argue the First Amended Complaint is dispositive of Plaintiffs' knowledge because Jane Does 1, 2 and 3 all state they were aware of their alleged assaults shortly after they occurred, all three reported their assaults in September or October of 2020, and Acevedo was no longer under the influence of drugs or alcohol the morning that Bjorkman allegedly attempted to assault her, placing her on notice. (Sanford Reply at 14; Gove Reply at 17–18; Bjorkman Reply at 14–15; Golden Reply at 7; FAC ¶¶ 25, 144, 152, 164). Sanford additionally argues that Plaintiffs fail to identify the discovery needed and fail to plead they engaged in reasonable diligence to obtain the necessary information. (Sanford Reply at 14). Gove argues Plaintiffs do not explain why "gaslighting" and "drugging" delayed Plaintiffs' discovery of the alleged harm. (Gove Reply at 19). Finally, Gove argues his alleged actions with regard to the criminal investigation took place in January of 2021 and Plaintiffs fail to allege in their First Amended Complaint that they only learned about this conduct long after that date. (*Id.*; *see also* FAC ¶¶ 156, 233).

Having found that Plaintiffs Acevedo, Jane Doe 1 and Jane Doe 2's claims are timely, the Court only addresses this argument with respect to Jane Doe 3 and John Doe's claims that are time-barred. Thus, the claims at issue are the following: Jane Doe 3's civil battery claim against Bjorkman and Golden (Count 5); Jane Doe 3's IIED claims against Golden, Gove and Sanford (Counts 6–8); Jane Doe 3's negligence claims against Golden, Gove and Sanford (Count 9); Jane Doe 3's negligent hiring, retention, and supervision claim against Sanford (Count 10); and John Doe's loss of consortium claim (Count 11). (FAC ¶¶ 216–253). Importantly, for the reasons already discussed, these claims are subject to Nevada's discovery rule. Because the issue of Nevada law

was not raised until Defendant Golden's Reply, the parties have provided no choice-of-law analysis or Nevada authority.

Generally, the discovery rule operates similarly in California and Nevada. *See Jolly v. Eli Lilly & Co.*, 44 Cal.3d 1103, 1110 (1988) ("The discovery rule provides that the accrual of a cause of action is delayed until the plaintiff is aware of her injury and its negligent cause. A plaintiff is held to her actual knowledge as well as knowledge that could reasonably be discovered through investigation of sources open to her."); *see also Siragusa v. Brown*, 114 Nev. 1384, 1392 (1998) ("An exception to the general rule has been recognized by this court and many others in the form of the so-called 'discovery rule.' Under the discovery rule, the statutory period of limitations is tolled until the injured party discovers or reasonably should have discovered facts supporting a cause of action.").

Jane Doe 3 and John Doe have failed to plead facts that demonstrate the discovery rule tolls their claims. John Doe only alleges that he has been married to Jane Doe 3 at all times relevant to this complaint and that he has suffered injury. (FAC ¶¶ 161–62). Jane Doe 3 alleges that she recalls Bjorkman and Golden consuming GHB and she recalls "blacking out," and being sexually assaulted on August 29, 2020. (FAC ¶¶ 151–53). She alleges that "[a] few weeks later" Golden encouraged her to lie to LVPD and she began receiving threatening messages from people associated with Bjorkman and Golden. (*Id.* ¶¶ 154–55). This sufficiently made Jane Doe 3 aware of the facts supporting her civil battery, IIED and negligence claims against Bjorkman and Golden.

Jane Doe 3 alleges she reported her assault shortly after it occurred in August of 2020. (*Id.* ¶ 164). She alleges that eXp was unhelpful and, specifically, allowed Golden to remain at eXp after she complained about his conduct. (*Id.* ¶ 171). Jane Doe 3 alleges Bjorkman's contract was terminated in September of 2020, but he was allowed to become a Vested Participant, while she was not. (*Id.* ¶ 50–53, 78). She alleges that around the same time eXp denied her sponsorship change requests. (*Id.* ¶ 55). These allegations demonstrate that, at least by September of 2020, Plaintiff knew eXp had,

among other things, decided to pay Bjorkman, retain Golden, and thwart Jane Doe 3's attempts to remedy her workplace injuries. These are the same facts supporting her IIED, negligence, and negligent hiring, retention and supervision claims against Sanford.

