Jennifer A. Lenze, Esq., CA Bar No. 246858
**LENZE LAWYERS, PLC**
999 Corporate Drive, Suite 100
Ladera Ranch, CA 91765
T: (310) 322-8800
F: (310) 322-8811
jlenze@lenzelawyers.com

Brooke Cohen, Esq., TX Bar No. 24007019 PHV Admitted
Andrea Hirsch, Esq. GA Bar No. 666557 PHV Admitted
**COHEN HIRSCH, LP**
5256 Peachtree Road, Suite 195-E
Atlanta, GA 30341
T: (678) 268-4683
brooke@cohenhirsch.com
andrea@cohenhirsch.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FABIOLA ACEVEDO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> EXP REALTY, LLC, et al., <br><br> Defendants. | Case No. 2:23-CV-01304-AB-AGR <br><br> **DECLARATION OF ANDREA S. HIRSCH IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO AMEND COMPLAINT** <br><br> Hearing Date: September 26, 2025 <br> Judge: Hon. Andre Birotte, Jr. |

1

**DECLARATION OF ANDREA S. HIRSCH IN SUPPORT OF PLAINTIFFS' REPLY TO THE EXP DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO AMEND THEIR COMPLAINT AND SCHEDULING ORDER**

I, Andrea S. Hirsch, declare under penalty of perjury that the following is true and correct:

1. I am a partner at Cohen Hirsch, LP, which represents Plaintiffs in this action. I am over the age of twenty-one and competent to make this declaration based on my personal knowledge. This Declaration is being submitted in support of Plaintiffs' reply to the eXp Defendants' response in opposition to Plaintiff's motion to amend its complaint (the "Motion").

2. Courtney Keating, eXp World Holdings, Inc.'s former CMO, was deposed on January 10, 2025, however, the parties were unable to complete her deposition and have been trying to reschedule the continuation of her deposition.

3. During her January 10, 2025, deposition, Ms. Keating testified she had no real estate knowledge, lacked training for the Committee role, and could not recall specifics of any investigation into Plaintiffs' complaints. *See* attached excerpts from Keating Deposition 37:15- 22; 38:1- 8; 39:1-5; 104:9-106:5 attached as Exhibit 28.

4. Cory Haggard was deposed on August 20, 2025, wherein he was asked about a document that was purportedly produced on July 17, 2025 (counsel for eXp accidentally did not include Plaintiffs' counsel on the production so it was actually produced on July 18, 2025). During that deposition, Mr. Haggard testified that his notes summarizing a call he had with Defendant Bjorkman on September 18, 2020, states that Mr. Bjorkman was

2

DECLARATION OF ANDREA S. HIRSCH IN SUPPORT OF PLAINTIFFS' REPLY TO THE EXP DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO AMEND THEIR COMPLAINT AND SCHEDULING ORDER

told that eXp would not be conducting an investigation. *See* attached excerpt from Haggard Deposition (8/20/2025) at 73:14-74:1 attached as Exhibit 29.

     5.     Plaintiff Tami Sims was deposed on March 4, 2025, wherein she testified about a conversation she had with Cory Haggard, summarizing her takeaway from her conversation with him as follows: "Cory led me to believe through those conversations that Mr. Bjorkman was not getting paid the revenue share anymore. He made me believe that it was actually being absorbed by eXp at that time." *See* excerpt from Sims Deposition, Volume 1, at 191:18-21 attached as Exhibit 30.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: September 12, 2025

                                              */s/ Andrea S. Hirsch*
                                              Andrea S. Hirsch

DECLARATION OF ANDREA S. HIRSCH IN SUPPORT OF PLAINTIFFS' REPLY TO THE EXP DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO AMEND THEIR COMPLAINT AND SCHEDULING ORDER