Finally, Plaintiffs argue they did not learn the full extent of Gove's conduct until Bjorkman's criminal charges were dismissed. (Gove Opp. 19). Jane Doe 3 alleges Gove reached out to multiple eXp agents requesting false police statements on or around January of 2021, (FAC ¶ 156), and she discussed her assault with Gove on March 3, 2021. (*Id.* ¶¶ 157–58). This supports an argument that Gove's intentions became increasingly evident. However, considering the existence of Jane Doe 3's other claims, it does not explain why she waited two and one-half years after reporting her assault to eXp and law enforcement to bring this lawsuit.

The Court acknowledges the nuance and the gravity of Plaintiffs' allegations, including those regarding the combination of drugs, sexual abuse, gaslighting and mental distress. However, absent specific factual allegations connecting Defendants' actions to Plaintiffs' inability to discover facts about those actions, the discovery rule does not toll Plaintiffs' claims.

### vii.    Conclusions regarding the statute of limitations

In sum, the Court concludes that California's section 340.16 revives all of Plaintiffs Acevedo, Jane Doe 1 and Jane Doe 2's claims against all Defendants. The Court **DENIES** Defendants' motions to dismiss those claims on the grounds that they are time-barred. The Court also concludes that Nevada's S.B. 129 applies to Jane Doe 3's sexual battery, IIED, and negligence claims against Bjorkman. Moreover, because Bjorkman does not move for dismissal on any other ground, the Court **DENIES** Bjorkman's motion to dismiss those claims (Count 4, 6 and 9). (FAC ¶¶ 211–215, 224–228, 242–246). However, the Court concludes that Jane Doe 3's civil battery claim against Bjorkman and Golden (Count 5), as well as her IIED, negligence, and negligent hiring claims against Defendants Golden, Gove and Sanford (Counts 6–10) are barred

by Nevada's two-year statute of limitations and not tolled by the discovery rule. (FAC ¶¶ 216–252). The Court **GRANTS** Defendants' motions to dismiss those claims. Finally, the Court concludes that John Doe's loss of consortium claim (Count 11) is also barred by Nevada's two-year statute of limitations and, thus, **GRANTS** Defendants' motions to dismiss that claim. (FAC ¶¶ 253–54).

The Court next addresses Defendants Sanford and Gove's arguments with respect to Plaintiffs Acevedo, Jane Doe 1 and Jane Doe 2's IIED, negligence, and negligent hiring, retention and supervision clams.

### b. Counts 6–8: Intentional infliction of emotional distress

All female Plaintiffs bring IIED claims against all Defendants, though only Sanford and Gove move for their dismissal, arguing that Plaintiffs fail to allege conduct that was "extreme and outrageous" and "directed at" Plaintiffs. (Sanford MTD at 29, Gove MTD at 27–28). The Court addresses these arguments with respect to Acevedo, Jane Doe 1 and Jane Doe 2's claims which are subject to California law.[32]

To state a claim for intentional infliction of emotional distress a Plaintiff must plead: "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct ....[ ] Conduct to be outrageous must be so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Christensen v. Superior Court*, 54 Cal. 3d 868, 903 (1991) (quotations and citation omitted); *see also Doe 1 v. Manhattan Beach Unified Sch. Dist.*, No. 19-cv-6962 DDP (RAOx), 2020 WL 2556356, at *9 (C.D. Cal. May 19, 2020)

---

[32] The elements of this cause of action are the same under Nevada law. *See Star v. Rabello*, 97 Nev. 124, 125 (1981). However, because Defendant Bjorkman does not make any substantive arguments regarding Plaintiffs' state tort claims, the Court need not address whether Jane Doe 3 has sufficiently alleged her IIED claim against Bjorkman.