# EXHIBIT 28

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4
 5   FABIOLA ACEVEDO, et al.,  )
                               )
 6            Plaintiffs,      )
                               )
 7         vs.                 ) CASE NO. 2:23-cv-1304-AB-AGR
                               )
 8   eXp REALTY, LLC, et al.,  )
                               )
 9            Defendants.      )
     _____)
10
11
12
13
14
                 DEPOSITION OF COURTNEY KEATING
15
            FRIDAY, JANUARY 10, 2025, 10:27 A.M.
16
                VOLUME I - PAGES 1 THROUGH 243
17
18
19
20
21
22
23
     Reported by:  Kimberly Rex, RMR, CSR No. 6638
24   Job No. AB 7102792
25
```

Page 1

**Page 34**

1  I'm estimating.
2  BY MS. LENZE:
3  Q  Your testimony is you believe that was eXp's
4  position the whole time you were there as CMO; true?
5  A  Correct.
6  Q  Is there a timeframe where you believe the
7  company's position was that they take allegations
8  against their agents very seriously?
9  A  For the whole time?  This is where I need to
10 ask another question.
11     MR. AZZARA:  Well, let her -- let her -- you're
12 okay.  You answered.  Go ahead and ask.
13 BY MS. LENZE:
14 Q  Now, in addition to your role as CMO, you were
15 also a member in what is called agent compliance;
16 correct?
17 A  It was called agent compliance committee.
18 Q  During your tenure at eXp, you were a member of
19 the agent compliance committee; correct?
20 A  For a period of time.
21 Q  What period of time was that?
22 A  I don't recall, but it wasn't the entire three
23 years I was there.
24 Q  Do you know if it was the majority of the three
25 years, can you estimate the period?

**Page 35**

1  A  It would not have been when I immediately
2  joined.  And it would not have been a fixed -- say,
3  maybe 50 percent of the time.  Not at the very beginning
4  and not at the very end.
5  Q  How did you become a member of the agent
6  compliance committee, Ms. Keating?
7  A  To my recollection, Jim Bramble asked me to be
8  a member.
9  Q  Incidentally, did you know any of the
10 individuals that you worked with at eXp prior to you
11 coming on board?
12 A  One, but I didn't know until after I joined
13 that she was a member of eXp.
14 Q  Who was that?
15 A  Allison Gaddy.
16 Q  What was Allison Gaddy's role?
17 A  She's a real estate agent.
18 Q  And in what context did you know her previous
19 to you joining eXp?
20 A  Socially.  I was at an event with her.  We had
21 a friend in common.
22 Q  Who -- strike that.
23     Who was the CMO prior to your joining?
24 A  I can't remember his name.  He would have left.
25 He was -- he was let go or left.  I don't know which one

**Page 36**

1  it was, a couple months before I joined.  And I never
2  met him.  I don't remember his name.
3  Q  Do you know who took over your role after you
4  left?
5  A  My role was not -- there was no CMO of eXp
6  World Holdings.  However, there was a CMO for eXp
7  Realty, which would have been Carolyn Merchant.
8  Q  She was -- my apologies.  Go ahead.
9  A  But she didn't take my role because it was just
10 dissolved.
11 Q  She became strictly CMO -- or strike that.
12     She was CMO of eXp Realty, LLC after you left
13 in 2023; correct?
14 A  Correct.
15 Q  And after you left in 2023, there was no CMO of
16 eXp World Holdings, Inc.; correct?
17 A  Correct.
18    MR. PALLARES:  Object to form.
19 BY MS. LENZE:
20 Q  Would the name Mitch Robinson ring a bell for
21 the previous role?
22 A  Yes.
23 Q  So Mitch Robinson was the previous CMO prior to
24 your signing on in June of 2020; is that correct?
25 A  That's my understanding.

**Page 37**

1  Q  Now, Jim Bramble was part of eXp's legal team;
2  correct?
3  A  Yes.
4  Q  Do you recall if he had any other roles at eXp?
5  A  I only remember him as general counsel.
6  Q  What was the -- strike that.
7     To your understanding, what was the role of the
8  compliance committee?
9  A  To -- when an agent, a real estate agent had a
10 question or a situation occurred, they would write this
11 up and it would come in front of the compliance
12 committee and we would review a request.  A request for
13 maybe move into a different team or something of that
14 nature.
15 Q  Did you have any training related to your role
16 as a compliance committee member?
17 A  Not to my recollection.
18 Q  Did you have any training with respect to eXp
19 Realty, LLC's policies and procedures in advance of you
20 becoming a compliance committee team member?
21 A  Not outside of the videos that were showed that
22 we reviewed.
23 Q  Had you prior to joining eXp's compliance
24 committee, had you familiarized yourself with the ICAs
25 of eXp Realty, LLC?

Page 38