(applying *Christensen*). The outrageous conduct must be "directed at the plaintiff, or occur in the presence of a plaintiff of whom the defendant is aware." *Christensen*, 54 Cal. 3d at 903. The plaintiff need not suffer physical injury to recover for emotional distress. *Stoiber v. Honeychuck*, 101 Cal. App. 3d 908, 921 (Cal. Ct. App. Fifth 1980) (citing *State Rubbish etc. Assn. v. Siliznoff*, 38 Cal. 2d 330 (1952); *Golden v. Dungan*, 20 Cal. App. 3d 295, 307–308 (Cal. Ct. App. First 1971)). "Behavior may be considered outrageous if a defendant (1) abuses a relation or position which gives him power to damage the plaintiff's interest; (2) knows the plaintiff is susceptible to injuries through mental distress; or (3) acts intentionally or unreasonably with the recognition that the acts are likely to result in illness through mental distress." *Stoiber*, 101 Cal. App. 3d at 921 (citing *Newby v. Alto Riviera*, 60 Cal. App. 3d 288, 297 (Cal. Ct. App. First 1971)). In *State Rubbish*, "the seminal case permitting recovery even absent physical manifestation of the injury," the California Supreme Court allowed recovery for serious mental distress where "agents of the defendant had intentionally caused the plaintiff to suffer extreme fright for the purpose of gaining a business advantage of the particular plaintiff." *Christensen,* 54 Cal. 3d at 903 (citing *State Rubbish*, 38 Cal. 2d at 337).

Plaintiffs argue Sanford and Gove—by denying Plaintiffs' requests to switch sponsors and effectively forcing them to pay their sex traffickers—demonstrated "extreme and outrageous" conduct "directed at" Plaintiffs. (Sanford Opp. at 26–27; Gove Opp. at 19–21.) Plaintiffs argue Sanford allowed other agents to switch sponsors when it financially benefitted him. (Sanford Opp. at 26). Plaintiffs argue Gove abused his specific position as "one of the most powerful agents at eXp" and a member of Plaintiffs' immediate upline. (Gove Opp. at 20). Plaintiffs argue both Sanford and Gove gaslit Plaintiffs by feigning ignorance, despite having actual knowledge of the drugging and assault allegations. (Sanford Opp. at 27; Gove Opp. at 20–21). Plaintiffs allege this experience caused severe emotional distress, including PTSD diagnoses and suicide attempts, and it has interfered with Plaintiffs' ability to network and sell real estate. (Sanford Opp. at 27). In his Reply, Sanford argues Plaintiffs fail to allege that he had

the ability to terminate Bjorkman and Golden's vested participation in the RSP. (Sanford Reply at 18–19). Gove argues Plaintiffs fail to allege that this conduct was "directed at" Plaintiffs or that Gove had the ability to switch Plaintiffs' uplines because he was not part of eXp's Leadership Team. (Gove Reply at 17).

Plaintiffs have sufficiently pled their IIED claims against Sanford and Gove. First, the First Amended Complaint clearly demonstrates that eXp had the ability to switch Plaintiffs' uplines because Jane Doe 1 alleges that she was eventually allowed to do so. (FAC ¶ 130). Plaintiffs have also alleged that Sanford rejected the Leadership Team and Board of Director's own requests to switch Plaintiffs, demonstrating the company's ability to move agents and Sanford's specific ability to prevent that from happening. (*Id.* ¶ 168). Plaintiffs allege Sanford refused these requests—not because he was ignorant to Plaintiffs' accounts of being drugged and raped—but because he feared more women would come forward with the same allegations. (*Id.* ¶¶ 166, 168). Second, the First Amended Complaint plausibly demonstrates that eXp had the ability to restructure the RSP or Pyramid, such that Bjorkman and Golden would not directly benefit from Plaintiffs' downlines. Plaintiffs allege that eXp allowed Bjorkman to become a Vested Participant even though he did not meet the requirements. (*Id.* ¶ 52). Jane Doe 3 alleges eXp did not grant the same vesting exception to her. (*Id.* ¶ 53). eXp eventually terminated Bjorkman's contract all together. (*Id.* ¶ 50). It stands to reason that eXp had the ability to alter the terms of a contract that they had the authority to terminate. However, that was not necessary to prevent Plaintiffs' financial contribution to Bjorkman—had eXp simply enforced the original vesting requirements, Bjorkman would never have vested. Whether through sponsorship changes or RSP restructuring, Plaintiffs have plausibly demonstrated that Sanford abused his position of authority to damage Plaintiffs' interests by choosing to financially benefit from Bjorkman and Golden's unique position within the Pyramid.