```
 1    A    They were extraordinarily complicated.  I would
 2  not say I was an expert in how the IACs worked or ICAs
 3  worked.
 4    Q    You were not an expert in how the ICAs were
 5  what, Ms. Keating?                                    11:10
 6    A    How they actually worked.  I would not be able
 7  to tell you in detail how that worked.  I was not
 8  compensated that way.
 9    Q    Were you -- strike that.
10         Prior to you becoming a compliance committee   11:10
11  team member, did you familiarize yourself with all of
12  eXp's policies and procedures that were connected to the
13  ICAs?
14    A    What do you mean by "familiarize yourself"?
15    Q    Prior to becoming a committee member with the  11:11
16  compliance committee, did you know all of eXp's policies
17  and procedures?
18    A    I would not know all of them.
19    Q    Did you receive anything in writing prior to
20  joining the compliance committee as a team member?     11:11
21    A    When you say "writing," meaning an agenda of
22  what we would be talking about or --
23    Q    That's a good clarification.  And we'll get
24  there for specific meetings.  I want to explore your
25  role as a team member.  When you -- strike that.       11:11
```

Page 39

```
 1         When you were asked to join as a compliance
 2  committee team member, did you receive any handbook, any
 3  standard operating procedures, any documents to review
 4  as a new team member?
 5    A    No.                                            11:12
 6    Q    And prior to becoming a compliance committee
 7  team member, you didn't receive any specific training
 8  about how to be a compliance committee member; true?
 9    A    True.
10    Q    Ms. Keating, what was the process as a         11:12
11  compliance committee team member that you all went
12  through in advance of deciding one of these issues that
13  was presented to you?
14         MR. AZZARA:  I'll object that it's vague,
15  ambiguous, and overbroad.  But you can answer the      11:12
16  question.
17         THE WITNESS:  I don't recall.
18  BY MS. LENZE:
19    Q    As a compliance committee team member, did you
20  receive documents to review in advance of a meeting?   11:13
21    A    In certain cases I remember -- I mean certain
22  instances I remember, but I wouldn't remember -- I don't
23  believe it was for every single one.  But I remember
24  maybe a few times there would be a document that was
25  submitted that we could read in advance of the         11:13
```

Page 40

```
 1  compliance meeting.
 2    Q    Did those few times you were submitted
 3  something to read in advance of the meeting, how did you
 4  receive that document?
 5    A    Via an internal thread.  It's not Slack, but a 11:13
 6  messaging system along those lines, but it's Facebook.
 7    Q    When you say you received those documents via
 8  thread, does it refresh your recollection if I say
 9  Facebook Workplace chat?
10    A    Yes.                                           11:14
11    Q    So the few times you received documents in
12  advance of these meetings, you were sent them via
13  Facebook Workplace chat; correct?
14    A    Yes.  I don't remember them being sent in any
15  other fashion.                                         11:14
16    Q    Were those documents submitted to you via the
17  compliance committee's Facebook Workplace chat group?
18    A    Yes.
19    Q    And you understand when I say "that group," it
20  was Facebook Workplace chat group with all the         11:14
21  individuals on the compliance committee at that time;
22  correct?
23    A    I believe they were on there.
24    Q    Did you ever receive those in any other
25  fashion?                                               11:14
```

Page 41