It is relevant, though not dispositive, that Gove is not a member of the eXp Leadership Team. (*Id.* ¶ 34). Plaintiffs have demonstrated that Gove held a position of

power at eXp—specifically, with respect to Plaintiffs because they were all in his individual downline. (*Id.* ¶¶ 102, 111, 148). He is one of eXp's top recruiters with more than 20,000 agents in his downline. (*Id.* ¶¶ 17, 69). After obtaining actual knowledge of Plaintiffs' allegations, he threatened to pull his team—more than one-fifth of the entire company—if eXp removed Defendants Bjorkman and Golden. (*Id.* ¶ 74). Instead, Gove and Sanford "came to an agreement" which allowed, among other things, Bjorkman and Golden to financially benefit from Plaintiffs' contribution to the Pyramid. (*Id.* ¶¶ 74–75). Read together, these allegations support the plausible inference that—not only did Gove have the ability to force these outcomes—but the financial incentive to do so.

Finally, Defendants' arguments that these actions were not "directed at" Plaintiffs are not persuasive. In sum, Plaintiffs have alleged that Sanford and Gove engaged in a concerted effort to prevent Plaintiffs' allegations from becoming public knowledge so they could continue to financially benefit from Bjorkman and Golden's contribution to the Pyramid, knowing that it would force Plaintiffs to financially contribute to their sex traffickers. Defendants' conduct was in reaction to Plaintiffs' allegations and for the purpose of thwarting their impact on the Pyramid, at the calculated cost of Plaintiffs' mental distress. This is sufficient to demonstrate "extreme and outrageous" conduct "directed at" Plaintiffs.

The Court finds Plaintiffs have plausibly demonstrated that they suffered intentional infliction of emotional distress and, thus, **DENIES** Defendants Sanford and Gove's motions to dismiss Acevedo, Jane Doe 1 and Jane Doe 2's IIED claims (Counts 7– 8). (FAC ¶¶ 229–241).

### c.  Counts 9: Negligence

All female Plaintiffs allege negligence against all Defendants. (FAC ¶¶ 242–246). Sanford and Gove conclusively argue Plaintiffs fail to allege the requisite elements of a negligence claim. (Sanford MTD at 30; Gove MTD at 29). Defendants do not meaningfully raise this issue and the Court agrees with Plaintiffs that it is "almost dealt with in passing." (Sanford Opp. at 27–28). "The elements of a cause of action for

negligence are well established. They are '(a) a legal duty to use due care; (b) a breach of such legal duty; (c) the breach as the proximate or legal cause of the resulting injury.'" *Ladd v. County of San Mateo*, 12 Cal. 4th 913, 917 (1996) (quoting *Evan F. v. Hughson United Methodist Church,* 8 Cal. App. 4th 828, 834 (Cal. Ct. App. Third 1992)). Plaintiffs reallege the same facts as their previous eight claims, (FAC ¶¶ 242–246), including those for violation of § 1595 of the TVPRA which "invokes a negligence standard[.]" *M.A*., 425 F. Supp. 3d at 965.

Because it is Defendants' burden to demonstrate that the Court should dismiss Count 9, the Court only analyzes this claim insofar as it must consider Defendants' arguments. Sanford argues, "[a]t best this count is duplicative of Plaintiffs' negligent hiring, retention and supervision count[.]" (Sanford MTD at 30). Gove argues Plaintiffs failure to allege that he "held a position of authority at eXp," and name him in their Count 10 for negligent hiring, demonstrates that he did not owe them a duty. (Gove MTD at 29). Both arguments are incorrect for similar reasons. Plaintiffs' negligence and negligent hiring claims are distinct—while both may require negligent conduct, only the former requires that conduct to include *hiring.* In other words, while one may sufficiently demonstrate the other, it does not necessarily do so and, thus, is not duplicative. Gove's argument demonstrates the same circular point: his role at eXp did not include hiring Bjorkman or Golden. For that reason, and that reason only, Plaintiffs do not allege that he violated Count 10. Rather, they allege that his role at eXp created a duty to act with reasonable care towards the agents in his downline (i.e., Plaintiffs), which he violated by recklessly subjecting them to alleged sexual predators and ignoring their allegations about those predators, all while financially benefitting and allowing the predators to benefit, as well. Absent an argument as to why these allegations do not sufficiently support Plaintiffs' claims for negligence, Defendants fail to meet their burden on a motion for dismissal.