```
 1    A    Not to my recollection.
 2    Q    Were you able as a compliance committee team
 3  member, to go on to what's called CounselLink and review
 4  a case file?
 5    A    I would have no idea what you're talking about. 11:15
 6    Q    As you sit here today, do you recall ever going
 7  onto something called CounselLink and reviewing case
 8  file?
 9         MR. PALLARES:  Objection to form.
10         THE WITNESS:  I don't remember anything of that 11:15
11  nature.
12  BY MS. LENZE:
13    Q    Did you ever read what are called journal
14  entries?
15         MR. PALLARES:  Objection to form.              11:15
16         THE WITNESS:  I don't remember that
17  nomenclature.  Anything called that.
18  BY MS. LENZE:
19    Q    In advance of a compliance committee meeting,
20  did you ever go onto a database called Enterprise and   11:15
21  review any files --
22         MR. PALLARES:  Objection to form.
23  BY MS. LENZE:
24    Q    -- for specific agents?
25         Let me try that question one more so we have a  11:15
```

**Page 102**

1  Q   You agree that on Bates stamp 118, that page
2  indicates by Ms. Farrell Nelson, what she believed to be
3  retaliatory behavior occurring after Mike Bjorkman was
4  released from the company; true?
5  A   On which -- which page?                    01:14
6  Q   On page 118, third paragraph from the bottom.
7  A   Yes, it says retaliatory behavior.  That's what
8  it says.
9  Q   And you agree that on page 114, Ms. Farrell
10  Nelson even lists the agents she had personally spoken  01:14
11  with; correct?
12      MR. PALLARES:  Objection.  Misstates the
13  testimony and to form.
14  BY MS. LENZE:
15  Q   On the last part of the second paragraph on   01:14
16  page 114.
17  A   She lists out people who she had spoken to?
18  Q   Yes.
19  A   Correct.
20  Q   What, if anything, did the compliance committee  01:14
21  do following this statement?
22  A   I don't know what --
23      MR. LEVINE:  Objection to the form of the
24  question.  Levine.
25      THE WITNESS:  I don't remember the timeline if  01:15

**Page 103**

1  we met or what specifically was done.
2  BY MS. LENZE:
3  Q   Was Mr. Golden interviewed?
4      MR. LEVINE:  Object to the form of the
5  question.  Levine.                             01:15
6      THE WITNESS:  I don't remember.
7  BY MS. LENZE:
8  Q   Was Mr. Geha interviewed?
9  A   When you say "interviewed," you mean by someone
10  on the Counsel?                                01:15
11  Q   Yes.
12  A   I don't remember.
13  Q   Was Mr. Geha interviewed by anyone at eXp that
14  you know of?
15  A   I don't recall.                            01:15
16  Q   Was Mr. Golden interviewed by anybody that you
17  know of at eXp?
18      MR. LEVINE:  Object to the form of the
19  question.  Levine here.
20      THE WITNESS:  I don't remember.            01:15
21  BY MS. LENZE:
22  Q   Was Ms. Rodriguez interviewed by anyone on the
23  agent compliance committee?
24  A   I don't remember.
25  Q   Was Ms. Rodriguez interviewed by anyone that  01:16

**Page 104**

1  you know of at eXp following the receipt of this
2  statement?
3  A   I don't remember.
4  Q   Were any of the individuals listed on page 114,
5  interviewed by anybody on the agent compliance committee  01:16
6  following receipt of this statement?
7      MR. LEVINE:  Object to the form of the
8  question.  Peter Levine on behalf of Mr. Golden.
9      THE WITNESS:  I believe Cory may have
10  interviewed some individuals.  I don't remember who all  01:16
11  he interviewed.  But I remember a member of the
12  compliance committee interviewed people, and I believe
13  it was Cory.  I just don't remember the list of people.
14  BY MS. LENZE:
15  Q   What makes you believe that a member of the   01:16
16  compliance committee interviewed people?
17  A   And by "interview" you mean talk to somebody?
18  Q   Yes.
19  A   Because I remember when we were in a meeting,
20  there was some level of color commentary about talking  01:17
21  to her or him.  Or it wasn't a him, I think it was her.
22  Said somebody had additional information beyond written
23  documents.
24  Q   Do you know who that her is that you're
25  referring to?                                  01:17

**Page 105**

1  A   I don't remember.  I -- I -- I think maybe
2  Megan, but I don't remember.
3  Q   Do you know specifically who Mr. Haggard
4  interviewed?
5      MR. PALLARES:  Objection to form.  Misstates   01:17
6  the testimony.
7      THE WITNESS:  I don't remember who, but I
8  remember him mentioning that he had talked to
9  individuals involved in this.
10  BY MS. LENZE:                                  01:17
11  Q   Do you remember what the conversations were
12  that he then shared with the compliance committee?
13  A   I don't remember the specifics of what he said
14  other than he had talked to people involved in this.
15  And I can't remember details of what he said, not  01:18
16  confidently.
17  Q   Was an investigation opened up following
18  receipt of this statement into the conduct of
19  Mr. Golden?
20      MR. PALLARES:  Objection.  Foundation.     01:18
21      MR. LEVINE:  Levine.  Object -- object to the