The Court has already concluded that Sanford and Gove negligently violated the TVPRA (Count 3) and intentionally caused Plaintiffs' injuries (Count 7–8). For many

of those same reasons, the Court concludes Plaintiffs have sufficiently pled Sanford and Gove negligently caused those injuries as well. Accordingly, the Court **DENIES** Defendants Sanford and Gove's motions to dismiss Plaintiffs Acevedo, Jane Doe 1 and Jane Doe 2's negligence claims (Count 9). (FAC ¶¶ 242–46).

### d. Count 10: Negligent hiring, retention and supervision

All female Plaintiffs allege Sanford and eXp Realty are liable for the negligent hiring, retention and supervision of Bjorkman and Golden (Count 10). (FAC ¶¶ 247–252). "An employer may be liable to a third person for the employer's negligence in hiring or retaining an employee who is incompetent or unfit." *Phillips v. TLC Plumbing, Inc.*, 172 Cal. App. 4th 1133, 1139 (Cal. Ct. App. Fourth 2009) (citing *Roman Catholic Bishop v. Superior Court,* 42 Cal. App. 4th 1556, 1564–65 (Cal. Ct. App. Fourth 1996)); *see also Dent v. National Football League*, 902 F.3d 1109, 1121–22 (9th Cir. 2018). To establish liability, a plaintiff must demonstrate the elements of negligence: duty, breach, proximate causation, and damages. *Phillips*, 172 Cal. App. 4th at 1139. There are "two elements necessary for a duty to arise in negligent hiring and negligent retention cases— the existence of an employment relationship *and* foreseeability of the injury." *Phillips,* 172 Cal. App. 4th at 1142 (quoting *Abrams v. Worthington*, 169 Ohio App. 3d 94 (Ohio Ct. App. Tenth 2006) (emphasis in original)). A claim for negligent supervision requires a plaintiff to allege that a particular risk of harm was foreseeable. *D.Z. v. Los Angeles Unified School District,* 35 Cal. App. 5th 210, 235 (Cal. Ct. App. Second 2019). ！

The California Supreme Court has set out a six-factor test for determining whether an individual is an employee or an independent contractor. *S.G. Borello & Sons, Inc. v. Department of Industrial Relations,* 48 Cal. 3d 341, 354–55 (1989). Those factors include: (1) the extent to which the employer had the right to control activities; (2) the alleged employee's opportunity for profit or loss depending on his managerial skill; (3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; (4) whether the service rendered requires a special skill; (5) the degree of permanence to the working relationship; and (6) whether the

service rendered is an integral part of the alleged employer's business. *Id.* at 355. "Each service arrangement must be evaluated on its facts, and the dispositive circumstances may vary from case to case." *Id.* at 354. "What matters is whether the hirer 'retains all *necessary* control' over its operations." *Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522, 531 (2014) (quoting *S.G. Borello*, 48 Cal. 3d at 350) (emphasis in original). "Perhaps the strongest evidence of the right to control is whether the hirer can discharge the worker without cause, because '[t]he power of the principal to terminate the services of the agent gives him the means of controlling the agent's activities.'" (quoting *Malloy v. Fong*, 37 Cal. 2d 356, 370 (1951)).

Sanford argues the Court should dismiss Count 10 because Plaintiffs fail to allege an employer-employee relationship, as well as foreseeability. (Sanford MTD at 27–28). While Plaintiffs do not concede that Defendants Bjorkman and Golden are Sanford's independent contractors, they fail to offer a robust argument that they are his employees. Plaintiffs argue "the uniqueness of the venture creates a question of the employment status of Defendants such that they might be considered employees for the purpose of their role in the venture." (Sanford Opp. at 24).