22  form of the question.  Peter Levine.
23      THE WITNESS:  I don't remember the word
24  "investigation" being used.  But I remember that Cory
25  talked to some people.  I don't know who they were and  01:18

**Page 106**

1  if that included those two individuals.
2     The one thing that I do recall, is Cory would
3  have indicated, and I don't remember who he talked to,
4  trying to give them some sort of an update.  I do
5  remember that much.                              01:19
6  BY MS. LENZE:
7     Q   It's your testimony that whoever you believe
8  Mr. Haggard spoke with, he was also giving them an
9  update; correct?
10    A   My understanding is that the course of him   01:19
11 talking to individuals, that they would have asked him
12 for what are the next steps or was there an update.  And
13 that's all I remember about the content of what he would
14 have shared with me.
15    Q   Did you, yourself, ever speak with Ms. Megan  01:19
16 Farrell?
17    A   No.
18    Q   Do you know if there was an investigation
19 opened up into the conduct of Mr. Geha by eXp?
20    A   I do not remember that.                      01:20
21    Q   Do you know -- do you have any recollection of
22 any conversation related to the possibility of opening
23 up an investigation into either Mr. Geha or Mr. Golden?
24    A   I don't remember.
25        MR. LEVINE:  Object to the form of the       01:20

**Page 107**

1  question.  Peter Levine.
2  BY MS. LENZE:
3     Q   Do you recall on the very next day, November
4  10th, 2020, the compliance committee voting to deny
5  Ms. Nielsen's request to change her sponsor?           01:20
6     A   I remember a vote to deny sponsorship change.
7     Q   For Ms. Nielsen?
8     A   I don't remember who it was for.
9     Q   If I represent to you that the agent compliance
10 committee met on November 10th, 2020 and discussed     01:21
11 Ms. Nielsen's request to change her sponsor and voted to
12 deny this request, would that refresh your recollection
13 about the date?
14    A   No.  Because I wouldn't have any clue what the
15 date was on there.                                      01:21
16    Q   Do you recall how you voted with respect to
17 Ms. Nielsen's request to change her sponsorship?
18    A   I don't.  There were numerous requests to
19 change sponsorship, and I can't remember how I voted.
20    Q   Do you recall if there were -- was a meeting   01:21
21 minutes memo in association with that agent compliance
22 committee meeting of November 10th, 2020?
23    A   I don't recall a memo or documentation.
24    Q   Do you recall how you would receive compliance
25 committee meeting minutes, if at all?                  01:22

**Page 108**

1        MR. PALLARES:  Objection.  Asked and answered.
2        THE WITNESS:  I don't remember any
3  communications outside of this compliance chat.
4  BY MS. LENZE:
5     Q   Do you recall hearing that Ms. Nielsen was    01:22
6  called by Mr. Haggard and Mr. Bramble and told of the
7  compliance committee's decision they reached?
8     A   I recall that we -- a decision was reached with
9  the compliance committee, but they are typically told by
10 Cory or Jim or some combination.                      01:23
11        I don't remember specific to this, but that
12 would be how they would find out.
13    Q   Do you recall that on November 12th, 2020, the
14 committee met again to reconsider their decision with
15 respect to Ms. Nielsen and her sponsorship change?    01:23
16    A   I don't remember.
17    Q   Do you recall if there was ever a meeting
18 minutes memo that detailed the agent compliance
19 committee meeting of November 12th, 2020?
20    A   I don't remember seeing it.                   01:23
21    Q   You agree with me, do you not, Ms. Keating,
22 that as of the date of November 10th, 2020, when the
23 committee met to deny Ms. Nielsen's request to switch
24 sponsors, they had both Noelle Nielsen's memo and Megan
25 Farrell Nelson's memo detailing sexual misconduct in  01:23

**Page 109**

1  their upline; correct?
2        MR. PALLARES:  Objection.  Foundation.  Form.
3        MR. LEVINE:  Object to the form of the
4  question.
5        THE WITNESS:  I don't know if I understand.    01:24
6  You mean about the two documents I just reviewed?
7  BY MS. LENZE:
8     Q   Yes.
9     A   Well, if the date is after the two documents I
10 reviewed, then, I had the documents because they're   01:24
11 there.  I just don't know when I opened them.
12    Q   Understood.  And so you agree with me that
13 based on the dates of the documents we've looked at,
14 those memos were sent to the compliance committee in
15 advance of the decision by the compliance committee to 01:24
16 deny Ms. Nielsen's request to change sponsor; correct?
17        MR. PALLARES:  Same objections.
18        THE WITNESS:  They -- they were, whether or not
19 they were reviewed at the exact time they were sent or
20 whether they were reviewed in one of those meetings and 01:24
21 there was a discussion, that's what I don't recall.
22 BY MS. LENZE:
23    Q   Now, you're not saying you would have reviewed
24 those memos after the compliance committee's --
25    A   No.                                           01:24