While the Court agrees that several aspects of eXp's business model obfuscate the issue of an employment relationship, it is not prepared to conclude that Bjorkman or Golden were Sanford's employees without the parties thoroughly addressing the six-factor test. In fact, to the extent that Plaintiffs do address that test, their arguments are brief and unclear. Plaintiffs argue, "Defendants have had control over their downlines, directing them, training them, setting forth their long-term payment structure." (Sanford Opp. at 25). Plaintiffs cite to FAC ¶¶ 25 and 26 which allege that eXp Realty automatically enrolls its agents in the RSP, incentivizes them to become Sponsor Agents, and then directs, trains, and teaches them how to recruit and entice other real estate agents to join the RSP. In sum, the Plaintiffs' First Amended Complaint alleges that Sanford contracted with Defendants Bjorkman and Golden to become eXp agents—*and* contracted with Plaintiffs to become eXp agents. (FAC ¶¶ 7–10, 14–15).

It also alleges that all eXp real estate agents share a two-fold common purpose of selling real estate and recruiting new agents. (*Id.* ¶ 22). The First Amended Complaint also demonstrates that, to further that latter purpose, eXp's entire business model incentivized, and relied upon, its Recruited Agents becoming Sponsor Agents, and its Sponsor Agents becoming Influencers. (*Id.* ¶¶ 25–27). These allegations are relevant to, though not sufficiently evident of, an employment relationship.

Finally, the Court has considered Plaintiffs' primary argument that—if Bjorkman and Golden are independent contractors—Sanford owes a non-delegable duty of care to Plaintiffs based on the actions of his independent contractors (Bjorkman and Golden) to his other independent contractors (Plaintiffs). (Sanford Opp. at 22–25). In sum, Plaintiffs argue that the same policy reasons protecting hirers of independent contractors from liability to the independent contractors' employees do not exist here, where both parties are independent contractors of the same hirer. This argument is premised on Plaintiffs' analysis of several California Supreme Court cases analyzing theories of negligent hiring and control described in the Restatement 2nd of Torts. *Privette v. Contreras,* 5 Cal. 4th 689 (1993) (employees of independent contractors cannot recover against contractor's hirer under the peculiar risk doctrine); *Toland v. Sunland Housing Group, Inc.*, 18 Cal. 4th 253 (1998) (this "bars employees of a hired contractor who are injured by the contractor's negligence from seeking recovery against the hiring person, irrespective of whether recovery is sought under the theory of peculiar risk set forth in section 416 or section 413 of the Restatement Second of Torts[.])"; *Camargo v. Tjaarda Dairy*, 25 Cal. 1234 (2001) ("For the same reasons, an employee of a contractor should be barred from seeking recovery from the hirer under the theory of negligent hiring set forth in section 411."); *Hooker v. Department of Transp.*, 27 Cal. 4th 198 (2002) (hirer of an independent contractor is not liable to an employee of the contractor merely because the hirer retained control over safety conditions but is liable if the hirer's exercise of retained control affirmatively contributed to the employee's injuries.). In a case of first impression, the Second District of the California

Court of Appeal held that *Privette* and its progeny also applies when the injured party is an independent contractor. *Michael v. Denbest Transportation*, *Inc.*, 137 Cal. App. 4th 1082, 1093–94 (Cal. Ct. App. Second 2006). The court held this decision was "consistent with common law principles and public policy … including the strong policy in favor of delegation by hirers." *Id.* at 1094.

Plaintiffs argue *Michael* demonstrates that the important principles in examining liability of a hirer directly to the independent contractor are "whether there was a nondelegable duty, whether there was a policy consideration, and whether the defendant affirmatively contributed to [Plaintffs'] injury." (Sanford Opp. at 23–24) (citing *Michael*, 137 Cal. App. 4th at 1095–97). Plaintiffs argue Sanford had an affirmative role in causing their injury, demonstrating liability under *Hooker* and *Michael*. (Sanford Opp. at 22). Plaintiffs argue they have alleged "affirmative actions that ultimately contributed to Plaintiffs' initial and ongoing injury, including, but not limited to, their failure to know or identify that the Perpetrators were and / or became unfit and that unfitness created a particular risk. This included Defendants' actual knowledge of the Perpetrators' violations against Plaintiffs yet continued their support of them (retention); history with the Defendant Perpetrators in their previous company Keller (negligent hiring), as well as their training and perpetuation of a permissive culture (supervision)." (Sanford Opp. at 24). Specifically, Plaintiffs point to the following allegations: Sanford personally knew Bjorkman and Golden before he hired them; Sanford worked with all Defendants at Keller Williams; during this time, Bjorkman allegedly raped a woman who later became an eXp real estate agent and reported the incident in 2018; Bjorkman drugged and assaulted women and threatened them to stay silent; and Sanford attempted to cover up Bjorkman and Golden's behavior with nondisclosure agreements. (FAC ¶¶ 250, 45–47, 83).