```
 1       THE REPORTER:  What is today?  I'll try my best
 2  by Sunday, might be Monday.
 3       MR. LEVINE:  Of course, thank you.  And that's
 4  Mr. Poull is picking up the freight.  Okay?
 5       MR. MORRIS:  And this is Mr. Morris, digital      06:23
 6  transcript, please.
 7       (Conclusion of Volume 1 of the
 8        deposition of Ms. Courtney Keating)
 9             -o0o-
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 238

```
 1         DECLARATION UNDER PENALTY OF PERJURY
 2
 3       I, Courtney Keating, do hereby declare under
 4  penalty of perjury, that I have read the foregoing
 5  transcript; that I have made any corrections as appear
 6  noted, in ink, initialed by me, or attached hereto; that
 7  my testimony as contained herein, as corrected, is true
 8  and correct.
 9
10       EXECUTED this _____ day of _____,
11  2025, at_____,_____.
12         (City)         (State)
13
14
15
16           _____
17                Courtney Keating
18
19
20
21
22
23
24
25
```

Page 239

```
 1  REPORTER'S CERTIFICATE
 2
 3       I, KIMBERLY REX, CSR No. 6638, Certified
 4  Shorthand Reporter, certify:
 5       That the foregoing proceedings were taken before
 6  me at the time and place therein set forth, at which
 7  time the witness was put under oath by me;
 8       That the testimony of the witness, the questions
 9  propounded, and all objections and statements made at
10  the time of the examination were recorded
11  stenographically by me and were thereafter transcribed;
12       That the foregoing is a true and correct
13  transcript of my shorthand notes so taken.
14       I further certify that I am not a relative or
15  employee of any attorney of the parties, nor financially
16  interested in the action.
17       I declare under penalty of perjury under the laws
18  of California that the foregoing is true and correct.
19       Dated this 15th day of January, 2025.
20
21
22            Kimberly Rex, CSR No. 6638
23
24
25
```

Page 240

```
 1  Philip Azzara
 2  pazzara@fisherphillips.com
 3                January 15, 2025
 4  RE: Acevedo, Fabiola, et al. v. EXP Realty, LLC, Et Al.
 5  1/10/2025, Courtney Keating, (#7102792).
 6  The above-referenced transcript has been
 7  completed by Veritext Legal Solutions and
 8  review of the transcript is being handled as follows:
 9  __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext
10    to schedule a time to review the original transcript at
11    a Veritext office.
12  _X_ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF
13    Transcript - The witness should review the transcript and
14    make any necessary corrections on the errata pages included
15    below, notating the page and line number of the corrections.
16    The witness should then sign and date the errata and penalty
17    of perjury pages and return the completed pages to all
18    appearing counsel within the period of time determined at
19    the deposition or provided by the Code of Civil Procedure.
20    Contact Veritext when the sealed original is required.
21  __ Waiving the CA Code of Civil Procedure per Stipulation of
22    Counsel - Original transcript to be released for signature
23    as determined at the deposition.
24  __ Signature Waived – Reading & Signature was waived at the
25    time of the deposition.
```