Sanford argues Plaintiffs' reliance on these cases is misplaced because Plaintiffs were neither employees nor contractors hired by Bjorkman and Golden. (Sanford Reply at 16). The Court agrees that these cases are not instructive. What matters is whether

Bjorkman and Golden were Sanford's employees. If they were not, Plaintiffs have merely demonstrated that Bjorkman, Golden and Plaintiffs were all Sanford's independent contractors. To the extent that Plaintiffs' policy arguments are compelling, they are ultimately irrelevant. The *Privette* cases demonstrate when a hirer does not have a duty to various individuals employed or contracted by their own employees' contractors. The policy barring recovery in those cases—namely, the policy in favor of delegation—is not at issue. The First Amended Complaint does not allege that Sanford delegated the duty he owed to Plaintiffs—whatever that duty was—to Defendants Golden and Bjorkman. At the same time, the First Amended Complaint clearly demonstrates a multi-tiered structure of roles at eXp and raises questions as to whether all eXp real estate agents had the same employment relationship with Sanford. This implicates the issue of duty.

A district court should provide leave to amend upon granting a motion to dismiss unless it is clear that the complaint could not be saved by amendment. *Manzarek v. St. Paul Fire & Marine Ins. Co*., 519 F.3d 1025, 1031 (9th Cir. 2008). Leave to amend a complaint should be freely granted. Fed. R. Civ. P. 15(a). Leave to amend may be denied when "the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986). In Plaintiffs' Complaint, they brought claims against eXp, Bjorkman, Golden and John Does 1–100. (Dkt. 1 ¶¶ 12–16). In the First Amended Complaint, they added several claims against Sanford, as the Founder of eXp. (FAC ¶ 16). Thus, they have not yet attempted to cure these allegations. Because Plaintiffs' First Amended Complaint fails to allege specific factual allegations that raise a plausible inference that an employer-employee relationship existed between Sanford and Bjorkman and/or Golden, the Court **GRANTS** Sanford's motion to dismiss Plaintiffs' Count 10, with leave to amend. (FAC ¶¶ 247–252).

### e.  Count 11: Loss of consortium

Finally, because John Doe's claim is time-barred, the Court need not address the

84

parties' remaining arguments regarding Count 11. (Sanford MTD at 30; Gove MTD at 30; *see also* Bjorkman MTD at 24). The Court **GRANTS** Defendants' motions to Dismiss John Doe's claim. (FAC ¶¶ 253–54).

## V. CONCLUSION

For the reasons stated above, Defendants' motions to dismiss are **DENIED IN PART AND GRANTED IN PART**:

1. Defendant Sanford and eXp Realty's motion to dismiss is **GRANTED** as follows: Counts 8 and 9, with respect to Jane Doe 3's claims only; Count 10, with respect to all Plaintiffs, with leave to amend; and Count 11.

2. Defendant Gove's motion to dismiss is **GRANTED** as follows: Counts 7 and 9, with respect to Jane Doe 3's claims only; and Count 11.

3. Defendant Bjorkman's motion to dismiss is **GRANTED** as follows: Count 5, with respect to Jane Doe 3's claims only; and Count 11.

4. Defendant Golden's motion to dismiss is **GRANTED** as follows: Counts 5, 6 and 9, with respect to Jane Doe 3's claims only; and Count 11.

5. Defendants' motions to dismiss are **DENIED** as to all other Counts.

IT IS SO ORDERED.

Dated: January 29, 2024

_____

HONORABLE ANDRÉ BIROTTE JR.

UNITED STATES DISTRICT COURT JUDGE