Page 241

# EXHIBIT 29

```
 1                    UNITED STATES DISTRICT COURT
 2                   CENTRAL DISTRICT OF CALIFORNIA
 3                              -ooOoo-
 4      FABIOLA ACEVEDO, JANE         :
        DOE 1, JANE DOE 2, JANE
 5      DOE 3, and JOHN DOE 1,        :
 6              Plaintiffs,           : Case No.
                                        2:23-CV-01304-AB-AGR
 7      v.                            :
                                        Hon. Andre Birotte, Jr.
 8      EXP REALTY, LLC, EXP          :
        WORLD HOLDINGS, INC.;
 9      MICHAEL L. BJORKMAN;          :
        DAVIS S. GOLDEN; GLENN
10      SANFORD; BRENT GOVE; and      :
        DOES 1-10,
11                                    :
                Defendants.
12                                    :
        _____
13
14
            ZOOM VIDEO CONFERENCE DEPOSITION OF CORY HAGGARD
15
16                      Taken on August 20, 2025
17                           At 9:30 a.m.
18
19
20                         At Lewis Brisbois
21                        Salt Lake City, Utah
22
23
24
25      Reported by:  Rockie E. Dustin, RPR, CSR, CCR
```

Page 1

| | | |
|---|---|---|
| 1 | Q.   Does that refresh your recollection of | 12:13 |
| 2 | whether or not Michael Bjorkman was permanently | 12:13 |
| 3 | terminated on 9/18/2020? | 12:14 |
| 4 | A.   Again, that wasn't my testimony, he was | 12:14 |
| 5 | permanently terminated.  I think I've always maintained | 12:14 |
| 6 | that yes, we terminated him.  If he was found | 12:14 |
| 7 | exonerated through legal means through a law | 12:14 |
| 8 | enforcement investigation, that we would -- we could -- | 12:14 |
| 9 | we could reevaluate. | 12:14 |
| 10 | Q.   And that doesn't say here "we could | 12:14 |
| 11 | reevaluate"; correct? | 12:14 |
| 12 | A.   You're right.  I wrote, "We will return you | 12:14 |
| 13 | to your spot." | 12:14 |
| 14 | Q.   It says here, "We are not investigating." | 12:14 |
| 15 |     Do you see that? | 12:14 |
| 16 | A.   I do see that. | 12:14 |
| 17 | Q.   Does that refresh your recollection about | 12:14 |
| 18 | ever telling Michael Bjorkman that "we are not | 12:14 |
| 19 | investigating"? | 12:14 |
| 20 | A.   Again, these are notes from a conversation | 12:14 |
| 21 | that was had with me, Jim Nuth and Michael Bjorkman. | 12:14 |
| 22 | On that call, Jim Nuth did a majority of the speaking | 12:14 |
| 23 | and informing Mr. Bjorkman.  So I don't know whether he | 12:15 |
| 24 | said that or I said that.  I wrote it down so it's | 12:15 |
| 25 | there.  I don't recall saying that or if Jim did, but | 12:15 |

| | | |
|---|---|---|
| 1 | it's written down here on my notes from the call. | 12:15 |
| 2 | Q. Do you have a recollection, Mr. Haggard, | 12:15 |
| 3 | of, on that conversation, somebody telling Michael | 12:15 |
| 4 | Bjorkman, "We are not investigating," as of September | 12:15 |
| 5 | 18, 2020? | 12:15 |
| 6 | A. I do not have that recollection of ever | 12:15 |
| 7 | telling him that. | 12:15 |
| 8 | Q. It then goes on to say, "The police will be | 12:15 |
| 9 | conducting this." | 12:15 |
| 10 | Do you see that? | 12:15 |
| 11 | A. I do. | 12:15 |
| 12 | Q. Now, you testified earlier that -- well, | 12:15 |
| 13 | strike that. | 12:15 |
| 14 | In a document earlier, from your May | 12:15 |
| 15 | of 2025 session, we understand you had the Las Vegas | 12:16 |
| 16 | Police Department phone number. | 12:16 |
| 17 | Do you recall that? | 12:16 |
| 18 | A. Say that one more time, please. | 12:16 |
| 19 | Q. Sure. | 12:16 |
| 20 | Do you recall having the Las Vegas Police | 12:16 |
| 21 | detective's phone number? | 12:16 |
| 22 | A. I don't recall having that personally. If | 12:16 |
| 23 | you have something that could refresh me that maybe I | 12:16 |
| 24 | did, I don't recall. | 12:16 |
| 25 | Q. But you never spoke with the police, who | 12:16 |

Page 74

```
1    STATE OF UTAH        )
                          )  ss.
2    COUNTY OF SALT LAKE  )
3                I, ROCKIE E. DUSTIN, duly
4    commissioned and licensed court reporter, State of
5    Utah, do hereby certify:
6                That the foregoing deposition of CORY
7    HAGGARD was taken before me pursuant to Notice at the
8    time and place therein set forth, at which time the
9    witness was put under oath by me and that the
10   typewritten transcript of said deposition is a
11   complete, true, and accurate transcription.
12               I FURTHER CERTIFY that I am neither
13   counsel for nor related to any party to said action nor
14   in anywise interested in the outcome thereof.
15
16           (X) Review and signature was requested.
17           ( ) Review and signature was waived.
18           ( ) Review and signature was not
19   requested.
20
21      Certified and dated this 8th day of September, 2025.
22
23               [signature: Rockie Dustin]
                 ROCKIE E. DUSTIN, CCR, RPR
24               Certified Court Reporter,
                  State of Utah
25
```

Page 328

# EXHIBIT 30

```
 1                UNITED STATES DISTRICT COURT
 2         CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
 3
 4      FABIOLA ACEVEDO, JANE DOE 1, ) CASE NO.
        JANE DOE 2, JANE DOE 3, AND  ) 2:23-cv-01304-AB-AGR
 5      JOHN DOE 1,                  )
                                     )
 6            PLAINTIFFS,            )
                                     )
 7      vs.                          )
                                     )
 8      EXP REALTY, LLP, EXP WORLD   )
        HOLDINGS, INC., MICHAEL L.   )
 9      BJORKMAN; DAVID S. GOLDEN;   )
        GLENN SANFORD; BRENT GOVE;   )
10      AND DOES 1-10,               )
                                     )
11            DEFENDANTS.            )
        _____)
12
13
14
15
16
17            VIDEO-RECORDED DEPOSITION OF TAMI SIMS
18                         VOLUME I
19                       MARCH 4, 2025
20
21
22
23      JOB NO. 7154712
24      REPORTED STENOGRAPHICALLY BY:
25      MARY K. MEDLEY, CSR NO. 9557

                                                    Page 1
```

```
 1    come to eXp and said, "I'm entitled to be placed in
 2    Mr. Bjorkman's position," and that would have to
 3    have come with a because.  I want to know what the
 4    because is.
 5         A.   Okay.  So you're going to get the
 6    narrative, then.
 7         MS. LENZE:  Object to form.
 8         Go ahead.
 9         THE WITNESS:  So the narrative is Mike is
10    arrested.  Mike gets fired from eXp.  I am like, oh,
11    my gosh, he's gone.  I call Cory Haggard.  I said
12    Cory, I have got great plans for this.  Just simply
13    slip me there, full, into -- into this line, it's --
14    it was 50 percent my line -- and let me grow it even
15    bigger and better.  Because they deserve to have
16    that as well, everybody that was below Mike, they
17    still needed to be supported.
18              Cory led me to believe through those
19    conversations that Mr. Bjorkman was not getting paid
20    the revenue share anymore.  He made me believe that
21    it was actually being absorbed by eXp at that time.
22    And I was saying to him -- I said, "But why wouldn't
23    we want to do the right thing here?"  Said, "I can
24    make this bigger and better."  Like I want to do
25    this, I am passionate about this.  Like let's --
```

Page 191

```
1        STATE OF CALIFORNIA    )
                                ) ss.
2        COUNTY OF LOS ANGELES  )
3
4            I, MARY K. MEDLEY, CSR NO. 9557, in and for the
5        State of California, do hereby certify:
6             That prior to being examined, the witness named
7        in the foregoing deposition was by me duly sworn to
8        testify the truth, the whole truth, and nothing but
9        the truth;
10            That said deposition was taken down by me in
11       shorthand at the time and place therein named and
12       thereafter reduced to typewriting under my
13       direction, and the same is a true, correct, and
14       complete transcript of said proceedings;
15            That if the foregoing pertains to the original
16       transcript of a deposition in a Federal Case, before
17       completion of the proceedings, review of the
18       transcript { X } was {  }  was not required.
19            I further certify that I am not interested in
20       the event of the action.
21       Witness my hand this March 13, 2025.
22
23                      [signature]
24                      CSR No. 9557
                    Certified Shorthand Reporter
25                      State of California
```

Page 277